FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT ON NEBRASKA

2008 AUG 26 AM 11:59

OFFICE OF THE CLERK

| | |
|---|---|
| WOLFGANG RÜST, BOBBY CONN, and other ÞÉODISC ƷELÉAFA PRISONERS, | ) Civil Action No. )  )  ) |
| Plaintiffs, | ) COMPLAINT )  ) 4:08cv3185 ) |
| Vs. | )  )  ) |
| NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES RELIGION STUDY COMMITTEE, in its official capacity to provide religious programming and activities; ROBERT P. HOUSTON, in his individual and official capacities as DIRECTOR OF CORRECTIONAL SERVICES FOR THE NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES; FRANCIS X. HOPKINS, in his individual and official capacities as DEPUTY DIRECTOR – INSTITUTIONS FOR THE NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES; LARRY WAYNE, in his individual and official capacities as DEPUTY DIRECTOR – PROGRAMS AND COMMUNITY SERVICES FOR THE NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES; KATHY BLUM, in her individual and official capacities as LEGAL COUNSEL/ADVISOR to and a MEMBER OF THE NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES RELIGION STUDY COMMITTEE MEMBER; JOE BALDASSANO, in his individual and official capacities as ADMINISTRATIVE ASSISTANT TO THE DEPUTY DIRECTOR – INSTITUTIONS FOR THE NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES and the ADMINISTRATIVE CO-CHAIR OF THE NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES | )  ) ) )  )  )  )  )  )  ) )  )  )  )  )  ) )  )  )  )  )  )  ) )  )  )  )  )  )  )  )  )  ) |

1

RELIGION STUDY COMMITTEE; STEVE MARSH,           )
in his individual and official capacities )
as RELIGIOUS COORDINATOR and as a NEBRASKA)
DEPARTMENT OF CORRECTIONAL SERVICES              )
RELIGION STUDY COMMITTEE MEMBER; and TARN )
E. DAVIS, in his individual and official )
capacities as RELGIOUS COORDIANTOR and as )
a NEBRASKA DEPARTMENT OF CORRECTIONAL            )
SERVICES RELIGION STUDY COMMITTEE MEMBER )
                                                 )
                                                 )
                    Defendants,                  )
                                                 )

## **PRELIMINARY STATEMENT**

This is a civil rights action filed by Þéodisc
ȝeléafa (hereinafter "Théodish Belief") state prisoners
Wolfgang Rüst and Bobby Conn and all the other Théodish
Belief prisoners committed to the Nebraska Department
of Correctional Services (hereinafter "NDCS"), for
damages, declaratory and injunctive relief under 42
U.S.C. §2000cc, et seq.; 42 U.S.C. §1983; and the
hybrid-rights pursuant to the Free Exercise Clause and
the Freedom of Association Clause of the First
Amendment to the United States Constitution (1)
alleging imposition of a substantial burden on
Plaintiffs' Religious exercise when the Defendants'
specific guidelines for the development and conduct of
religious practices for all the NDCS facilities sets an
illegally high standard, i.e., "Necessary" to practice

2

of religion, is a "tenet requirement," "community
standard practice for that faith group" and "practices
deemed essential by the faiths judicatory" in violation
of 42 U.S.C. §2000cc, et seq.; (2) Alleging imposition
of a substantial burden on Plaintiffs' religious
exercise when Defendants determined what Théodish
Belief religious orthodoxy and orthopraxy is or shall
be when Defendants refused to accept the basic Théodish
Belief doctrines required and requested pursuant to
Defendants' specific guidelines in violation of 42
U.S.C. §2000cc, et seq.; (3) Alleging imposition of a
substantial burden on Plaintiffs' religious exercise
when defendants refused to provide separate time and
space for Théodish Belief religious worship in
violation of 42 U.S.C. §2000cc, et seq.; (4) Alleging
imposition of a substantial burden on Plaintiffs'
religious exercise to engage in assembling only with
Théodsmen for Blót and Symbel, participation in the
sacramental Feast and Mead, and abstaining from certain
foods in violation of 42 U.S.C. §2000cc, et seq.; (5)
Alleging imposition of a substantial burden on
Plaintiffs' religious exercise when Defendants refused
to grant the request for devotional items that are
indeed necessary for valid Théodish practice in
violation of 42 U.S.C. §2000cc, et seq.; (6) Alleging
imposition of a substantial burden when Defendants
grant individualized exemptions to other groups but

3

refuse to extend/allow similar exemptions to Théodish Belief in violation of 42 U.S.C. §2000cc, et seq.; (7) Alleging imposition of a substantial burden on Plaintiffs' religious exercise when Defendants refuse to allow Théodish Belief inmates to participate in and to undertake education/study that is integral to our beliefs/practices in violation of 42 U.S.C. §2000cc, et seq.; (8) Alleging imposition of a substantial burden on Plaintiffs' religious exercise by subjecting Plaintiffs through forced inculcation, e.g., preaching, singing, prayer, other religious activities/messages in violation of 42 U.S.C. §2000cc, et seq.; and (9) Alleging imposition of Plaintiffs' religious exercise of assembling with other Théodsmen for Blót and Symbel, participation in the Sacramental Sacrificial Feast and Mead, and abstaining from certain foods during a separate time and place when Defendants deny Plaintiffs the correlative right to engage in group effort toward those ends in violation of the hybrid-rights pursuant to the Free Exercise Clause and the Freedom of Association Clause and 42 U.S.C. §1983.

## JURISDICTION

1. The court has jurisdiction over the plaintiffs' claims of violation of federal constitutional and statutory rights under 28 U.S.C. §§ 1331 and 1343.

4

2. The court has supplemental jurisdiction over the plaintiffs' state law tort claims under 28 U.S.C. § 1367.

### PARTIES

3. The plaintiffs Wolfgang Rüst (hereinafter "Rüst"), Bobby Conn (hereinafter "Conn"), and other Théodish Belief prisoners committed to the Nebraska Department of Correctional Services (hereinafter "NDCS") during the events described in the complaint.

4. Defendant Nebraska Department of Correctional Services Religion Study Committee (hereinafter "NDCS Religion Study Committee") is comprised of all staff responsible for religious programs from every institution within the NDCS and a member of the NDCS legal Division. Additional staff may be assigned as needed. A qualified senior religious Coordinator staff member shall be responsible for coordinating the agency religious program. The senior staff shall be designated as the Religious Coordinator Co-Chair of the NDCS Religious Study Committee, and shall be selected by the Deputy Director-Institutions and the Deputy Director-Programs and Community Services. The Administrative Assistant to the Deputy Director-Institutions shall co-

5

chair the NDCS Religion Study Committee, and shall be
designated as the Administrative. The NDCS Religion
Study Committee is responsible for providing viable
religious programming and activities to help meet the
NDCS objective of increasing the opportunities for
inmate self-betterment. The NDCS Religion Study
Committee members responsibilities are set forth in
NDCS Administrative Regulation, Number 208.01,
RELIGIOUS SERVICES (hereinafter "AR 208.01"). AR 208.01
is annexed hereto and incorporated herein by this
reference as part of this Civil Rights Complaint as
"Exhibit #1". Defendant NDCS Religion Study Committee
is sued in its official capacity.

5. Defendant ROBERT P. HOUSTON (hereinafter
"Houston") is the Director of the NDCS. Houston is
responsible for religious programs to prepare and
assist each person committed to the NDCS to assume
their responsibilities as useful citizens; the final
approval/disapproval of all changes, etc. to AR208.01;
the final approval/disapproval of all requests to
practice a faith not presently recognized by the NDCS
or for religious items and/or practices, including
food, recommendations made by the NDCS Religion Study
Committee, Defendant Houston is sued in his individual
and official capacities.

6

6. Defendant FRANCIS X. HOPKINS (hereinafter "Hopkins") is the Deputy Director – Institutions for the NDCS. Hopkins is responsible for approval/disapproval of all requests to practice a faith not presently recognized by the NDCS or for religious items and/or practices, including food, recommendations made by the NDCS Religion Study Committee; the approval/disapproval of changes, etc made to AR 208.01 by the NDCS Religious Study Committee. Hopkins is sued in his individual and official capacities.

7. Defendant LARRY WAYNE (hereinafter "Wayne") is the Deputy Director – Programs and Community Services for the NDCS. Wayne is responsible for approval/disapproval of all requests to practice a faith not presently recognized by the NDCS or for religious items and/or practices, including food, recommendations made by the NDCS Religion Study Committee; the approval/disapproval of changes, etc. made to AR 208.01 by the NDCS Religion Study Committee. Wayne is sued in his individual and official capacities.

8. Defendant KATHY BLUM (hereinafter "Blum") is an attorney who is an employee of the NDCS Legal Division and is a member of the NDCS Religion Study Committee.

7

Blum is responsible for providing legal advice and/or opinions on inmate religious programming and activities to members of the NDCS Religion Study Committee, Religious Coordinators, and all employees of the NDCS; and has the responsibilities set forth for NDCS Religious Study Committee members set forth in AR208.01. Blum is sued in her individual and official capacities.

9. Defendant JOE BALDASSANO (hereinafter "Baldassano") is a NDCS employee who is the Administrative Assistant to the Deputy Director - Institutions Hopkins and is the co-chair of the NDCS Religion Study Committee. Baldassano's responsibility is: to provide administrative oversight for the NDSC Religious Study Committee ensuring that religious programs are delivered throughout the NDCS facilities within parameters that support legal consistency, sound operations, and security; as co-chair Baldassano is a member of the NDCS Religion Study Committee whose responsibilities are set forth in AR208.01. Baldassano is sued in his individual and official capacities.

10. Defendant STEVE MARSH (hereinafter "Marsh") is a NDCS employee who is a Religious Coordinator at the Nebraska State Penitentiary (hereinafter "NSP") and is a member of the NDCS Religion Study Committee. Marsh's

8

responsibilities as NSP Religious Coordinator and NDCS Religion Study Committee are set forth in AR 208.01. Marsh is sued in his individual and official capacities.

11. Defendant TARN E. DAVIS (hereinafter "Davis") is a NDCS employee who was a NSP Religious Coordinator and is presently the Religious Coordinator at the Tecumseh State Correctional Institution, Tecumseh, Nebraska and is a member of the NDCS Religion Study Committee. Davis responsibilities as a Religious Coordinator and a NDCS Religion Study Committee member are set forth in AR 208.01. Davis was the NSP Religious Coordinator until approximately July 2005. Davis is sued in his individual and official capacities.

12. All defendants have acted, and continue to act, under color of state law at all times relevant to this complaint.

#### STATEMENT OF FACTS

13. AR 208.01 sets an illegally high standard, in violation of 42 U.S.C. §2000cc, et seq., i.e., "Each faith shall receive... as required by the faith and consistent with the faith's practice in the community;" "The proposal will also include sufficient written

9

documentation demonstrating the justification/rationale for the necessity of the faith specific practices and/or items, including food, religious event celebrations and/or other practices requested;" "... for actual tenet requirements of the faith and local community practices;" "The theological tenets of the faith group require the use of the item for valid observation of the practice;" and "Community standard practice of that faith group must support the use of the food item." See AR 208.01 (annexed hereto as Exhibit #1) Sections: IV. on pg 5; IV.B. & on pp. 6-7; IV.G.2. on pg.11; and IV.G.6. on pg.12.

14. Théodish Belief is a religion whose focus is the pre-5[th] and 6th century Old English/Continental tradition. Théodism is Retro-Heathenry, which means that Plaintiffs are dedicated to practicing the religion of our ancestors in an authentic, traditional tribal form which is as close to the elder ways as possible. Plaintiff's goal is to offer worship to our great gods, ælfs, ancestors, and other wights (any being that "has power to actuate", similar in many ways to the Japanese concept of Kami) in ways that are not just what Plaintiffs prefer or think is easiest or what others (Ásatrú, etc.) prefer, but rather, in forms which will be the most pleasing to the gods, ælfs, ancestors, and other wights themselves.

10

15. Ásatrú is a religion whose focus is the Old Norse/Icelandic beliefs of the Viking Age as described in the *Eddas* (the *Elder* or *Poetic Edda* and the *Younger* or *Prose Edda*) a compilation of 13th Century Old Norse/Icelandic poems.

16. The Teutonic Heathen faith of Northern Europe has at least two major religious traditions: Théodish Belief and Ásatrú. Théodish Belief and Ásatrú have largely the same body of lore. The difference is how this body of lore is interpreted. Even though Théodish Belief and Ásatrú are both working from largely the same body of lore, what results is a very different animal, much as the Catholics and Protestants can look at the same source material and come up with what are essentially different religions, but are both under the umbrella of "Christianity".

17. On or about 25 July 2003, Defendant Davis and former NSP Religious Coordinator Randy Donner (hereinafter "Donner") submitted copies of both the 147 page "A Proposal for the Recognition of Théodish Belief" (hereinafter "Proposal") and "Synopsis of the Differences Between Théodish Belief and Ásatrú" (hereinafter "Synopsis") to each NDCS Religion Study Committee member and to Théodish Belief Sacral King

11

Gárman Lord (hereinafter "Gárman Lord") with a letter requesting Gárman Lord review and provide input on the "Proposal" and "Synopsis" submitted by Rüst on behalf of the Greater Théodish Hræfnes Léode of Théodish Belief. Annexed hereto and incorporated herein by this reference as part of this Civil Rights Complaint as "Exhibit #3" is a copy of the aforesaid "~~Recognition~~" *"Proposal"* and annexed hereto and incorporated herein by this reference as part of this Civil Rights Complaint as "Exhibit #4" is a copy of the aforesaid "Synopsis".

18. Gárman Lord submitted a letter which apprised the Defendants that Théodish Belief and Ásatrú are two radically different religions:

(a) "The Synopsis as presented does pretty well as a recapitulation of the salient points in the presentation of the Théodish practical thesis, as distinguished from Ásatrú;"

(b) "In sum, then, Léoden Rüst seems to make about as good a case as could be expected, under the circumstances, for the need to distinguish between Théodism and Ásatrú in the facility, as two culti which could not reasonably be expected to get along without strife, because of being two radically different religions, even though they may seem superficially of more or less the same or equivalent pantheon of gods. One cannot

12

compare their status to, say, Catholicism and
Protestantism; rather, they sprang from
fundamentally different existential origins, and
aren't even as closely related as that."

(c) "An even more salient watershed divide between
the two culti occurs in the form of their
respective metaphysical philosophies,
specifically in their attitudes toward
mysticism." which "It is in this sense, perhaps,
more than any other, that Théodism and Ásatrú
stand out as religions as fundamentally different
from one another as either is from, say,
Christianity."

(d) The differences between Théodish and Ásatrú holy
calendars and modes results in religious purposes
and function that are different enough to
guarantee that differences between their
ecclesiastical calendars will remain
irreconcilable for the foreseeable future and
neither would ever be willingly constrained to
the calendrical observances or even concepts of
the other.

Annexed hereto and incorporated herein by this
reference as part of this Civil Rights Complaint as
"Exhibit #5" is a copy of Gárman Lord's 6 January 2004
letter.

13

19. Gárman Lord submitted a 2-page letter
addressed: "To the Religious Study Committee and other
concerned parties" that states "Firstly, my assertion
that the items [nearly 50 Théodish devotional
accessories] Léoden Rüst asks to be allowed are indeed
necessary to valid Théodish practice, to the extent
that such observance without them would be bound to be
unacceptably debilitated. And secondly, my request that
no listed item be disallowed other than as a duly
negotiated judgment based on the Corrections System's
compelling need and reason for such disallowal."
Annexed hereto and incorporated herein by this
reference as part of this Civil Rights Complaint as
"Exhibit 6" is a copy of Gárman Lord's 4 March 2004
letter.

20. Defendant Davis and former NSP Religious
Coordinator Donner informed Rüst they would submit
their recommendations on the Plaintiffs' Proposal at
the March 2004 NDCS Religion Study Committee meeting.

21. Gárman Lord submitted a letter responding to
questions by Gary Grammer. Annexed hereto and
incorporated herein by this reference as part of this
Civil Rights Complaint as "Exhibit 7" is a copy of
Gárman Lord's late July 2004 letter.

14

22. Gárman Lord submitted a letter responding to questions by Gary Grammer. Annexed hereto and incorporated herein by this reference as part of this Civil Rights Complaint as "Exhibit 8" is a copy of Gárman Lord's 1 September 2004 letter.

23. Plaintiffs allege upon information and belief the Defendants sought input on the Plaintiffs' Proposal and on the differences between Théodish Belief and Ásatrú religious beliefs and practices from a NDCS Correctional Officer and said Correctional Officer indicated that due to their radically different religious beliefs and practices that Théodish Belief and Ásatrú cannot use the same permanent worship site and that both faiths cannot worship together.

24. On or about 2 August 2005, Marsh informed Rüst that based on Gárman Lord's letters the NDCS Religion Study Committee determined Théodish Belief and Ásatrú are essentially the same faith and could be combined for religious worship services, communal religious property, etc.

25. Rüst received a letter dated 9 August 2005, from the NDCS Religious Study Committee Chair Joe Baldassano indicating: the NDCS recognizes there are some differences between Théodish and Ásatrú, however,

the NDCS is not able to provide separate time and space to all subsets of a faith, the NDCS will continue to allow a separate study time for Théodish Belief, and the NDCS expanded the approved property list for the Ásatrú/Théodish faith group. Annexed hereto and incorporated herein by this reference as part of this Civil Rights Complaint as "Exhibit #9" is a copy of the 9 August 2005 letter from NDCS Religious Study Chair Joe Baldassano.

26. The Grievance process provided the following additional reason(s) for the denial of the Théodish Belief Proposal: "While there may be some differences between Ásatrú & Théodish practices, information provided to the NDCS is that both groups descend from Northern Heathenry & do worship together in the community. Due to time & space constraints, the NDCS has scheduled a time for the Ásatrú/Théods to worship as a group. In order to accommodate some individualized practice, the NDCS does allow Théods to meet and study apart from the Ásatrú and has expanded the approved property list for Théodish practitioners. This is similar to the way NDCS accommodates Protestants of various denominations and Native American practitioners of different tribal affiliations." Annexed hereto and incorporated herein by this reference as part of this

16

Civil Rights Complaint as "Exhibit #10" is Rüst's Grievance.

27. The Defendants response to Plaintiffs' Proposal, Synopsis, Interview Requests, and Garman Lord's letters demonstrates:

(a) They reject Plaintiffs' sincerely held Théodish Belief orthodoxy and orthopraxy;

(b) They refuse to apply the "strict scrutiny test" to engage in individualized consideration, sensitive to the facts, of Plaintiffs' sincerely held religious orthodoxy and orthopraxy;

(c) They can decide, there may be some differences between Ásatrú and Théodish practices, these two different religious beliefs are essentially the same;

(d) They can judge whether Plaintiffs' and Théodish Belief Sacral King Gárman Lord's sincerely and honestly believed contentions of the radical differences between Théodish Belief and Ásatrú are correct;

(e) They can determine what the Théodish Belief orthodoxy and orthopraxy is and shall be in total disregard of the documentation presented by the Plaintiffs and Théodish Belief Sacral King Gárman Lord;

17

(f) That intrafaith and/or interfaith differences are not protected even if the beliefs are purely personnel; and

(g) They can disregard the input from the NDCS Correctional Officer that is alleged upon information and belief.

28. Defendants response to Plaintiffs' Proposal denies Plaintiffs the right to group worship when the only option available to Plaintiffs is under the guidance of Ásatrúar whose beliefs/practices are radically different and blasphemously obnoxious. Moreover, the unified one worship time (communal) for Ásatrú and Théodish Belief practitioners provided by Defendants does not meet and maintain Plaintiffs' spiritual needs because they cannot receive proper religious guidance from the gods, ancestors, wights, etc. pursuant to Théodish Belief Theology and practice.

29. Defendants refusal to provide available outdoor space for a separate Théodish Belief worship site prevents Plaintiffs from creating/building a Wéohsteall (place of the altar) and a Symbel Hall fundamentally inhibits Plaintiffs ability to practice their faith because such a separate space is indispensible adjunct of the core First Amendment and RLUIPA right to assemble for religious purposes where Plaintiffs can

18

congregate and practice their faith together consistent with their theological requirements.

30. The NSP has seven (7) outdoor land sites which can be utilized as a separate Théodish Belief worship space. Plaintiffs listed two (2) of these outdoor land sites on page 62 in Exhibit #3 and listed all seven (7) of the outdoor land sites in their Grievances.

31. The Ásatrú Blót (worship service) adheres to the *EDDA*-Based Voluspa's comprehensive view of the Ásatrú Norse/Icelandic cosmogonic Sacrificial Feasts' renewal of life ritual drama: the establishment of the cosmos; progress to Ragnarök and the dissolution of the world (killing of Baldr, punishments and portents before Ragnarök), Ragnarök (the destruction of the gods, worlds and man); and after Ragnarök (new pure world rises out of the sea with the surviving gods Vidar, Vali, Modi & Magni with Baldr & Hod, who return from Hel, establish a reign of justice and peace). See pp. 31-32, 36-43, 61, & 108-109 in Exhibit #3 and pp. 11, 13, & 30 in Exhibit #4.

32. Théodish Belief Faining(s) (general term for any religious occasion) incorporates: (a) bringing ritual purity and personal spiritual purity to the Wéohsteall (place of the altar), Symbel Hall, and in

19

the Blót, Symbel, or other Fainings, via clearing
sacred space, Stánbæd (aka Sauna), and not permitting
introduction of non-Théodish concepts of gods, ælfs,
creation, ideas, practices, etc. into the Faining; (b)
the liturgical language of Anglo-Saxon (Old English) in
the Faining; (c) literally the re-linking of ourselves
to our cosmogonic, sociogonic, anthropogenic,
hierarchical, spiritual source for our common
generational kinship; (d) helping the Sacral King as
our intermediary with the gods, by keeping up the
Feasts and Sacrifices, and such; (e) the act of
creation e.g., cosmogonic, sociogonic, and
anthropogenic; (f) the celebration of the cycle of the
great year, e.g., Sacrificing/Feasting for good
harvests, frith, victory/success, making the year; (g)
places oneself in the flow of Wyrd; (h) receive
blessings, e.g., mæʒen and other gifts from the gods,
ælfs, ancestors, and all friendly holy wights
(landwights, homewights, etc.); and (i) only heathens
who love the king and the Théodish Belief institution
of the Sacral Kingship are permitted to participate in
the Théodish Belief Blót's Sacrifice and Feast. See pp.
13-39, 51-69, 78-81, 88-91, & 108-127 in Exhibit #3 and
pp 4-14, 17-23 & 27-32 in Exhibit #4.

33. Plaintiff Rüst (and several Plaintiffs in this
action) are not permitted entrance to an Ásatrú Vé

20

(worship site) or participation in Ásatrú religious activity because we have been Outlawed. Heathen Outlawry stands in direct apposition to the Christian doctrine of excommunication. See Exhibit #3, at pg. 59, and Exhibit #4, at pg. 21.

34. The Théodish Belief Sacrifice and Feast is not shared with non-Théodsmen, i.e., non-members, as the Orthodox and Roman Catholic churches do not share Holy Communion with those outside there respective disciplines.

35. Defendants reject Plaintiffs' sincerely *held* "arational" mystic tradition of Théodish Belief is substantially different from the Ásatrú thesis makes, as Gárman Lord informed the Defendants (see Exhibit #5, at pp. 3-4): "…that Théodism and Ásatrú stand out as religions as fundamentally different from one another as either from, say, Christianity." In the interests of brevity Plaintiffs refer to the fairly exhaustive detailing of Théodish Belief mystical practices which make Théodish Belief and Ásatrú different religions in Exhibit #3, at pp 43-50, 63-69, 78-81, 111-115, & 127-131; Exhibit #4, at pp. 15-23, 27-28, & 30-32; and Exhibit #5.

36. Gárman Lord (see Exhibit #5, at 4-5) corroborates Plaintiffs' Théodish creation and cosmography practical thesis set forth in the Synopsis, at pp. 11-13 (see Exhibit #4) is substantially different from the Ásatrú practical thesis, see also, Exhibit #3, at pp. 28-36.

37. Defendants provide a separate worship time and space for each of these Abrahamic descended religious/faith systems: Catholic (a English and a Spanish Mass), Protestant (a English and a Spanish service), Judaism, House of Yahweh, Islam, Sabbatharians (Seventh-Day Adventist, Jehovah's Witnesses), and provides special holiday worship time and space for such religious/faith groups as Episcopalian, etc.

38. All Théodism springs from the ancient "Holy Grail" folk-religious principle embodied in the "Sacral Kingship" which is thought not as a person but as an institution. Sacral Kingship is the belief that, in the Théodish model, the gods prefer to deal with mankind most readily and dynamically on a group level, by and through tribes which the gods have metaphysically or metaphorically spawned. Accordingly, a Théodish King is the conduit through whom the gods interact with the individual members of the tribe. Since the king is god-

sprung (descended from one of the three gods of kingship), he is thus an effective facilitator for ræd (the god's counsel to man); the charismatic embodiment of the collective mæʒen or luck of the tribe, sacrifices for good harvests, frid (frith, peace enjoyed among one's own tribe, with overtones of both security and refuge), victory, and making the year; leader of the folk and guarantor of their hál (holiness and health) who acts so the gods may bless the folk. The folk help the king, as their intermediary with the gods, by keeping up the feasts and sacrifices and such. The folk do not allow any influence in the community, which will interfere with these gifts and the institution of the Sacral King, which are shared by the whole community of those who love the king. It is in this fashion that a tribes' folk-religious specific thews (customs and traditions) develop and evolve, giving a tribal context for the gods' interactions with a particular people. See pp. 78-81, 108-109, & 121-123 in Exhibit #3 and pp. 17-22, 27-28 & 30-31 in Exhibit #4.

39. Ásatrú finds such Théodish institutions as Sacral Kingship positively obnoxious and patently an insult to the ideological spirit and significance of their religion. Heathens who reject and remain outside the Holy Grail folk-religious principal embodied in the Théodish Belief institution of the Sacral Kingship are

deprived of the constructive element of Théodish Belief which is analogous to the Catholic doctrine where anyone remaining outside the Catholic Church cannot become partakers of eternal life, etc. because they do not enjoy apostolic succession in the sacrament of orders. See pp. 51-52, 63, 79, & 123 in Exhibit #3 and pp. 18 & 27 in Exhibit #4; the 1442 Papal decree of the General Council of Florence; the force and substance of the aforementioned 1442 decree was reiterated by Pope Benedit XVI July 2007 decree.

40. The Théodish institution of Sacral Kingship stands in direct apposition to the papacy of the Roman Catholic Church where the Pope is the Vicar of Christ on Earth. The Protestant theological position is contemptuous of the Roman Catholic reliance on a papal authority however the Defendants do not require Roman Catholic and Protestant inmates to worship together in one worship service as Defendants require Théodish Belief and Ásatrú inmates.

41. Mæʒen is central to the Germanic Heathen religion. Mæʒen is a metaphysical spiritual energy contained in every living being and in sacred objects. Each person has their own personal mæʒen and the Þéod (tribe) has a collective mæʒen held by the Sacral King.

24

Mæʒen flows from the Wéohsteall (place of the altar) to members of the tribe. The gods grant the tribe and men mæʒen during Fainings (Blóts, Symbel, etc.) to make the tribe and men whole spiritually, physically, and mentally. See pp. 44, 47, 50-51, 53-54, 111-112, & 115 in Exhibit #3 and pp. 16, 18-22 & 31 in Exhibit #4.

42. Théodsmen know that everything depends upon the mæʒen of the Wéohsteall and the tribe. The Wéohsteall's (place of the altar) cosmo/socio-theological beliefs/practices have a very special significance in Théodish Belief. The Wéohsteall expresses absolute reality in its aspect as central to the tribes spiritual and physical wholeness (mæʒen); is cleansed of all unwanted energies, and the raising of hazel stakes and natural fiber rope, and then infused with sacred power by means of sacred ritual and sacrifice; is where the gods, ælfs (elves), and other wights dwell there and their essence impregnates/permeates the Wéohsteall. See pp. 43-63 in Exhibit #3 and pp. 15-24 in Exhibit #4.

43. Defendant Marsh verbally informed Rüst and page 1 of Attachment E to AR 208.01 (hereinafter "AR 208.01 Attachment E") sets forth the Ásatrú "Sun Wheel (Land Design)" has to remain a part of the designated Ásatrú/Théodism Communal worship area. The "Sun Wheel

(Land Design)" is an integral formulaic element of the
Ásatrú Blót. This land area is transformed, and
continues therein, as the center of EDDA-Based sacred
cosmogony through the repetition of the Ásatrú Blót's
renewal of life ritual drama; the Ásatrú concepts of
their EDDA-Based gods dwell on that land site; the
Ásatrú EDDA-Based litany on their Blasphemous concepts
of Óðinn, Ragnarök, etc. dwell in their Vé (sacred
space) since 1989.

44. Gárman Lord informed former NSP Religious
Coordinator Bill Perreira, in a 21 January 2001 e-mail,
that: "To our Theology, however, the clearing of sacred
space, upon the efficacy of which all that follows must
depend, is an important business justifying a good deal
of trouble to get it right. It is our belief that the
type of ceremonial we do, as described above, is such
as is found repulsive by woe-working wights, but very
attractive to the helpful wights we wish to attract and
especially to our gods". See pp. 18-19 of Exhibit #4
for this and other quotes.

45. In order to conduct a valid Théodish faining
the Ásatrú Vé would have to be cleared of all harmful
forces, e.g., the Ásatrú EDDA-Based litany of Óðinn
being a troublemaker/betrayer, of the Ragnarök motif,
and other equally Blasphemous concepts which have

26

impregnated the soil, air etc. through the Ásatrú renewal of life ritual drama drawn from the Voluspá (In the *Poetic Edda* or *Elder Edda*). See pp. 51-63 in Exhibit #3 and pp. 17-21 in Exhibit #4.

46. The tribe can be deprived of its wholeness through total desecration of the sacrality of its Wéohsteall when another faith is allowed to exist on the tribe's Wéohsteall, which to the Heathen Worldview demonstrates the superiority of new faith over the old tribal religion. Pope Greogory recognized and utilized the Heathen Worldview to destroy the Heathen faith. See pp. 56-57 in Exhibit #3.

47. Gárman Lord, on page 1 of his January 6, 2004 letter, states: "In Théodish congregational practice anywhere, the bringing of personal spiritual purity into the holy stead is a special religious importance." See Exhibit #5. The Stánbæd is a excellent legal method of seeking and receiving personal spiritual purity. The Stánbæd and the Native American Sweat lodge (Inipi) serve the same general purpose(s). See pp. 44, 52, 62, 63-69 & 130 in Exhibit #3 and pp. 16, 21, & 22-23 in Exhibit #4.

48. Defendants authorize the following required religious purification/cleansing rituals, for these

NDCS Approved Religious Faith Groups: Islam - Wudu (ablution); Protestant - Baptism; Catholic - Baptism, Confirmation, Confession, hand bathing with wine/water; Judaism - Bathing with water; House of Yahweh - Bathing with water; Jehovah's Witness - Baptism, bathing with water; and Native American - Sweat Lodge. The aforementioned religious purification/cleansing rituals stand in direct apposition to the Stánbæd.

49. Théodish Belief practice requires that the Sacral Needfire has to be kindled with Nine Kinds of Sacred Wood and be generated using the friction of wood against wood with the Fire Twirl in order to have a valid Faining, e.g., Blót, Stánbæd, etc. See pp. 110, 116-117, & 128-129 in Exhibit #3; paragraphs 13, 36, 57 & 58 in Exhibit #7; and paragraph 8 in Exhibit #8.

50. The Théodish Belief take and Ásatrú take on each of the gods differ in ways that present problems, for example, Freyja, Balder (who with Loki plays a prominent role in the Ásatrú *EDDA*-Based progress to and after Ragnarök and in the Ásatrú Blót), Loki, Nanna, Ullr, Vali, Vidar, Bragi, Idunn, & Sigyn do not exist in Théodish Belief; Théodish Belief concepts as to Wóden, Tiw, Friȝe, Thúnor, Meomer, Ing, Hama, Saga, Fylle, and Forseta are different from Ásatrú; and these Théodish Belief gods do not exist in Ásatrú: Weyland,

28

Nehalennia, Zisa, Nerthus, Hreda, Éostre, Alcis, and Tuisto. See pp.12-28 in Exhibit #3 and pp. 4-11 in Exhibit #4.

51. Plaintiffs trace our Sacral descendant to the earth-born (Terra editum) hermaphrodite god Tuisto, whose son Mannus, is the author of the Continental Germanic peoples, and to Mannus three sons, its founders. Tuisto is related (Tuisto = Ymir) to the Norse/Icelandic Ásatrú hermaphrodite Ymir. At one time Tuisto/Ymir were regarded in the North as the progenitors of mankind. That something has gone wrong with the Ymir corpus in its latest manifestation: according to both *The Poetic Edda* and Snorri Sturluson's *EDDA*, Ymir is no longer a god though he is still terra editum hermaphrodite, instead now he is a creature of evil and all his descendents are evil. See pp. 21-22 & 28-32 in Exhibit #3 and pp. 6 & 11-12 in Exhibit #4.

52. The *EDDA*-Based Ásatrú Blóts litany of the Ragnarök motif, e.g., progress to and the total destruction of the gods, the world, and mankind, and the renewal after Ragnarök does not exist in Théodish Belief which strikes the Plaintiffs and other Théodsmen as Blasphemous and an insult to our gods and to what our religion stands for.

29

53. The Continental/English/Théodish gods Wodan, Wóden, and Wuotan cannot be invoked and/or worshipped in the same Faining (e.g., Blót, Symbel, etc.) and in the same space with the Ásatrú Norse/Icelandic *Eddic*-based Viking Age Óдinn because the gods' names Wodan, Wóden, and Wuotan might differ in sound, but never in meaning. However, Óдinn is another matter. Although the aforementioned gods are more or less similar deities, Óдinn displays radically different aspects and attributes, that developed mostly during the Viking Age, which will taint and destroy a mystical working (Blót, Symbel, etc.) or a religious space dedicated to Wodan, Wóden, or Wuotan. See pp. 13-18 & 53-63 in Exhibit #3 and pp. 4-6 & 15-22 in Exhibit #4.

54. In Théodish Belief theology the Eormensýl is: at the "Center of the Universe" upholding the cosmos and binding the worlds together; communication, i.e., prayers and/or offerings, to the gods, Ælfs, ancestors, or other wights can only be effected near it, or by means of it; provides wizards/shamans with a road to seek wisdom/advice/etc. from the gods, Ælfs, ancestors, wights, et al.; it has to pierce both earth and sky; it has to be "twice the height of a man or better". The use of Eormensýl is fundamental to our practice of Théodish Belief because without Eormensýl prayer,

offerings, travel to seek wisdom/etc., or worship is rendered impossible. See pp. 52, 62, & 69-72 in Exhibit #3 and pp. 21 & 23-24 in Exhibit #4 and Exhibit #8.

55. Defendants have no compelling governmental interest in authorizing Roman Catholic Priests to bring wine into the NDCS facilities to validate services while refusing to grant Plaintiffs the right to acquire (through donation or purchase), erect, and utilize the Eormensýl, and to acquire (through donation or purchase) and utilize "Nine Kinds of Sacred Wood" and the "Fire Twirl" for the Sacred Fire to validate Théodish Belief Fainings (Blót, Symbel, etc.).

56. Plaintiffs adhere to the lunar Cynings Týdgenges (King's Calendar) See Exhibit #8. The Cynings Týdgenges sets most of the eight major Holy Tides (religious Holy days) on a full moon (except Yule and Midsummer which are on the solstices) and the two monthly Thingtides are set three days before the full moon and three days after the new moon. The Ásatrú does not follow the lunar calendar and their Holy Tides are held on different dates than Théodish Belief. See pp. 40-43 in Exhibit #3.

57. Defendants allow Islam, House of Yahweh, and Judaism inmates to celebrate their respective Holy Days

31

pursuant to their respective lunar religious calendars but refuse to accord Plaintiffs the same right to celebrate their Holy Tides and Thingtides pursuant to the Théodish Belief Cynings Týdgenge lunar religious calendar.

58. The Théodish Belief beliefs/practices on the Ælf (elves) are completely different from the Ásatrú Old Norse beliefs/practices as to the Álfar (elves) which makes it impossible to honor (worship) the Ælf or Álfar in the same Blót. See pp. 89-90 in Exhibit #3.

59. Each god has ritual foodstuffs, e.g., animal, fowl, fish, or garden produce, correlate which is intimately bound up with the being of the god, when Théodsmen make sacrifices (offerings) of these ritual foodstuffs we are engaging in a sacrifice of that god, to that god. See pp. 108-127 in Exhibit #3 and pp. 30-32 in Exhibit #4

60. In Théodish Belief theology the sacrifice of ritual foodstuffs, to the gods, Ælfs, wights, and ancestors, which is derived from ordinary agribusiness-produced supermarket products is Blasphemy and has the capacity to create unimaginable turbulence on the Web of Wyrd. Therefore, the ritual foodstuffs can only be organic foodstuffs (e.g., free range meat products,

32

etc.) as being very significantly different in mæʒen and energies than ordinary agribusiness-produced supermarket products.

61. Defendants authorize the purchase, utilization, and consumption of these necessary ritual items for the respective religious exercise of these faith groups: the Holy Eucharist and wine for the various Christian faith groups; matzo for the House of Yahweh and Judaism; and ceremonial foods for the Native Americans.

62. Defendants deny Plaintiffs the Théodish Belief "religious exercise" of religious education/study:
   (a) inmates on room restriction are not allowed to attend the weekly Théodish Belief religious education/study class. See section G.2. on page 11 of AR 208.01 in Exhibit #1;
   (b) are placed on an Early Lines roster which would allow Théodish Belief inmates to in a timely manner before their scheduled religious activity;
   (c) to loan their personal religious materials to Théodish Belief inmates who cannot afford to purchase said materials; and
   (d) to seek a grant to acquire an "automated reference center computer" for the religious center.

33

63. Théodish Belief religious education/study is integral to Plaintiffs "Religious exercise" because to Théodism the belief is the gods demand that we cultivate Wisdom for the growth of our intellect and understanding is critical to our process of "Worthing and Becoming."

64. NDCS grants inmates early line status which permits said inmate(s) to eat before the rest of the general inmate population in order to allow early line inmates to attend any of the following scheduled activities: sports activities (as a player or referee), officer of a self-betterment club, dog handlers in the Canine Program, work assignment, medical reasons, Hobby Association, law library passes. Plaintiffs, who are not on early line status, have to choose between their religious exercise and the NDCS government benefit of eating the scheduled meal when inmate count is late, etc.

65. Plaintiffs submitted a Proposal to seek a grant for an "Automated Reference Center Computer" to be installed in the NSP Religious Center/Chapel for religious education/study purposes. Defendant Marsh's May 18, 2007 response to Rüst's May 3, 2007 Interview Request, which was upheld in the Grievance process, indicates the Department will not pursue such a grant

34

at this time because inmates are afforded an opportunity to access religious educational material through a variety of means.

66. Defendants refusal to pursue a grant for Automated Reference Center Computers in the Religious Center/Chapel results in Plaintiffs being denied the same opportunity to learn our liturgical language granted other religious faiths and religious lore available from England which is produced solely for reference computers.

67. The NDCS obtained a grant to provide the general inmate population with two (2) "Automated Reference Center Computers' located in the NSP recreational library even though these general population inmates have been "afforded an opportunity to access educational materials through a variety of means".

68. The structure and acoustics of the NSP Religious Center/Chapel allows sound(s) to reverberate throughout the first floor of the building which results in the coerced inculcation of unwanted religious messages and/or religious exercise from the various faith groups upon Plaintiffs in direct

35

violation of the clearly established law. See Campbell
v. Cauthron, 623 F.2d 503, 509 (8th Cir. 1980).

69. Plaintiffs are subjected to coerced inculcation
of unwanted religious messages and/or religious
exercise, e.g., singing, prayer, etc., on a weekly
basis during the Théodish Belief class in the NSP
Religious Center/Chapel.

70. Plaintiffs submitted Grievances raising the
coerced inculcation of religious messages and/or
religious exercise from other faith groups is in direct
violation of RLUIPA and Campbell, supra, and Defendant
Hopkins, while alleging that space is limited,
speciously responded: "[t]he groups meeting at the same
time need to be respectful and not disturb each other."
Plaintiffs' grievances, specifically raised there is
available space in the NSP school building (which is
closed every evening and all day on the weekends) or
the eight rooms located in the basement of the NSP
Religious Center/Chapel which wouldn't cost Defendants
any funds for construction but Defendants refuse to
utilize this available space.

71. Defendants assert "in response to your request
for property, the DCS previously expanded the approved

36

property list for the Ásatrú/Théodish faith group." See
Exhibit #9.

72. Defendants refuse to provide any written
explanation of the denial of the nearly 50 devotional
accessories/items. See Exhibit #10.

73. Defendants refuse to grant Plaintiffs
request(s) for personal and communal devotional
accessories/items as specified in "Exhibit #3" and in
"Exhibit #10" (Step Two Grievance #05-0926, at pp. 6-
8), while granting other NDCS Approved Religious Faith
Groups by granting their requests to have/use similar
personal and communal devotional accessories/items. See
"Exhibit #1" of AR 208.01, Attachment E "Approved
Religious Property, " at 1-4.

74. Defendants refuse to accept the religious
importance in Théodish Belief theology as to the
sacrality of the Wéohsteall (place of the altar),
Symbel Hall, devotional accessories/items, and the
Théodish congregational practice of bringing ritual
purity and personal spiritual purity into the Holy
Stead (Wéohsteall and Symbel Hall), the Blót and
Symbel, and other Fainings and Mysticism. The
aforementioned total disregard of Plaintiffs
sensitivities about sacrality and the Ásatrú

37

sensitivities about sacrality is expressed in the
Defendants requiring communal worship using the same
devotional accessories/items on the same Sacred Space,
etc. Furthermore, while addressing the Ásatrú Interview
Request on the sacrality of the Vé (worship site) and
Blót during the April 9, 2008 Faith Group
Representatives Meeting with the NSP Warden, Defendant
Marsh negated the importance of the Ásatrú religious
concepts of the sacrality of their Vé and Blót.

75. Failure to bring and maintain ritual purity and
personal spiritual purity into the Wéohsteall (place of
the altar), Symbel Hall, Blót, Symbel, other Fainings
and Mystical practices, renders those rites ineffective
and therefore pointless.

76. Defendants refuse to grant Plaintiffs' requests
for herbs and incense (récels): for the
purification/cleansing the Wéohsteall (Place of the
altar) of all unwanted energies, etc.; which are sacred
to each god, Ælfs, ancestors, wights, etc. for use in
ritual(s) for and to them; and to induce meditative
concentration in divination, spæcræft, útesita (setting
out), runcræft (runecraft), dreecraft (shamanic
journey), and other mystical practices.

## EXHAUSTION

77. Plaintiffs Rüst and Conn have exhausted
administrative remedies regarding the matters described
in this complaint.

## CAUSES OF ACTION

78. Plaintiffs support the following claims by
reference to the previous paragraphs of the Complaint.

### Count 1

79. Defendants impose a "substantial burden" on
each Plaintiffs' "religious exercise" via AR 208.01 and
NDCS Policy and Procedure which set an illegally high
standard that requires Plaintiffs to show each request
for Théodish Belief faith specific belief(s);
practice(s); sacred devotional item(s), including food;
religious education/study; bringing of ritual purity
and personal spiritual purity into the Wéohsteall
(place of the altar), Symbel Hall, Blót, Symbel, other
Fainings and Mystical Practice(s); etc., is "necessary"
to the practice of Plaintiffs' religion, are actual
"tenet requirements" thereof, and are "local community
practices," has deprived and continues to deprive each

Plaintiff of his rights under 42 U.S.C. §2000cc, et seg.

## Count 2

80. Defendants have no compelling governmental interest to require Théodish Belief Sacral King Gárman Lord to provide documentation on beliefs and practices deemed essential by the Théodish judicatory (See § IV.B. at pp. 6-7 in AR 208.01 of Exhibit #1), then refuse to accept Gárman Lord's 6 January 2004 and 4 March 2004 letters (Exhibits #5 & #6), has imposed and continues to impose a substantial burden on each Plaintiff's "Religious exercise" under 42 U.S.C. §2000cc, et seq.

## Count 3

81. Defendants reviewed Plaintiffs' Proposal and Gárman Lord's letters and made the determination that Plaintiffs' sincerely held religious beliefs of the radical differences between Théodish Belief and Ásatrú are not correct has imposed and continues to impose a substantial burden on each Plaintiff's "Religious exercise" under 42 U.S.C. §2000cc, et seq. because is the province of government officials to determine Théodish Belief religious orthodoxy and orthopraxy.

## Count 4

82. Imposition of a substantial burden on each Plaintiff's "religious exercise" of: assembling with only fellow Théodsmen for a valid Théodish Faining (Blót, Symbel, etc.) and participation in the Théodish Blóts Sacramental Sacrificial Feast of organic foodstuffs and free range meat products, When the Defendants refuse to permit the aforementioned separate valid Théodish Belief Faining and Sacramental Sacrificial Feast, has deprived and continues to deprive Plaintiffs of their rights under 42 U.S.C. §2000cc, et seq.

## Count 5

83. Imposition of a substantial burden on each Plaintiff's "religious exercise" of assembling with fellow Théodsmen for the purpose of a valid Théodish group worship when Defendants schedule one worship time for Théodish Belief and Ásatrú inmates which results in the only available option is for Plaintiffs to worship under the guidance of Ásatrú whose beliefs are significantly different from or obnoxious to and blasphemous to Plaintiffs' beliefs and orthopraxy, has deprived and continues to deprive Plaintiffs of their rights under 42 U.S.C. §2000cc, et seq.

## Count 6

84. Imposition of a substantial burden on each
Plaintiff's "religious exercise" when Defendants refuse
to provide separate time and space for a Théodish
Belief Wéohsteall (place of the altar) i.e., place of
worship, even though there is otherwise available
outdoor space, which prevents Plaintiffs from building
a place of worship that is integral to Plaintiffs'
religion and therefore fundamentally inhibits the
Plaintiffs ability to practice their religious act of
assembling with fellow Théodsmen for the purpose of
worshipping in a sacrosanct Wéohsteall, has deprived
and continues to deprive Plaintiffs of their rights
under 42 U.S.C. §2000cc, et seq.

## Count 7

85. Imposition of a substantial burden on each
Plaintiff's "religious exercise" under Defendants
policies "maintaining consistency and equality for
time, space, and resources among all faith groups, will
be a prime consideration," "to grant Plaintiffs
Proposal means Defendants would have to grant similar
requests for other religious faiths or inmates,"
"create perception of favoritism by staff and other

42

inmate," and "both groups [Théodish Belief and Ásatrú] descend from Northern Heathenry and do worship together in the community," has deprived and continues to deprive Plaintiffs of their rights under the "strict scrutiny test" under 42 U.S.C. §2000cc, et seq.

## Count 8

86. Imposition of a substantial burden on each Plaintiff's "religious exercise" when Defendants permit NDCS approved religious faith groups to obtain/use religious devotional items but refuse to grant Plaintiffs' request(s) for similar religious devotional items (see Attachment E of AR 208.01 in Exhibit #1, Exhibit #3, and Exhibit #10) shows the better treatment of the other NDCS approved religious faith groups demonstrates the restrictions on Plaintiffs' requests for Théodish Belief specific devotional items are not necessary to serve a compelling governmental interest, has deprived and continues to deprive Plaintiffs of their rights under 42 U.S.C. §2000cc, et seq.

## Count 9

87. Imposition of a substantial burden on each Plaintiff's "religious exercise" when Defendants authorize other NDCS approved religious groups the

right to participate in their respective sacramental
uses of the Holy Eucharist for Christians, Matzo for
House of Yahweh and Judaism, and Ceremonial Foods for
Native Americans while denying Plaintiffs the same
right of participating in the Théodish Belief
Sacramental Feast of organic foodstuffs and free range
meat products, which stands in direct apposition to the
Christian Sacrament of the Holy Eucharist, shows the
better treatment of these other NDCS approved faith
groups clearly demonstrates the restrictions on
Plaintiffs participating in the Théodish Belief
Sacramental Feast of organic foodstuffs and free range
meat products are not necessary to serve a compelling
governmental interest, has deprived and continues to
deprive Plaintiffs of their rights under 42 U.S.C.
§2000cc, et seq.

### Count 10

88. Imposition of a substantial burden on each
Plaintiff's "religious exercise" when Defendants
authorize other NDCS approved religious faith groups
the right to participate in their respective religious
purification/cleansing rituals while denying Plaintiffs
request for the similar right to participate in their
religious purification/cleansing Stánbæd to bring
personal spiritual/purity in the holy stead, providing

44

a path to altered states of conscious, etc., shows the
better treatment of the other NDCS approved religious
faith groups clearly demonstrates the restrictions on
Plaintiffs' request for a Stánbæd are not necessary to
serve a compelling governmental interest, has deprived
and continues to deprive Plaintiffs of their rights
under 42 U.S.C. §2000cc, et seq.

## Count 11

89. Imposition of a substantial burden on each
Plaintiff's "religious exercise" when Defendants
subject Plaintiffs to coerced inculcation of unwanted
religious messages and religious exercise from other
NDCS approved religious faith groups in the Religious
Center/Chapel while refusing to correct the coerced
inculcation by utilizing the available space located
elsewhere in the facility, has deprived and continues
to deprive Plaintiffs of their rights under 42 U.S.C.
§2000cc, et seq.

## Count 12

90. Imposition of a substantial burden on each
Plaintiff's "religious exercise" of religious
education/study when a Plaintiff is not permitted: to
attend religious class while on room restriction; to

45

timely attend a scheduled worship or class while other
inmates are placed on early line status to timely
attend secular activity, e.g., sports, etc.,; and
acquire materials to assist in the study of Théodish
lore, liturgical language, rituals, etc., has deprived
and continues to deprive Plaintiffs of their rights
under 42 U.S.C. §2000cc, et seq.

## Count 13

91. Imposition of a substantial burden on each
Plaintiff's "religious exercise" by Defendants refusal
to grant Plaintiffs' Proposal for a separate time and
space to assemble with fellow Théodsmen for the purpose
of worshipping in a valid Théodish Belief Sacrificial
Feast/Blót, Symbel, or other Faining denies Plaintiffs
the ability to seek and maintain their spiritual
wholeness, has deprived and continues to deprive
Plaintiffs of their rights under 42 U.S.C. §2000cc, et
seq.

## Count 14

92. Imposition of a substantial burden on each
Plaintiff's "religious exercise" when Defendants refuse
to permit Plaintiffs to bring, create, and maintain
personal spiritual purity and ritual purity to the

46

Wéohsteall (place of the altar), Blót, Symbel, and
other Fainings renders said religious activity
ineffective and therefore pointless, has deprived and
continues to deprive Plaintiffs of their rights under
42 U.S.C. §2000cc, et seq.

## Count 15

93. Defendants policy and decision to require
Théodish Belief and Ásatrú religious faith groups to
one communal worship time and space, when there is
otherwise available time and space, infringes
Plaintiffs' freedom of expressive association to
assemble only with fellow Théodsmen for the purpose of
worshipping in a valid Théodish Belief Sacrificial
Feast/Blót and Symbel where presence of Ásatrú, whose
religious beliefs are significantly different and
attitudes towards Théodish Belief orthodoxy and
orthopraxy is blasphemous, affects in significantly
ways Plaintiffs ability to assemble for the purpose of
worshipping a valid Théodish Belief Sacrificial
Feast/Blót and Symbel which is acceptable to the gods
and which will maintain Plaintiffs' spiritual
wholeness, etc., therefore, Defendants refusal to
permit Plaintiffs to associate with fellow Théodsmen,
at a separate time and space, for the purpose of
assembling in a valid Théodish Belief Sacrificial

Feast/Blót and Symbel and the forced inclusion of
Ásatrú with Plaintiffs in the one communal worship time
and space, has deprived and continues to deprive
Plaintiffs of their rights under both the combined
Freedom of Association and Free Exercise Clauses of the
First Amendment to the united States Constitution and
42 U.S.C. §1983.

## Count 16

94. Each Defendants deliberate imposition of the
substantial burden on each Plaintiff's "religious
exercise" described herein makes Plaintiffs' religious
exercise impracticable, ineffective, and pointless
because of the substantial pressure on Plaintiffs to
modify their behavior to force Plaintiffs to forego and
abandon their religious precepts (Théodish Belief
orthodoxy and orthopraxy) and violate their beliefs,
has deprived and continues to deprive Plaintiffs of
their rights under 42 U.S.C. §2000cc, et seq.

## Count 17

95. Defendants have no compelling governmental
interest in refusing to accept or in overriding a
recognized religious institution right to decide
matters of faith and discipline derived from

48

ecclesiastical rule, custom, or law for the Outlawry of
Plaintiff Rüst (and several Plaintiffs in this action)
and the require said Plaintiffs to enter the Ásatrú Vé
and participate in one communal worship time results in
strife between Théodish Belief and Ásatrú inmates, has
deprived and continues to deprive Plaintiffs of their
rights under 42 U.S.C. §2000cc, et seq.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays this Court
grant the following relief:

1. Declare that the acts and omissions described
   herein violated Plaintiffs rights under both the
   Freedom of Association and the Free Exercise
   Clauses of the First Amendment to the United States
   Constitution, 42 U.S.C. § 1983, and RLUIPA – 42
   U.S.C. § 2000cc, et seq.

2. Enter preliminary and permanent injunctions
   ordering Defendants, their successors, agents,
   employees, and all persons acting in concert with
   them:
   A. that NDCS AR 208.01 RELIGIOUS SERVICES and
      Defendants policy sets an illegally high standard
      for approval/Disapproval our requests for

religious practices and religious items, including
food, in violation of 42 U.S.C. § 2000cc, et seq.;

B. to promulgate rules and regulations which adhere
to the legal standard(s) under 42 U.S.C. § 2000cc,
et seq.;

C. does not have the authority to determine the
orthodoxy and orthopraxy of Théodish Belief is or
shall be;

D. cannot refuse to accept Théodish Belief orthodoxy
and orthopraxy provided by Théodish Belief Sacral
King Gárman Lord pursuant to Defendants request;

E. review each item requested in Plaintiffs' Proposal
pursuant to the strict scrutiny test of RLUIPA;

F. provide a separate time and space, from the
available time and space, to permit Théodish
Belief inmates to assemble with fellow Théodsmen
for the purpose of a valid Théodish Belief
Sacrificial Feast/Blót, Symbel, and other sacred
Faining(s);

G. permit Théodish Belief inmates to purchase with
their funds and/or permit free world Théodsmen to
donate organic foodstuffs, free range meat
products, and such, for the Théodish Belief
Sacramental Sacrificial Feast/Blót;

H. permit Théodish Belief inmates to either purchase
with their funds or permit free world Théodsmen to

50

donate the devotional items requested Plaintiffs Proposal;

I. permit Théodish Belief inmates to acquire and erect a 24 foot Eormensýl (18 foot above ground and 6 foot placed in ground), and "nine types of sacred wood" and a Fire Drill for the Needfire in order to validate the Sacrificial Feast/Blót;

J. permit Théodish Belief inmates to purchase and construct a Stánbæd (sweat lodge type structure);

K. permit Théodish Belief inmates to purchase herbs sacred to the gods (for communal worship and personal use) and herbs used in clearing (ritual purification and cleansing) the Wéohsteall (place of the altar) and for the Stánbæd;

L. permit Théodish Belief inmates, who are on room restriction, to attend the scheduled Théodish Belief education/study class;

M. place Théodish Belief-inmates on early line status in order to allow them to eat so they can timely attend Théodish Belief worship and education/study class;

N. permit exchange of Théodish Belief religious materials, which is the personal property of a Théodish Belief inmate, within the Théodish Belief faith group for education/study purposes;

51

O. permit Théodish Belief inmates the "use of a
   Automated Reference Center Computer" for Théodish
   education purposes;

P. prohibit any coerced inculcation of unwanted
   religious exercise from other religious faith
   groups by utilization of otherwise available areas
   or necessary construction

3. Enter judgment in favor of Plaintiffs for nominal,
   compensatory, and punitive damages, as allowed by
   law, against each Defendant, jointly and severally,
   in each Defendant's official and individual
   capacity in the amount of $10,000.00 for each
   defendant, for violation of both the Freedom of
   Association and Free Amendment to the United States
   Constitution.

4. Enter judgments in favor of Plaintiffs for nominal,
   compensatory, and punitive damages, as allowed by
   law, against each Defendant, jointly and severally,
   in each Defendants official capacity in the amount
   of $10,000.00 for violation of RLUIPA - 42 U.S.C. §
   2000cc, et seq.

5. Order such additional relief as this Court may deem
   just and proper.

52

Respectfully submitted

Wolfgang Rüst #30118
P.O. Box 2500
Lincoln, NE
68542-2500

Bobby Conn #57625
P.O. Box 2500
Lincoln, NE
68542-2500

## **VERRIFICATION**

Pursuant to 28 U.S.C. § 1726, I declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Wolfgang Rüst #30118
P.O. Box 2500
Lincoln, NE
68542-2500

SUBSCRIBED AND SWORN to before me on this _____

day of _August_____ , 2008.

> GENERAL NOTARY - State of Nebraska
> CURTIS MOFFAT
> My Comm. Exp. Jan. 10, 2010

NOTARY PUBLIC

Bobby Conn #57625
P.O. Box 2500
Lincoln, NE
68542-2500

SUBSCRIBED AND SWORN to before me on this _____

day of _22nd August_, 2008.

> GENERAL NOTARY - State of Nebraska
> CURTIS MOFFAT
> My Comm. Exp. Jan. 10, 2010

NOTARY PUBLIC

54



Wolfgang Rüst #30118
P.O. Box 2500
Lincoln, NE 68542-2500

Clerk
U.S. District Court
Federal Building N. #593
100 Centennial Mall N.
Lincoln, NE

Notice: This correspondence
was mailed by an inmate
confined by an inmate
operated by the Nebraska
Department of Correctional
Services. Its contents are
unreviewed.

46-03-13



7005 0390 0003 8629 0130

CERTIFIED MAIL