FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

09 JUL -9 PM 12: 22

OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WOLFGANG RÜST and BOBBY CONN, | 4:08CV3185 |
| Plaintiffs, | |
| VS. | BRIEF IN OPPOSITION OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES RELIGION STUDY COMMITTEE, et.al., | |
| Defendants. | |

### INTRODUCTION

Wolfgang Rüst and Bobby Conn (hereinafter "Plaintiffs") are inmates of the Nebraska Department of Correctional Services (hereinafter "NSP"). The Plaintiffs have filed a civil rights action for damages, declaratory relief, and injunctive relief pursuant to 42 U.S.C. §2000cc, et. seq., and 42 U.S.C. §1983. The Plaintiffs allege that the Defendants have violated their rights under the Religious Land Use and Institutionalized Persons Act (hereinafter "RLUIPA") and the First Amendment. The Plaintiffs contend that the Defendants have placed a substantial burden on their ability to exercise their religion.

1

The Plaintiffs' request, <u>inter alia</u>, recognition of Theodish Belief as a separate and distinct faith group as compared to Asatru ; separate time and space for Theodish specific worship; approval of Theodish specific devotional items necessary for valid Theodish practice; prohibit the coerced inculcation of unwanted religious exercise from other faith groups; retain personal religious materials beyond four cubic feet; <u>Administrative Regulation 208.01 Religious Services</u> and Defendants' policy sets an illegally high standard in violation of 42 U.S.C. §2000,cc, et seq. (Amended Complaint) Plaintiffs' also seek $10,000.00 (ten thousand) dollars in monetary relief from each Defendant in their official and individual capacity, for violation of both the Freedom of Association and Free Exercise Amendment of the United States Constitution; and $10,000.00 (ten thousand) dollars from each Defendant in their official capacity for violation of RLUIPA (Amended Complaint).

## STATEMENT OF FACTS

1.   On or about August 22, 2008, Plaintiffs submitted a verified Civil Rights Complaint with nine (9) exhibits annexed and incorporated in said Complaint by reference to each exhibit of which the Plaintiffs' RLUIPA and First Amendment Claims against Defendants were allowed to proceed as set forth in the December 1, 2008 Memorandum and Order.

2.   On or about June 29, 2009, pursuant to this Court's Memorandum and Order, Plaintiffs verified Amended Complaint, with

2

ten (10) exhibits [annexed and incorporated by reference thereof], was filed.

3.    Plaintiffs request this Court consider the verified Amended Complaint, with said exhibits annexed thereto, as an Affidavit in Opposition of the Defendants' Motion for Summary Judgment. Plaintiffs' Amended Complaint and exhibits are equivalent to an Affidavit for purposes of summary judgment proceedings. See Williams v. Adams, 935 F2d 960, 961 (8th Cir. 1991); Callum v. Axdahl, 2007 WL 1289949 (D.Neb. 3/12/07) at 1.

4.    On or about July 25, 2003, "A Proposal for the Recognition of Theodish Belief  (hereinafter "Proposal") and a "Synopsis of the Differences Between Theodish Belief and Asatru" (hereinafter "Synopsis") was presented for: (a) Recognition of Theodish Belief as a separate faith belief and practice from Asatru,   (b) separate time and space for Theodish Belief specific worship, and (c) devotional items necessary for valid Theodish practice (Amended Complaint Exhibits #3 and 4).

5.    Theodish Belief Sacral King Garman Lord submitted a letter which apprised the Defendants that Theodish Belief and Asatru   are two radically different letters (Amended Complaint pp. 12-13 ¶18 and Exhibit #5) and the requested devotional items are indeed necessary for valid Theodish practice (Amended Complaint Exhibit  #6).

6.    Defendants have determined Theodish Belief and Asatru   religious orthodoxy and orthopraxy are essentially the

3

same.

7.    In the interest of brevity, the Plaintiffs, in the various paragraphs of the Amended Complaint's "STATEMENT OF FACTS", cite to specific pages in Exhibits #3 and 44 to set forth in greater detail the specific beliefs and practices of Theodish Belief and Asatru.

8.    Defendants scheduled one single communal worship time for Theodish Belief and Asatru on the same Asatru sacred space, (Amended Complaint Exhibit #9), even when there are available outdoor space for a separate Theodish Belief worship site, (Amened Complaint pp. 18-19 ¶29 & 30 and Exhibit #10).

9.    Theodish Belief consists of: The Kings Religion—the version of Theodism which all ordained Veofodthanes (priests) and other Kings Men are required to practice in their public ritual; mainstream Theodism—which is the most widely accepted and practiced form of Theodism which pretty much parallels the King's Religion; and "everything else" (a.k.a. Rooftree: A familial unit, usually the nuclear family plus an extended family of blood and in law, i.e., oathed, relationship) which means variations in practice and belief sometimes found (Amended Complaint Exhibit #3, at p.#8, ¶ with footnote #15).

10. Plaintiffs are subjected to coerced inculcation of unwanted religious messages and/or religious exercise from other faith groups in the Religious Center even when there are eight rooms available below the Religious Center stage or the classrooms in the school which are not used during the evening

4

hours, and during the day and evenings on weekends and holidays (Plaintiffs' Exhibit #1).

11.   Plaintiffs are denied an exemption to retain religious materials beyond four cubic feet and/or denied an option to store said materials elsewhere.

ARGUMENT

1.   DEFENDANTS TREATMENT OF THEODISH BELIEF VIOLATES RLUIPA AND THE FIRST AMENDMENT.

"By enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to constitutional free exercise claims." Murphy v. Missouri Department of Corrections, 372 F.3d 979, 986 (8th Cir. 2004). Moreover, Congress has mandated that courts construe the Act "in favor of a broad protection of religious exercise," to the maximum extent permitted by law. 42 U.S.C. §2000-3(g). Thus, the RLUIPA standard poses a far greater challenge than does traditional free exercise analysis to prison regulations that impinge on inmates' free exercise of religion.

Congress effectuated this intent by distinguishing RLUIPA from traditional First Amendment claims in at least two ways. First, it expanded the reach of the protection to include any "religious exercise" including "any exercise of religion whether or not compelled by or central to, a system of religious belief." Cutter v. Wilkinson, 544 U.S. 709, 713 (2005)(quoting 42 U.S.C. §2000cc-5(7)(A). In fact, RLUIPA "bars inquiry into whether a

5

particular belief or practice is [']central['] to a prisoners religion, the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity. Cutter,supra, 544 U.S., at 725, N.13; 42 U.S.C. §2000cc-5(7)(A). Second, as opposed to the deferential rational basis standard of Turner v. Safley, 482 U.S. 78, 89-90 (1987), RLUIPA requires the government to meet the much stricter burden of showing that the burden it imposes on religious exercise is "in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §2000cc-1(a)(1) and (2). See also, Cutter, 544 U.S., at 717. Furthermore, in Gladson v. Iowa Department of Corrections, 551 F.3d 825, 833 (8th Cir. 2009), the court noted "In light of Cutter, we have recognized that portions of the definition [stated in Murphy] requiring beliefs to be a [']central tenet['] or [']fundamental['] may not apply to a RLUIPA claim, Patel, 515 F.3d, at 813, N.7".

Defendants' arguments appear to assume the First Amendment and RLUIPA protect the rights of religious groups. Both protect the individual's religious practice from government interference, regardless of the individual's membership in ay particular religious group. RLUIPA addresses the imposition of "a substantial burden on the religious exercise of a person," not a member of a religious group, and Congress enacted RLUIPA in the context of Supreme Court decisions holding that the First Amendment's Free Exercise Clause protects an individual's right to follow his

6

or her sincerely held religious belief.  The protection is in force even if the Plaintiffs' belief is not held by all adherents of a religious group, Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 715-16 (1981), and even if it is purely personal.  Frazee v. Illinois Dept. of Employment Security, 489 U.S. 829, 834 (1989)(rejected the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization).

The Eighth Circuit has made it clear that it is irrelèvant whether a particular religious practice is mandated by the religion in question.  Instead, the relevant inquiry is whether the prisoner's desire to engage in a particular practice is based upon his own, sincerely held religious belief.  Goff v. Graves, 362 F.3d 543, 547 (2004)(providing that the religious practice in question must be "based on"—but not mandated by—"sincerely held" religious beliefs); Love v. Reed, 216 F.3d 682, 687, N.9 (2000)(explaining that the relevant inquiry is whether the religious belief is "sincerely held" and not whether it is ecclesiastical`law).

Administrative Regulation 208.01, RELIGIOUS SERVICES (hereinafter "A.R. 208.01"), programming section IV.B.1., 2., 3.a.b. of Defendants' Exhibits (Ex.1, p.6; Ex.30, pp. 6-7; Ex.31, p.6; Ex.32, p.6; Ex.33, p.6; Ex.34, p.6; Ex.35, p.6; Ex.36, pp. 5-6) specifically requires an inmate and the faiths community organization or religious leadership, for a request to practice a faith not presently recognized by the Department, to provide

7

a list of faith specific doctrines, practices and/or items,
including food, and rationale for the necessity of such. (Emphasis
supplied). When the requested faith practice is authorized, the
Religious Coordinator will coordinate necessary activities to
allow the inmate the opportunity to participate in practices of
his/her faith deemed essential by the faith's judicatory.
(Emphasis supplied). Thus, Defendants' A.R. 208.01 clearly
establishes the tenats of Plaintiffs' Theodish Belief faith had
to be submitted, reviewed, approved/disapproved, and only the
faith practices deemed essential by the faiths judicatory would
be authorized.

On or about July 25, 2003, Plaintiff Rust's "A Proposal for
the Recognition of Theodish Belief" and "Synopsis of the
Differences Between Theodish Belief and Asatru" ("Proposal" and
"Synopsis" respectively), was submitted to the Defendants and to
Theodish Belief Sacral King Garman Lord (Amended Complaint ¶17,
pp. 11-12). The Proposal and Synopsis sought: (a) recognition
of Theodish Belief as a faith group separate from Asatru; (b)
separate time and space for Theodish Belief specific worship; and
(c) the devotional items necessary for valid Theodish Belief
practice.(Amended Complaint, pp. 11-12, ¶17 in which Exhibits #3
and 4 are annexed and incorprated by reference). Theodish Belief
Sacral King Garman Lord submitted a letter apprising Defendants
that Theodish Belief and Asatru are two radically different
letters (Amended Complaint ¶18, pp. 12-13; Defendants' Ex.17).

8

Instead, Defendants rejected the Plaintiffs' sincerely held Theodish Belief orthodoxy and orthopraxy and then determined what Plaintiffs' Theodish Belief orthodoxy and orthopraxy is when Defendants chose to determine that Theodish Belief and Asatru religious orthodoxy and orthopraxy were essentially the same, thereby imposing a substantial burden on Plaintiffs' religious exercise under RLUIPA. Teterud v. Burns, 522 F.2d 357, 360 (8th Cir. 1975)(Free Exercise prison case held, "[i]t is not the province of government officials or court to determine religious orthodoxy"); Allah v. Menei, 844 F.Supp. 1056, 1064-65 (E.D.PA. 1994)(RFRA prison case held "there is a constitutional difficulty in the state's deciding whether two different religious beliefs are essentially the same").

The prison has established a system of individualized exemptions which impose a substantial burden on Plaintiffs' religious exercise. In circumstances which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious exercise without compelling reasons and refusal to consider a sincerely held religious belief tends to exhibit hostility, not neutrality, towards the particular religious exercise. Bowen v. Roy, 476 U.S. 693, 708 (1986).

"The exercise of religion often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating

9

in sacramental use of bread and wine, . . . abstaining from
certain foods . . . ". <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 720
(2005); <u>Employment Div., Dept. of Human Res. v. Smith</u>, 494 U.S.
872, 877 (1990).

<u>Separate worship time and space for Theodish Belief</u>

Controverted material facts exist to establish that Plaintiffs'
Theodish orthodoxy and orthopraxy are significantly different and
incompatable with Asatru beliefs and practices which require a
separate time and space for Theodish specific worship.

Plaintiffs briefly outlined the Asatru Blot in paragraph #31
and the Theodish Belief Faining in paragraph #32 where Plaintiffs
cite to specific pages in the Amended Complaint's Exhibits #3 and
4 for greater detail.

Plaintiffs consider the Asatru Blots EDDA-Based Voluspa's
Renewal of life ritual drama of Rangnarok to be blasphemous to
our gods and to what our religion stands for (Amended Complaint
Exhibit #3, pp. 36-39; Exhibit #4, p. 13). Odinn is celebrated
in the Asatru Blot for establishment of the cosmos (Amended
Complaint Exhibit #3, pp. 31-32 and Exhibit #4. pp. 13 and 30).
Plaintiffs consider the Asatru-based litany of Odinn as trouble-
maker/betrayer to be blasphemous (Amended Complaint Exhibit #3,
p. 17 and Exhibit #4, p. 6). Furthermore, the Continental/English/
Theodish god Wodan, Woden, and Wuotan cannot be ~~involved~~ *invoked* and/or
worshipped in the same Faining (Blot, Symbel, etc.) and the same
sacred space with Asatru Odinn since to do so will taint and

10

destroy a mystical working (Blot, Symbel, etc.) or a religious

space dedicated to Wodan, Woden, or Wuotan (Amended Complaint

p. 30, ¶53).

A valid Theodish Faining involves cleaning *CLEANSING* the sacred space

of all harmful forces, i.e., the Asatru Sun Wheel Land Design,

the Asatru EDDA-Based blasphemous concepts of Woden *Odin* which impreg-

nate the soil, air, etc. (Amended Complaint pp. 25-27, ¶42-46) or

not permitting the introduction of foreign concepts of the gods,

elfs, creation, etc. (Amended Complaint pp. 19, ¶31, p. 29, ¶53,

p. 32, ¶58).

Defendants appear to be resurrecting the ancient christian

practice of Pope Gregory to destroy heathen faith of Asatru

(Amended Complaint p. 27, ¶46 and Exhibit #4, p. 20) or to create

strife between Theodish Belief and Asatru when Theodish Belief

clears the Asatru Ve of all the harmful forces supra, (Amended

Complaint's Exhibit #3, p. 63 and Exhibit #5, pp. 4-5; Defendants'

Exhibit #17, pp. 4-5).

Only those who love the Sacral King and the institution of

Sacral Kingship and accept Theodish creation and cosmography are

allowed to participate in the Theodish Sacrifice and Feast (Amend-

ed Complaint pp. 22-23, ¶36 and 38, p. 29, ¶51).  The Asatru

EDDAs state the descendants of Ymir/Tuisto are evil (Amended

Complaint Exhibit #3, p. 29 and Exhibit #4, p. 11) and the Sacral

Kingship: Tuisto, Woden and Ing.                        Asatru

finds Theodish institution of Sacral Kingship positively obnoxious

11

and patently an insult to the ideological spirit and significance
of their religion which places them outside the Holy Grail folk-
religious institution of Sacral Kingship and deprives Asatru of
Theodish Belief construct (Amended Complaint pp. 23-24, ¶39).
Thus, Asatru will not participate as non-Theodsmen in the Theodish
Blot.

Defendants' brief at pp. 15-16 cite Ex. #13, p. 1 and Ex. #14,
p. 4 for the premise that Theodish and Asatru practitioners are
able to compromise and worship together on the same ground thus
joint worship with Asatru is a part of the thology of Theodish
Belief. That Ex. #14 is a July 21, 1999 e-mail to Chaplain
Perreira and Ex. #13 Theodism and Asatru article by Garman Lord
which had no date indicating when it had been written. Defendants
utilize the early writings of Garman Lord to establish a theology
of Theodish Belief. Defendants completely ignore and/or reject
the latest writing and statement embodied in the January 6, 2004
letter from Garman Lord to Randall Donner (Defendants' Ex. #18;
Amended Complaint's Exhibit #5) and the May 28, 2009 deposition
testimony of Plaintiffs' expert witness J.Dirk Reek that Garman
Lord's writings demonstrate a break from relationship with Asatru
into a separate and distinct religion which is analogous of the
Schisms from the *Catholic* ~~Cathic~~ Church, e.g., Martin Luther in the 1500s
to create the Lutheran Church (Plaintiffs' Affidavit).

Defendants' brief at p. 16 cites Ex. #14, p. 1 for the
premise "anything Garman Lord might say or endorse, theologically,

12

may be cited as precedent and is part of the theology of Theodish
Belief forever." Defendants' argument clearly establishes the
January 6, 2004 letter from Garman Lord to Randall Donner (Defen-
dants' Exhibit #18; Amended Complaint's Exhibit #5) which endorses
Plaintiffs' "Proposal" and "Synopsis" (Amended Complaint's Exhibit
#3 and Exhibit #4) submitted with "The Chapel Memo from Randall
Donner to RSC Members, dated July 25, 2003" (Defendants Exhibit
#15) and supercedes and nullified the "Theodism and Asatru article
by Garman Lord" (Defendants' Exhibit #13) and the "E-mail from
Garmin (sic) Lord to Chaplin (sic) Perreria dated July 21, 1999"
Defendants's Exhibit #14).

Defendants impose a substantial burden on Plaintiffs'
religious exercise of participation in Theodish Belief specific
group worship by requiring a joint worship time and space which
results in forcing Plaintiffs to change their sacred worship
orthopraxy and violate their beliefs. Thomas v. Review Bd. of
Indiana Employment Sec., 450 U.S. 707, 718 (1981)(where it denies
a benefit because of conduct mandated by religious belief, thereby
putting substantial pressure on an adherent to modify his
behavior and to violate his beliefs, a burden exhists).
Defendants do not force Catholics to change their sacred mass
(worship) instead Defendants permit separate Catholic worship
time.

Foodstuffs and Mead

Each god has ritual foodstuffs and when Plaintiffs engage in a sacrifice of ritual organic foodstuffs we engage in a sacrifice of that god to that god (Amended Complaint p. 32, ¶59).  Theodish Belief theology involves the sacrifice of "organic foodstuffs" and "free range meat products", and to sacrifice ordinary agribusiness-produced supermarket products is blasphemy (Amended Complaint pp. 32-33, ¶60).  The Theodish Belief Sacrificial Feast and Holy Drink stand in direct opposition to the Christian sacrament of the Holy Eucharist and Holy Drink (Amended Complaint's Ex. #3, pp. 123-127 and Ex. #4, pp. 30-31).

Defendants' argument (Brief at 16-17) is based on the mistaken premise that Garman Lord indicates organic foodstuffs and free range meat products are not essential to the practice of Theodism and that Plaintiffs can purchase foodstuffs needed for worship from the canteen (Defendants' Ex. #18, p. 2).  First, Garman Lord indicates this is the first time Theodish Belief has had to deal with the constraints of organized practice behind bars. Thus, Garman Lord has no knowledge of how a correction system or prison canteen operates (Defendants' Ex. #18, p. 1). Second, Garman Lord states: "Moreover, it is a setting in which, in some cases, we must allow some latitude for Leoden Rust to overrule me if he needs to, based on his far greater knowledge of conditions in an incarcerated setting than my own." (Defendants' Ex. #18, p. 1).  Third, Garman Lord indictes organic

14

and unprocessed foodstuffs are preferred wherever available.

The guarantee of Free Exercise and RLUIPA is not limited to beliefs which are shared by all of the members of a religious sect. Thomas v. Review Bd. of Indiana Employment Sec., 450 U.S. 707, 715-16. The relevant inquiry is whether Plaintiffs' religious beliefs are "sincerely held" and not whether it is ecclesiastical law. Love v. Reed, 216 F.3d 682, 688, N.9 (8th Cir. 2000). "RLUIPA bars inquiry into whether a particular belief is "central" to a prisoners religion, see 42 U.S.C. 2000cc-5(7)(A), the Act does not preclude inquiry into the sincerity of a prisoners religiosity." (citation omitted) Cutter v. Wilkinson, 544 U.S., at 725.

The sacrifice of "organic foodstuffs" and "free range meat products" are the Plaintiffs' sincerely held Theodis Belief religious orthodoxy and orthopraxy. Plaintiffs have compromised and offered to to purchase the "organic foodstuffs" and "free range meat products" from a health food grocery in lieu of the historical Theodish sacrifice of live animals.

Defendants authorize the purchase utilization and consumption of the Holy Eucharist and wine for the various Christian groups, Matzo for House of Yahweh and Judaism, and ceremonial foods for the Native Americans but Defendants refuse authorization of Plaintiffs' request to purchase, utilize and consume Theodish Beliefs sacred Sacraficial Foods and Holy Drink. The Defendants better treatment of the various Christian faith groups, House of

15

Yahweh, Judaism, and Native Americans by allowing individualized exemptions to purchase, utilize and consume their respective sacred sacraments shows the Defendants' refusal to allow Plaintiffs to purchase, utilize and consume "organic foodstuffs" and "free range meat products" for the Theodish Belief Sacrificial Blot are not necessary to serve a compelling governmental interest as RLUIPA requires and tends to exhibit hostility, not neutrality, towards Theodish Belief pursuant to RLUIPA and Bowen v. Roy, 476 U.S. 693, 708 (1986). "[C]ourts have generally found that to deny prison inmates the provision of fact that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." (citations omitted) McEachin v. McGuinnis, 357 F.3d 197, 203, N.7 (2nd Cir. 2004); Love v. Reed, 216 F.3d 682, 689-90 (8th Cir. 2000)(Prison inmates are entitled under the First Amendment reasonable accommodation of their religious dietary needs).

Defendants have imposed a substantial burden on Plaintiffs' religious exercise by not permitting purchase, utilization and consumption of "organic foodstuffs" and "free range meat products" for Theodish Belief Sacrificial Blot as set forth above; in Plaintiffs' Amended Complaint with annexed exhibits; and Plaintiffs' right to participate "in the sacramental use of bread ["organic foodstuffs" and "free range meat products"] and wine." Cutter,supra, 544 U.S., at 720.

16

Devotional Items

Defendants' argument uses a illegally high standard of
"common community practice" for the devotional items that were
approved and to deny Plaintiffs' request for the Stanbaed.   In
"Foodstuffs and Mead" supra, Plaintiffs argued that RLUIPA and
free exercise guarantees require that the relevant inquiry is
whether the religious belief is "sincerely held" and whether it
is ecclesiastical law and the guarantees are not limited to beliefs
which are shared by all the members of a religious sect.   See
Thomas,supra, 450 U.S., at 715-16; Love,supra, 216 F.3d, at 688,
N.9; Cutter,supra, 544 U.S., at 725; and 42 U.S.C. §2000cc-5(7)(A).

Furthermore, Defendants' brief at 18, misquotes Garman Lord
to indicate devotional items are not needed for true Theodish
worship to occur and true Theodish worship "is a matter of the
heart and soul, and not of the hardware" in order to make it a
matter of Theodish theology.   In the paragraph, Garman Lord
mentions both Theodish clergyman and Jesus in connection and
states in the sentence in reference to Jesus "that real religion
is always a matter of the heart and soul, not of the hardware"
thus, Garman Lord may be referring only to Jesus or to all "real
religion(s)"..

The Stanbaed is a legal method for bringing personal spiritual
purity to the holy stead, shamanic practice, etc. in Plaintiffs'
sincerely held Theodish Belief orthodoxy and orthopraxy (Plaintiffs
Ex. #1) and the Native American Sweat Lodge and Stanbaed serves

the same general purposes (Amended Complaint P. 27, ¶47).

Defendants authorize these religious rituals: Islam-Wudu, Protestant-Baptism, Catholic-Baptism, confession, hand bathing with wine/water, Judaism and House of Yahweh-bathing (baptism); and Native American-sweat lodge but refuse to authorize the Stanbaed religious ritual request of Plaintiffs. The better treatment of Islam, Protestant, Catholic, Judaism, House of Yehweh and Native American faiths by the Defendants authorization of their respective religious rituals for purification/cleansing, etc. shows the restriction/denial of Stanbaed does not serve a compelling governmental interest as RLUIPA requires and tends to exhibit hostility, not neutrality, towards Theodish Belief religious exercise under RLUIPA and <u>Bowen v. Roy</u>, 476 U.S., at 708.

The Fire Twirl was denied because all religious fires are currently started by a lighter checked out from the appropriate security personel.(Defendants' Ex. #11, p. 3). Defendants' refused to consider and reject the efficency of less restrictive measures. <u>Gartell v. Ashcroft</u>, 191 F.Supp.2d 23, 39-40 (D.DC 2002)(The government cannot meet its burden to prove least restrictive means unless it netually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice)(citations omitted); <u>Sample v. Lappin</u>, 424 F.Supp.2d 187, 195 (D.DC 2006)(same).

Eormensyl is fundamental to Plaintiffs practice of Theodish Belief because without Eormensyl prayer, offerings, travel to

18

seek wisdom etc., or worship is rendered impossible.(Amended
Complaint pp. 30-31, ¶54).  The Eormensyl was denied "due to
obvious security concerns, it is recommended that this item be
denied with the current dimensions" (Defendants' Ex. #11, p. 2).
Defendants failed to actually consider and reject the efficacy of
a different dimensions for Eormensyl before adopting the denial.
Gartell v. Ashcroft, 191 F.Supp.2d, at 39-40; Sample v. Lappin,
424 F.Supp.2d, at 195.  Defendants cannot merely brandish the
words "security" and "safety" and expect their actions will
automatically be insulated from scrutiny. Buchanan v. Burbury,
2006 WL 2010773 (N.D. Ohio 7/17/06) at 4; Campos v. Coughlin,
854 F.Supp. 194, 207 (S.D.N.Y. 1994).

     Defendants' denial of the Stanbaed, Fire Twirl, and Eormensyl
imposes a substantial burden on Plaintiffs religious exercise.
Administrative Regulation 208.01

     Administrative Regulation 208.01 (A.R. 208.01) set an
illegally high standard in which Defendants require Plaintiffs
to show that religious items requested are "community standard
practice . . . .", "Theological tenets of the faith group require
. . . ", "actual tenet requirements of the faith and local
community practice", "practices of his/her faith deemed essential
by the faith's judicatory," etc. (Amended Complaint p. 9-10,
¶13; Defendants' Exhibits #1, 30, 31, 32, 33, 34, 35 and 36).  In
fact, Defendants use similar mandatory tenets to deny Plaintiffs'
religious requests: Brief at p. 16: "then their ability to engage

19

in joint worship is a part of the theology of Theodish Belief",
"Because joint worship with the Asatru is part of the Theodish
Belief"; Brief at 16-17: "organic foodstuffs and free range meat
products are not essential to the practice of Theodism" (emphasis
supplied); brief at 17-18: "all the devotional items that the
Plaintiffs requested that are common community practice", "use
of a "Stanbæd" is not common practice" (emphasis supplied).

A.R. 208.01 imposes a substantial burden on the Plaintiffs'
religious exercise in that Plaintiffs have to prove their requests
are necessary, essential, tenet of, community wide practice, etc.
of Theodish Belief orthopraxy and orthodoxy.

## Room Restriction

Plaintiffs have suffered and are facing the threat of an
"injury-in-fact" by the criminal sentences imposed upon each
Plaintiff by their respective sentencing courts.  Sandin v. Conner,
515 U.S. 472, 485 (1995) held "Discipline by prison officials in
response to a wide range of misconduct falls within the expected
perimeters of the sentence imposed by a court of law."

Room restriction imposes a substantial burden on Plaintiffs'
religious exercise of learning (Amended Complaint p. 34, ¶63).

## Coerced Inculcation of Religious Messages

Plaintiffs were provided with a weekly class time for
Theodish Belief practitioners in the Chapel on or about March 24,
2004.  Plaintiffs filed grievances addressing the construction of
the additional rooms and plan to move religious groups to the

20

Chapel (Plaintiffs' Ex. #2).  For about three years, Theodish
Belief practitioners were the only religious activity in the
Chapel.  Plaintiffs filed a grievance raising that religious
education classes could be relocated to the prison school which
is closed on week nights and during the day and night on weekends
and holidays (Plaintiffs' Ex. #3).

Defendant Marsh schedules the faith groups which subject
Plaintiffs to coerced inculcation of religious messages
(Plaintiffs' Ex. #3).  The structure and acoustics of the Chapel
allow sounds to reverberate throughout the building (Amended
Complaint pp. 35-36, ¶68-70).  Defendants speciously suggest
Plaintiffs have the option to move their class to meet earlier
would punish them, i.e., Plaintiffs Personal Plan requires them
to work so no one would be able to participate in our religious
exercise and it would relieve Defendants of eliminating the
coerced inculcation of religious messages.

Early Line Status

Plaintiffs have to choose between their religious exercise
and the government benefit of eating when they are denied early
line status for religious exercises (Amended Complaint p. 34,
¶63-64; Plaintiffs' Exhibits #4, 5 and 6).

Early line status exemptions are granted to inmates for
sports activity, dog handlers, Plaintiff Rust, etc., however,
deny the same exemption for Plaintiff Conn (Amended Complaint
p. 34, ¶63-64; Plaintiffs' Exhibits #4, 5, and 6).  The better

treatment of granting early line status to inmates for sports
activity, dog handlers, etc. but refusing to grant the same early
line exemption for religious activity shows the restriction/denial
of early line status for Theodish education/worship does not serve
a compelling governmental interest as RLUIPA requires and tends
to exhibit hostility, not neutrality, towards Theodish Belief
religious exercise under RLUIPA and Bowen v. Roy, 476 U.S., at
708.

## Possession of Religious Materials

The gods demand that Theodsmen cultivate Wisdom as critical
to our process of "Worthing and Becoming" (Amended Complaint
p. 34, ¶63). Plaintiffs submitted a "Proposal" to obtain an
exemption to allow Theodish Belief inmates to retain personal
religious materials beyond four cubic feet of space, which was
denied (Amended Complaint p. 39, ¶77-79).

Exemptions have been granted to inmates to store personal
property beyond the four cubic feet allotment (Amended Complaint
pp. 39-40, ¶80; Amended Complaint Ex. #2). The granting of
exemptions for legal materials, electronics, state issue items,
musical instruments, and "Plan A" Hobby Card inmates but refusing
to grant the same exemption for Theodish religious materials
shows the restriction/denial of Theodish Belief religious materials
does not serve a compelling governmental interest as RLUIPA
requires and tends to exhibit hostility, not neutrality, towards
Theodish Belief religious exercise under RLUIPA and Bowen v. Roy,

476 U.S., at 708.

    B.    The denial of the various requests are not in
           furtherance of compelling state interests and the denials
           are not the least restrictive means available in
           furthering those compelling interests.

<u>Joint Worship Time and Space for Asatru and Theodism</u>

    Defendants assert that if Theodish practitioners were given
separate designated outdoor worship areas, the requests of the
other recognized faith groups would have to be accommodated.
Defendants' slippery slope concerns "argument echoes the classic
rejoinder of bureaucrats throughout history: If I make an
exception for you, I'll have to make one for everybody, so no
exceptions. But RFRA [RLUIPA] operates by mandating consideration,
under the compelling interest test, of exceptions to [']Rule[s]
of general applicability.['] (cite omitted) Congress determined
that the legislated test [']is a workable test for striking
sensible balances between religious liberty and competing prior
governmental interests.[']" <u>Gonzales v. O Centro Espirita</u>
<u>Beneficente Uniad Do Vegetal</u>, 126 S.Ct. 1211, 1223 (2006). The
<u>Gonzales</u> Court found the aforesaid determination finds support
in <u>Sherbert v. Verner</u>, 374 U.S. 398, 407 (1963) and in "<u>Cutter</u>
<u>v. Wilkinson</u>, 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020
(2005), we held that the Religious Land Use and Institutionalized
Persons Act of 2000, which allows federal and state prisoners to
seek religious accommodations pursuant to the same standard as

set forth in RFRA, does not violate the Establishment Clause.
We had [']no cause to believe['] that the compelling interest
test [']would not be applied in an appropriately balanced way[']
to specific claims for exemptions as they arose. Id., at 2122-23."
Id. Gonzales, 126 S.Ct., at 1223-24.

Defendants assert scheduling joint worship time and space
for Asatru and Theodish practitioners is furtherance of several
compelling governmental interests such as safety and security,
budget restrictions, and staffing limitations.  RLUIPA does not
"elevate accommodation of religious observances over an institu-
tion's need to maintain order and safety."  Cutter,supra, at 722.
"Lawmakers supporting RLUIPA were mindful of the urgency of
discipline, order, safety, and security in penal institutions"
and "[t]hey anticipated that courts would apply the Act's standard
with [']due deference to the experience and expertise of prison
and jail administrators in establishing necessary regulations and
procedures to maintain good order, security and discipline,
consistent with consideration of costs and limited resources."  Id.
at 723 (quoting the Joint Statement at 57775).  But Defendants
"cannot merely brandish the words [']security['] and [']safety[']
and expect that their actions will automatically be deemed
constitutionally permissible conduct", and thus, insulated from
scrutiny.  Campos v. Coughlin, 854 F.Supp. 194, 207 (S.D.N.Y.
1994); see also Werner v. McCotter, 49 F.3d 1476, 1480 (9th Cir.
1995)("['][T]he state must do more than simply offer conclusory

24

statements that a limitation on religious freedom is required for security, health or safety to establish that its interests are [compelling].[']")(quoting Weaver v. Jago, 675 F.2d 116, 119 (6th Cir. 1982)); Jolly v. Coughlin, 76 F.3d 468, 479 (2nd Cir. 1996)("['][P]olicies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to met the Act's requirements['] even in the prison context.")(citations omitted).

Buchanan v. Burbury, 2006 WL 2010773 (N.D. Ohio 7/17/06) at 7, found, "As found by the Supreme Court in Cutter, safety and security, indisputably compelling state interests, outweigh an inmate's claim to a religious accommodation.  However, this is not a case in which the Plaintiff seeks an exception to a generally applicable rule that goes to the safety and security of the prison, such as a proscription on long hair.  Rather, Plaintiff seeks to engage in religious exercise that other inmates already enjoy."  The Plaintiffs in this action want to engage in religious exercise that other NDCS inmates already enjoy.

Defendants assert NSP does not have the staffing required to properly supervise inmate activities within multiple outside worhship areas.  The NSP has on Asatru worship area and one Native American sweatlodge worship area.  Both worship areas are located within full observation by NSP security staff positioned in Towers #5 and 6, as well as a security camera.  Also, NSP security staff positioned in Towers #7 and 10 can see portions of

both worship areas.  Furthermore, NSP does not assign a correctional officer to be present, at ground level, to monitor activities when either outside worship area is occupied (Plaintiffs' Exhibits #7 and 8).

Defendants assert that "Garman Lord himself acknowledges that separate space for Theodish worship may not be possible in a correctional setting. (Ex.#26)"  That a careful review of Ex. #26 will show that Garman Lord only acknowledges that full Theodish practice, which calls for edged weapons, young maiden bedecked with flowers, wain (wagon) drawn by cows, cattle pasturage or housing for spring maidens or sacred wains, would not be allowed in a prison facility.

Defendants assert if NSP showed favoritism to one religious group security of the facility would be harmed because other faith groups may protest.  Defendants appear to argue the third-factor "rational relationship" test of <u>Turner v. Safley</u>, 482 U.S. 78 (1987) which is not applicable since RLUIPA is the law.

Defendants assert NSP does not have sufficient land to accommodate all of the potential requests.  Plaintiff Rust identified seven (7) land sites which could be divided into 13-15 smaller land sites (Defendants' Ex. #20, p.5-6).

Defendants assert limited or lack of funds to accommodate separate worship beliefs or religious sects.  RLUIPA does not require a state to pay for an inmate's devotional accessories. <u>Cutter v. Wilkinson</u>, 544 U.S., at 720.  Furthermore, Plaintiffs

26

are willing to pay for our devotional accessories.(Plaintiffs'
Ex. # 8 ).

## Foodstuffs and Ritual Mead

Defendants assert Plaintiffs want to conduct animal sacrifice.
Defendants Brief at 16, states Plaintiffs submitted "requests for
[']organic foodstuffs['] and [']free range meat product['] from a
health food store for sacrifice".    Defendants "cannot merely
brandish the words [']security['] and [']safety['] and expect
that their actions will automatically be deemed constitutionally
permissible conduct", and thus, insulated from scrutiny.  Campos,
supra, at 207; see also Werner,supra, at 1480; Jolly,supra, at
479.

## Devotional Items

Defendants assert that providing Plaintiffs with "Nine kinds
of Sacred Wood" and a "Fire Twirl" would cause serious safety
and security concerns to arise if inmates were provided access to
blunt instruments or burning pieces of wood. Defendants cannot
merly brandish the words "security" and "safety" and expect that
their actions will automatically be insulated from scrutiny.
Campos,supra, at 207; see also Werner,supra, at 1480; Jolly,
supra, at 479.  Defendants have authorized access to blunt
instruments or burning pieces of wood to other religious faith
groups as set forth in Attachment E of A.R. 208.01 (Defendants'
Exhibits #1, 30, 31, 32, 33, 34, 35, and 36).  Why is there
serious safety and security concerns when Plaintiffs request wood

27

which Defendants permit the Native American and Asatru faith groups to burn in their respective rituals?

The failure to consider the least restrictive measure on the "Fire Twirl" was addressed by Plaintiffs,supra, at 18. Plaintiffs addressed the alleged insufficient land issue supra, at 26. Plaintiffs addressed the Stanbæd at 17-18, and the Eormensyl, supra, at 18-19.

Defendants have failed to set forth any compelling governmental interest or the least restrictive means for the denial of each of the devotional items listed in Plaintiffs Step 2 Grievance (Amended Complaint Ex. #10 and Defendants' Ex. #21, pp. 6-7). Defendants refused to consider and reject the efficency of less restrictive measures. Gartell v. Ashcroft, 191 F.Supp.2d at 39-40; Sample v. Lappin, 424 F.Supp.2d, at 195.

## Coerced Inculcation of Religious Messages

Defendants assert that Plaintiffs are referring to the "eight rooms located in the basement" of the Religious Center. Plaintiffs have referred to both the eight rooms located in the basement of the Religious Center and the prison school which is closed on weeknights and during the day and night on the weekends and holidays.

Defendants could move all the week-night night, weekend and holiday day/night religious education/study classes and worship services (except the Sunday Christian worship) along with the assigned Correctional Officer to the prison school. The prison school has an estimated 5-7 enclosed classrooms where the

28

Religious Center has only 3 areas for religious meetings. The
prison school's enclosed classrooms have windows which allows the
assigned Correctional Officer to monitor the religious activities.
The utilization of the empty school building during the week-night,
weekend and holiday day/night would cost the Defendants little or
no funds.

Defendants have refused to consider and reject the effency
of the less restrictive measure of utilization of the pre-existing
empty school building. See Gartell v. Ashcroft, 191 F.Supp.2d,
at 39-40; Sample v. Lappin, 424 F.Supp.2d, at 195. In fact,
Defendants have failed to make any reference in their Brief that
Plaintiffs have raised the issue of using the empty school
building in their Complaint and Grievances (Amended Complaint
pp. 35-36, ¶68-70 and Plaintiffs' Ex. #3).

Possession of Personal Religious Materials

Defendants assert "DCS cannot demonstrate favoritism by granting special privileges to the Theodish inmates.  It would be a safety risk to provide special treatment to Theodish inmates."

Defendants show favoritism when they grant the exemption to allow inmates to retain legal materials beyond the four cubic feet of personal property allotment.  Pursuant to the Defendants' argument it would be a safety risk to provide special treatment to only the low percentage of inmates who have legal materials.

Defendants show favoritism when they grant the exemption to allow only inmates with "Plan A" Hobby Cards to retain personal hobby materials beyond the four cubic feet personal property allotment.  Pursuant to Defendants' argument it would be a safety risk to provide special treatment to the low number of inmates who are allowed to purchase "Plan A" Hobby Cards and go to the Hobby Association's Hobby Center while refusing to extend a similar exemption to inmates with "Plan B" Hobby Cards.

Defendants show favoritism when they grant the exemption to exempt t.v. sets, cassette/compact disc players walkman-type units and musical instruments from the four cubic feet personal property allotment.  Pursuant to Defendants' argument it would be a safety risk to provide special treatment to only those inmates who can afford to purchase t.v. sets, cassette/compact disc players, radios, walkman-type units, and musical instruments.

Defendants failed to apply the compelling interest test or

consider the least restrictive means when they reviewed Plaintiffs'
"religious exercise" request to retain personal religious
materials beyond the four cubic feet of personal property
allotment.  Cutter,supra, at  717 ; Gartell,supra, at 39-40;
Sample,supra, at 195.

Furthermore, Defendants cannot brandish the words
"security" and "safety" and expect that their actions will
automatically be insulated from scrutiny.  Campos,supra, at 207;
see also, Werner,supra, at 1480; Jolly,supra, at 479.

In conclusion, the Defendants have failed to apply RLUIPA
to Plaintiffs' "religious exercise" and have imposed a substantial
burden on the Plaintiffs' "religious exercise".  An evidentiary
hearing and/or trial will flesh out the factual context.

Plaintiffs Claims Against the Defendants in Their Official
Capacities is not Barred by the Doctrine of Sovereign Immunity

RLUIPA states in relevant part, "A person may assert a
violation of this Act as a claim or defense in a judicial
proceeding and obtain appropriate relief against a government."
42 U.S.C. §2000cc-2(a).  "Government" is defined as "(i) a State,
county, municipality, or other governmental entity created under
the authority of a State; (ii) any branch, department, agency,
instrumentality, or official of an entity listed in clause (i);
and (iii) any other person acting under color of State law."
42 U.S.C. §2000cc-5.

The Civil Rights Remedies Equalization Act of 1986, 42 U.S.C.

31

§2000d-7, contains the required unequivocal waiver of state
sovereign immunity. The statute provides in relevant part:

"A State shall not be immune under the Eleventh Amendment of
the Constitution of the United States from suit in Federal
court for a violation of section 504 of the Rehabilitation
Act of 1973, title IX of the Education Amendments of 1972,
the Age Discrimination Act of 1975, title VI of the Civil
Rights Act or 1964, or the provisions of any other Federal
statute prohibiting discrimination by recipients of Federal
assistance."

42 U.S.C. §2000d-7(a)(1).

RLUIPA was enacted, in part, to prohibit discrimination by
prison officials against prisoners who desire to exercise their
religious beliefs. The Seventh Circuit observed that: "RLUIPA
follows in the footsteps of a longstanding tradition of federal
legislation that seeks to eradicate discrimination and is
[']designed to guard against unfair bias and infringement on
fundamental freedoms.[']" Charles v. Verhagen, 348 F.3d 601,
607 (7th Cir. 2003)(quoting Mayweathers v. Newland, 314 F.3d 1062,
1066-67 (9th Cir. 2003)). The right to exercise one's religion
is clearly a fundamental freedom and Congress found that prison
officials were discriminating against prisoners who sought to
exercise their religious beliefs. Accordingly, the Court finds
that RLUIPA is a "Federal statute prohibiting discrimination by
recipients of Federal financial assistance", and the Defendants

32

sovereign immunity for monetary damages on official claims under RLUIPA is waived under the Equalization Act by the acceptance of federal prison funding.  42 U.S.C. §2000d-7(a)(1).  <u>Sisney v. Reisch</u>, 533 F.Supp.2d 952, 971-72 (D.S.D. 2008).

CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Court deny the Motion for Summary Judgment as there are genuine issues of material fact present in the case at bar.

RESPECTFULLY SUBMITTED By:

Wolfgang Rüst #30118
Nebraska State Penitentiary
P.O. Box 2500
Lincoln, NE 68542-2500

Bobby Conn #57625
Nebraska State Penitentiary
P.O. Box 2500
Lincoln, NE 68542-2500

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the Plaintiffs' Brief in Opposition of Defendants' Motion for Summary Judgment was sent to the Defendants, by and through their attorney of record, via U.S. Mail Services, first class mail, postage pre-paid, on this _____ day of _____, 2009.

Addressed to:

Mr. Ryan C. Gilbride
Assistant Attorney General
2115 State Capitol
Lincoln, NE 68509

Wolfgang Rust #30118
Nebraska State Penitentiary
P.O. Box 2500
Lincoln, NE 68542

Bobby Conn #57625
Nebraska State Penitentiary
P.O. Box 2500
Lincoln, NE 68542-2500

34

EXHIBIT

#1

Wolfgang Rüst aka John F. Rust #30118

Required elements/features of the Sacred Space
For Théodish Belief inmates
Eormensýl

Eormensýl is the cosmic axis that pierces
both earth and sky that links these three (3)
distinct but interpenetrating realms: A
lower (under) world existing beneath the
surface of the earth (that 3 Worlds, the
Well of Wyrd, and the Wyrdæ are located),
the upper World existing above the sky
(that 3 Worlds are located there), and the middle
World existing on the physical where we
live. Eormensýl expresses the absolute
reality in its aspect of norm, of the fixed
point (focal point of Théodism), at the center
of the cosmos upholding and binding the
Worlds together; it is the site where
communication (prayers and offerings) with the
gods, ancestors, and other wights can only be
effected near it, or by means of it; it is the
break-through in plane for the shamanic technique
of journeying from one cosmic region/realm to
another – earth to sky or earth to the lower
world to seek wisdom and/or advice from the
gods, ancestors and other wights; and the
actions, that fall into Wyrd's Well via Eormensýl,
which the Wyrdæ convert for the proper
results (an increase or decrease in mæzen), then

page 2

transmit MÆZEN back to the source of the action VIA Eormensýl. Both the Eormensýl and the Weôfod (altar) need to be placed on the sites power point. Without the permanently erected Eormensýl, which pierces both sky and earth, imposes a substantial burden on the central focal point in Theodism beliefs/practices as set forth herein and the Proposals sections: MÆZEN, pp. 50-51; Eormensýl, pp. 69-72; Well of Wyrd and the Wyrdæ, pp. 72-75; and various relevant paragraphs in Sacred Space, pp. 52-54 & 62.

## STÁNBÆÐ

The ingestion of herbs or the stánbæð (sweat lodge type structure) are the structural components for creating the shamanic path to a state of altered consciousness and visions (and to consecrate those who are seeking power and knowledge on the spiritual plane) to seek wisdom, advice, etc. from the gods, ancestors, and other wights. See generally The Way of the Shaman by Michael Harner, Shamanism and Old English Poetry by Stephen O. Glosecki, Shamanism Archaic Techniques of Ecstasy by Mircea Eliade. The aforementioned ~~herbs~~ herbs can be substances declared illegal by State and Federal laws or other herbs (having mildly psychoactive effects) which can

page 3

be legally purchased wherever herbs are sold. The
NDCS security concerns regarding legal herbs,
e.g., any mild psychoative effects, possibility of
adverse reactions with prescribed medications
or health condition, etc., will prevent Theodish
inmates access to and use of said legal herbs.
However, pursuant to Okone v Shabazz, 107
S.Ct. 2400 standard: "alternative means of
exercising the right remain open to prison
inmates" the "stindbed" is the alternative
means to the legal herbs. Garman Lord, in the
3rd paragraph on page 1 of his January 6, 2004
letter to Randy Donner, indicates the stindbed
is the alternative means to bring spiritual
purity into the holy (that is of special
religious importance in Theodism) in a
regulated punitive environment of a prison.
    The stindbed has to be located in
close proximity to Eormensyl to allow Theodish
shamanic practitioners to fare foath to
ascend/descend the Sacred Eormensyl for
acquiring wisdom, advice, etc. from the gods,
ancestors, and other wights in the lower
or upper Worlds.
    See the Proposal's sections: Stindbed, pp.
63-69; Mysticism, at p. 44 indicating that
shamanism (dreecraft) is very much part Theodish
Belief spiritual nourishment

page 4

Weafod (ALTAR) constructed of Heaped Stones

The heaped stone ALTAR has been an integral sacred element of Germanic heathenry see the Proposal's section: Weofod (ATTAR) Constructed of Heaped Stones, p. 128. That a large stone ALTAR was never used by ancient Germanic heathens.

Hazel Wood Stakes and Twine

GARMAN Lord, in the 2nd full paragraph on page 2 of his January 6, 2004 letter to Randy Downer, states the Hazel Wood Stakes and Twine are essential to making whatever plot of ground "holy ground" and wards it from ears casual profanation. See Proposal's sections: Hazel Wood Stakes And Twine, pp 127-128 and "Sacred Space, at p. 52 discuss use of Hazel Wood Stakes and Twine to make site Sacred

Please be Advised that a Natural color YARN made from A NATURAL fiber is An Acceptable substitute for the Twine to meet the Departments security concerns

Blowing Horn with a Trombone Mouthpiece

The blowing horn is an essential element

page 5

for a valid Theodish Faining. The blowing horn
is a necessary item to consecrate the land.
See Proposal's sections: Blowing Horn with a
Trombone Mouthpiece, pp. 130-131; Worship/Sacrifice
pp. 110-115 (provides the essential "formulaic elements"
in the "Theodish Faining Ritual: An Outline")

Wood Wand (Sigeyard)

Sigegyrd is an essential "formulaic element" for
warding the land. See Proposal's sections: Wood Wand
(Sigegyrd), p. 131; Worship Sacrifice, pp. 110-115. Also, I
did not include the fact that Wicca has a community
wand since I did not know this to include in Proposal

Récels and Récelfæt with charcoal

Récels and Récelfæt with charcoal is a necessary
"formulaic element" for a valid Theodish Faining and
(and for sacrifices)
to ward/consecrate the land. See Proposal's sections:
"Récels and Récelfæt with charcoal, pp. 103-104; Worship
Sacrifice, pp. 110-115

Sacred Fire and Fire wood

For Sacrificial Fire and heat stanbed stones

Long Benches and Table
Will be utilized for Sacrificial Feasts

page 6

Ribbons

Used to weave good luck (MEZEW) into
the land, etc.  See Proposals sections: Ribbons,
p. 142; Formensyl, pp. 69-72

A Rough outline of the possible layout of
the Theodish Weohsteall

The location of the Weofod (altar) and the
Eormensyl is tentative until the exact
location of the power spot is located by
the shaman. The location of the power spot
will affect the placement of Weofod, Eormensyl,
Needfire and Standred.

18 feet is necessary around the Eormensyl
and the Sacred Firepit. The 18 ft is for the use
of Ribbons on Eormensyl to weave good
luck, i.e., Mæzen into the site. The 18 st
around the firepit is based on the
ancient warding symbol of the "Helm of
Awe." The Helm of Awe is shaped somewhat
like a snowflake and participants will be
positioned on each of the points of the
Helm of Awe. Approximately 4 foot will be
necessary around the entire perimeter to
allow for placement of the Sacred "Hickory
Stakes and Twine (yarn)" and for the
required processional to ward the entire
site for the fawning. Also, there will be a
bull skull top with the horns attached (about a
6 foot wide span) mounted on the top of the
Eormensyl pursuant to the ancient
Religious belief. The Weofod will be about

4 foot long AND 2 foot wide (depends on the size of the granite slab being donated) And the heaped stones will make the Weesod about 3 foot high. The StandBED is 15 foot diameter And should seat up to 20 people sitting cross-legged.

We want to point out the 4 foot perimeter mentioned includes the area between the perimeter chain line security fence (located on all 4 sides) and all the items located on the Weehstall (including the 2 parallel benches & table)

Both the NeedFire firepit and the StandBED pit to hold the hot rocks are approximately 2 feet in diameter



Case: 4:08-cv-03185-LSC-PRSE    Document #: 63    Date Filed: 07/09/2009    Page 44 of 112

pp 165 - 179

## *The Sacred Plants of our Ancestors*

Christian Rätsch

Golden Apples grow in her garden;
she alone knows how to tend the apples!
By eating the fruit, her kindred are endowed
with eternal, never-aging youth;
yet sick and pale their blossom falls,
old and weak they dwindle away,
and must do without Freia.
—Richard Wagner, *Rheingold* [1]

The religious experiences of our Germanic-Celtic ancestors were significantly influenced by the considered and responsible use of consciousness-expanding plants. Because these plants made contact with the goddesses, gods, and divinatory beings possible, and revealed the secrets of the universe, they were held in esteem and worshiped as sacred objects. The plants bestowed the people who ingested them with visions of a joyful world in which everything was right. The brutal Christianization of Europe robbed Europeans of their sacred knowledge of how to use these plants in meaningful ways. The plants were demonized by the Church and mystical experience was forbidden (Cf. Müller-Ebeling 1991). Today, European culture still suffers from the gaping wound that was ripped open by Christianization. Modern man is uprooted, culturally divided, and lost in a demystified universe that seems meaningless. He has forgotten the beneficial use of sacred plants and suffers from the uncontrolled abuse of alcohol, tobacco, barbiturates, and other substances. Perhaps the time has come to honor our ancestors and to once more place our trust in the protection of sacred plants.

### The Way the Plants are Used Determines Their Effect

The earth provides humans with everything they need. It offers them plants that nourish, heal, stimulate, or intoxicate. Certain plants can be used raw, others must be prepared. Often the preparation of a plant is complicated and demands knowledge, experience, and technology. Many plants are suited only as food when they are prepared by cooking or juicing. Some commonly eaten

plants can be fatally toxic if prepared in the wrong manner. Someone who eats raw potatoes, for example, will be ingesting a very dangerous poison. But those who know how to prepare potatoes will not poison themselves.

This holds even truer with medicinal plants than with plants used for food. In the hands of an inexperienced person, foxglove *(Digitalis purpurea)* is a terrible, deadly poison, but in the hands of experienced doctors and herbalists, digitalis preparations have already saved the lives of thousands of people suffering from heart problems. Nearly every medicinal plant can be medicinal or poisonous—sometimes fatally so—depending on the dosage. To be able to use medicinal plants in a wise and truly healing way demands superior expertise concerning application, dosage, and the spectrum of effects. If medicinal plants are used incorrectly, they can do more harm than good (Storl 1986). The same is true for intoxicating or psychedelic plants that expand consciousness. To use these naturally intoxicating plants in a wise and beneficial manner demands the most precise knowledge of preparation and dosage, as well as thorough experience so that the desired effect occurs at the right place and at the right time (Zinberg 1984).

Evidence for the wise use of intoxicating and psychedelic plants has been established as early as the Neolithic period. The disastrous abuse of recent plant drugs is a manifestation of recent centuries. The sacred or ritual use of such plant drugs has existed in nearly all cultures throughout the history of the human race (McKenna 1992). Their inherent powers, which expanded consciousness and triggered mystical experiences, caused them to be seen as "plants of the gods," "plant teachers," and "magical plants" (Rätsch 1988; Schultes and Hofmann 1979).

In the *Rig Veda*, the most ancient written source of the religion of the Aryans and Indo-European tribes who settled in the Indus Valley, hundreds of songs are sung about the mystical and wondrous effects of the sacrificial drink soma. The soma ritual was quite simple, but all the more potent as a result. It was said that under the guidance of the divine soma drink the creation of the universe could be relived in a mystical way and one could understand oneself as a part of the whole. For this the people gathered together in a circle, lit an altar fire, and sacrificed soma to the gods by ingesting the drink. The body was considered to be the Vedic temple, which was filled and illuminated by the gods incarnated in the draught. In addition to grain and milk, the beer-like drink

*TYR: Myth—Culture—Tradition*

Case: 4:08-cv-03185-LSC-PRSE   Document #: 63   Date Filed: 07/09/2009   Page 46 of 112

pp 165 - 179

contained the juice of the soma plants (which still have not yet been definitively botanically identified). In post-Vedic times, the soma drink was brewed with hashish or other *Cannabis* products. It was considered a drink of inspiration. The intoxicated artists referred to in the Vedic hymns attest to the mystical experience of cosmic consciousness (Wasson 1968).

The soma drink of the Aryans corresponds to many intoxicating sacrificial drinks of the Indo-European peoples (Huber 1929; Wohlberg 1990). The Zoroastrian Persians (the ancient Parsi) knew the drink *haoma*, which was brewed with ephedra (*Ephedra* sp.), rue *(Peganum harmala)*, and pomegranate *(Punicum grantum)* (Flattery and Schwartz 1989). The ancient Greeks drank ambrosia, nectar, and *kykeon*—the initiation drink of the Eleusinian mysteries (Wasson et al. 1984). The Thracians became intoxicated on oat beer and wine in which mushrooms had been soaked. The Celts worshiped a magical cauldron that contained the mead of poetry (Maurizio 1933). All of these heathen sacrificial drinks were brewed with the addition of plant drugs (hemp, mushrooms, opium, nightshade plants, etc.), the uses of which are currently subject to laws and regulations. Why were the intoxicating plants of our Indo-European ancestors sacred, and why are they demonized and illegal today? Apparently people back then knew better than they do now how to handle—that is, how to beneficially make use of—consciousness-expanding drugs.

Like many archaic peoples and tribal cultures, our Celtic-Germanic ancestors recognized, cultivated, and integrated the basic human need for intoxication and mystical experience into their lives in a meaningful way (Siegel 1989; Weil 1986). They knew about the divine origins of intoxicating plants and drinks: "Mead itself, which dropped down like heavenly dew from the world tree, was, for the Germanic peoples, the symbol of the drink of the gods" (Delorez 1963: 23).

Our ancestors recognized the cosmic significance of this means of intoxication. It was to open the human being to the fairy world, to raise the rainbow bridge to Valhalla, the fortress of the gods, and offer them sanctuary in a clear, magical, and mystical universe. For this reason the secrets of the sacred plants were guarded by wise women, seeresses, prophets, magicians, priests, and Druids. Sacred drinks were not drunk like the nightly beer in front of the television, but rather as part of communal rituals on special occasions in an extraordinary environment, in order to



IN THE FOLKLORE OF NORTHERN
GERMANY, THE BELIEF AROSE THAT
WITCHES DRANK BEER AT
THEIR GATHERINGS.
("WITCHES' SUPPER," WOODCUT
BY ULRICH MOLITORIS, 1489)

glimpse into the beyond—to see the gods (Rätsch 1990).

During the libational ceremonies of the Germanic peoples, the sacred beverage (mead or beer) that had been brewed specifically for the festival was passed around to the circle of participants in large drinking horns decorated with mythical motifs. The priest or chieftain took the horn and drank to the gods, offered some of the liquid to the earth, and sprinkled a few drops to the heavens. He thanked Wotan [Odin], the god of ecstasy and the lord of magical drinks. He called to the ancestors and the heroes who founded the culture of the humans, and wished his tribe peace, well being, and health. Then he passed the horn along. The next round he toasted again to the gods, to friends, or to special ancestors, and passed the horn again, further and further around the circle, until it was empty. As soon as it was, a refilled horn was brought, passed around the circle, aud drained—until all the participants in the circle were communally and concurrently intoxicated and the gods descended among the humans (Gaeßner 1941).

Sacred plants were not only used to flavor the sacrificial drink; they were also used in divination and rune oracles. In late Antiquity the figure of the Germanic seeress (called in Old Norse a *seiðkona* or *völva*), was already known for her wondrous abilities throughout Europe and beyond its borders (one was even active in Egypt!). These seeresses—of whom Albruna and Weleda are

*TYR: Myth—Culture—Tradition*

pp 165 - 179

*Sacred Plants of Our Ancestors*                                    *169*



BLACK HENBANE, AN INGREDIENT
IN TRUE PILSNER.
(ENGRAVING, NINETEENTH CENTURY)

two famous examples—fell into a prophetic trance with the help
of such magical substances and shamanic techniques (Delorez).
Sacred plants were used in medicine to exorcise harmful spirits,
that is, to heal insanity and madness. Other plants were used to
increase the fertility of humans, animals, and fields. Love potions
were not reprehensible, but instead something sacred, for they
could help to spur forth creation.

## Henbane and True Beer

Black henbane *(Hyoscyamus niger)* contains various tropane alka-
loids that can lead to extreme changes in consciousness (euphoria,
hallucination, trance, delirium). These powerful characteristics
have been recognized by all peoples and thus henbane has been
considered a "plant of the gods" since very early times (Heiser
1987). Today henbane—known in the German vernacular as
*Prophetenkraut* (prophet's herb), *Zauberkraut* (magic herb), or
*Nifelkraut* (fog herb)—is one of the rare, and therefore protected,
plants of Europe. It is more commonly found in the warmer
Mediterranean-type climates of countries such as Greece,
Portugal, and Spain. In Germany and Denmark it rarely ever
appears anymore. It is still occasionally found in Norway. It
prefers loamy, nitrogen-rich soil in remote areas, and is often

located growing near cultic sites and in the vicinity of convent ruins. Because of its scarcity, the Germanic peoples cultivated henbane in gardens (Höfler 1990). Famous henbane gardens were grown in places whose current names still attest to their former status: Pilsensee (henbane lake), in the regions of Bilsengarten (henbane garden) and Bilstein (henbane stone), and in the Czech city of Pilsen (henbane).[2] The pre-Indo-European natives of the Alps knew of henbane. They placed the small, strongly intoxicating henbane seeds in the urns of their deceased tribal brothers and sisters (Graichen 1988: 69). Henbane was also well known to the Celts. They called it *Belinuntia* or *Beleño*, names which indicate it was sacred to Bel, the god of the sun, oracles, and medicine. The Gaelic Celts also used the herb in the preparation of arrow poison and for the killing of the elders, which is where the German common name *Altsitzerherb* (an herb for *Altsitzer*, or those who can no longer work and are dependant upon others) comes from. At their own request, aged and frail people were sent first on a trip, and then to the beyond, with a brew of henbane (Höfler 1990).

The Germanic peoples used henbane for magical and religious rituals, medicine, and love magic. The consciousness-altering powers of the herb were so skillfully employed that, depending on what was needed, they could lead to insights, healing, or romantic yearnings. When possible, the herb was to be harvested by a naked girl who was consecrated to the magical spirit or the divine nature of the plant. Henbane stood under the dominion of the fertility god Donar/Thor (the Romans connected it with their own thunder god, Jupiter). For this reason it was used for weather magic. When the land was suffering from a drought, a stalk of henbane was dipped into a spring. The drops that clung to it were then sprinkled onto the sun-parched earth. Bishop Burchard of Worms (ca. 965–1025) described a heathen henbane weather magic ritual of the tenth century:

> During a period of incessant drought the girls gathered together, stripped one of their playmates naked and searched for *belisa* (i.e., henbane). The naked girl had to pull it out with her right hand, and it was then bound to the small toe of her right foot. Afterward some of the girls, with sticks in their hands, led the naked one to the nearest stream and sprinkled her with water. Doing this was supposed to call down the desired rain. Then the girl, who had to now walk backwards like a crab, was led back to

Case: 4:08-cv-03185-LSC-PRSE   Document #: 63   Date Filed: 07/09/2009   Page 50 of 112

pp 165 - 179

where they had begun. (Quoted after Bräunlein 1986: 55)

Henbane's most important religious role is in the Germanic libational offering to honor the thunder god Donar/Thor. Already in the first century C.E., the Roman historian Tacitus wrote that the Germanic peoples have always been heavy beer drinkers. They drank many different kinds of beer: lighter beer for daily enjoyment, strong beer for the ram and buck sacrifices, heavy Yule beer for the winter solstice. There was also beer for weddings, the harvest, binding ceremonies, and for friendship. The Germanic beers were all top-fermented and brewed without hops. They were brewed with barley malt, *bierbrot* (bread soaked with water, used to start the fermentation), and honey (Gaeßner 1941). In order to make the brew strong and intoxicating, marsh rosemary *(Ledum palustre)*, bog myrtle *(Myrica gale)*, or above all henbane was added (Maurizio 1933). The name "pilsner," currently used to denote modern hoppy beer, came from henbane, which was formerly known in German as *pilsener krut* (henbane herb). Henbane beer was a potent intoxicant, aphrodisiac, and could reveal visions of divine splendor. A beer like this would not make you tired and sleepy, as a hopped beer does. It was stimulating and inspired the imagination, inducing heavenly trips and causing the henbane fairies to introduce themselves. The "true pilsner" is the only beer that makes you thirstier, the more you drink!

## Not Only Rope Got Twisted From Hemp

Hemp (of which there are three species: *Cannabis sativa, Cannabis indica,* and *Cannabis ruderalis*) has been used for around 10,000 years for fiber, food (the seeds and their oil), medicine, and as an intoxicant. It is one of the oldest—perhaps *the* oldest—cultivated plants of the human race. The drugs derived from hemp (hashish, marijuana) are very mild euphorics. They stimulate the associative imagination and put the user into a euphoric state for 2–3 hours, which is characterized by aphrodisiac feelings and changes in the experience of the time-space continuum.

The most ancient archeological discovery of hemp seeds *(Cannabis sativa)* was found at a dig done at the stratum of the band ceramics culture in Eisenberg near Thuringia (Renfrew 1973: 163). Thus, the earliest evidence of hemp culture (approxi-

172 *Christian Rätsch*



GERMANIA, THE PERSONIFICATION OF THE GERMAN REVOLUTION
OF 1848, HOLDS A HEMP BRANCH AND SWORD.
(PAINTING BY PHILIPP VEIT, 1848)

Case: 4:08-cv-03185-LSC-PRSE   Document #: 63   Date Filed: 07/09/2009   Page 52 of 112

*pp 165 - 179*



THE WHITE GARDEN POPPY.
(ILLUSTRATION FOR "THE HERBAL"
OF JOHN GERARD, 1633)

mately 7,500 years old) is found on the soil of present-day
Germany! Hemp has been established as part of Germanic culture
from before the fifth century B.C.E. It was cultivated in fields,
often together with flax. Hemp was sown, tended, and harvested
by women (Höfler 1990: 98). The workings of the love goddess
Freya were recognized in hemp. Sowing and harvest were con-
ducted in her honor with an erotic ritual, a *Hochzeit* —a "high
time."[3] In the feminine flowers lay the eroticizing and love-gen-
erating power of Freya (Neményi 1988). Those who became
intoxicated from them experienced the sensual joy and aphrodisi-
ac ecstasies of the love goddess. From archeological digs it has
been discovered that the Germanic and Celtic tribes were already
placing female hemp flowers (marijuana) in the graves of their
dead 2,500 years ago (Kessler 1985).

## The Garden Poppy's Got It

Most people believe that the poppy *(Papaver somniferum)* original-
ly came from eastern Asia and that the opium produced from it
was a discovery of the Chinese. Both beliefs are incorrect. Poppies
were cultivated in the eastern Mediterranean region. Opium was
discovered by the Minoans (on Crete) and the ancient Greeks,

and used medicinally, ritualistically, and hedonistically in many different ways. Poppies, and the knowledge of how to prepare opium (by making incisions in the immature capsules), came very early to the Celtic-Germanic regions. In the pile dwellings on Lake Constance and in Switzerland (e.g., at Robbenhausen), which date back around 4,500 years, cakes with poppy seeds as well as incised capsules have been found (Seefelder 1987).

The Germanic peoples planted poppies in poppy fields or *Magenfeldern* (stomach fields) which were considered convalescing and healing fields and were known as *Odâinsackr* (Old Norse, "field of the living"). There Odin/Wotan, the god of healing and ecstasy, practiced his greatest marvels. Dissolving all fears, stimulating the imagination, and facilitating psychic abilities, the poppy juice (=opium) also protected one from harmful spirits, bloodsucking vampires, and the mischievous Prussian gnome known as the Nickel-Kobold or Nickelruh (Höfler 1990).

In our own century, poppy juice dissolved in wine continues to be used in German folk medicine as a remedy for sleep, pain, and anxiety. Perhaps these folk-medicinal uses have their roots in a Germanic drinking tradition in which opium was added to mead.

## The Fruits of the Valkyries

The atropine-containing belladonna *(Atropa belladonna)* is called *tollkirsch* ("crazy" or "lusty cherry") in German. Because it is also known as *Wutbeere* (rage berry) in German (Hirschfeld and Linsert 1930: 157), the intoxicating, hallucinogenic plant is placed under the dominion of Odin, the "raging." The plant, which causes death in higher doses, is also connected to Odin as the god of death, and to the valkyries as the spirits of death. The beautiful and seductive valkyries were the daughters of Odin and Erda—in other words, of heaven and earth. They were the goddesses of the wind, who carried the souls of heroes who had fallen in battle, or others who had died honorably, to the divine fortress of Valhalla. Those chosen by the valkyries are then allowed to delight and intoxicate themselves with the divine mead until the end of the world, or more precisely, until the cyclical renewal of the universe. In the lower Rhine regions, belladonna is called *Walkerbaum* (valkyrie tree). It is said that everyone who eats of the berries will fall prey to the valkyries (Perger 1864: 182f).

Case: 4:08-cv-03185-LSC-PRSE    Document #: 63    Date Filed: 07/09/2009    Page 54 of 112

pp 165 - 179

Belladonna is said to open the gateway to Valhalla, thus to an alternative state of consciousness.

## Fly Agaric and Other Flying Mushrooms

In many German-speaking regions the expression *"der hat wohl Narrenschwämme gegessen"* ("he must have eaten fool's mushrooms") has been preserved into modern times.[4] This refers to someone who has been living out his foolishness, craziness, or insanity. The name is a folkloric memory that mushrooms exist which can put a normal person into an extraordinary state of consciousness. Many indigenous mushrooms of Europe such as liberty caps *(Psilocybe semilanceata)* contain the same active ingredients as the famous Mexican magic mushrooms *(Psilocybe mexicana)* (Hofmann et al. 1963; Jordan 1989). These native European mushrooms are just as capable as the Mexican species of revealing the splendidly colorful visions of a different, higher, or truer reality. They can answer questions, provide solutions, and fill the individual's life with meaning. But they can also reveal the depths of the individual soul in the form of demons and horrific images. Those who are afraid of themselves are easily made foolish by the mushrooms. Those who wish to further expand themselves will find true allies. We know that the Germanic peoples added mushrooms to their ritual beer or mead (Lohberg 1984: 66). It is only likely that the mushrooms would imbue the drink with the power of divine revelation—for those who drank in the circle saw the gods descend among them.

We know of one mushroom that was consecrated to Odin, the god of ecstasy: fly agaric *(Amanita muscaria)*. Fly agaric has a very long shamanic tradition in northern Eurasia. Its intoxicating qualities were used culturally for shamanizing, divination, and dreams (Bauer et al. 1991; Rosenbohm 1991). According to Germanic conceptions, fly agaric arose when Odin rode through the air with his horse on a wild hunt at the time of the winter solstice. The foam from his horse's nostrils fell to the ground, fertilizing and impregnating it. After nine months—thus, at the end of August or beginning of September—the earth bore forth the bright red, phallic fly agaric (Pursey 1977: 80). These mushrooms are able to help the soul to fly, and to bestow it with the visionary gift of the divine. Odin had two ravens who were called "thought" and "memory." They fed themselves from the mushroom which since



AN AGE-OLD CONNECTION EXISTS
BETWEEN MUSHROOMS AND OTHER REALMS.
(ILLUSTRATION BY EDMUND DULAC FOR
SHAKESPEARE'S "THE TEMPEST," 1906)

Antiquity has been called *Rabenbrot* (raven's bread) in German
vernacular. Perhaps this mushroom can make the thoughts of our
ancestors more understandable, in that it once again sets our sup-
pressed memories free.

This brief overview should be sufficient to illustrate that the
use of mind-altering drugs is not originally "culturally alien" to

*TYE: Myth—Culture—Tradition*

Case: 4:08-cv-03185-LSC-PRSE Document #: 63 Date Filed: 07/09/2009 Page 56 of 112

*pp 165 - 179*

Europeans. Our ancestors have known them and used them in a meaningful way for centuries. It was only by the suppression of our native tradition that the misuse—in other words, the uprooted use—of psychoactive substances was brought about.

*(Translated by Annabel Lee)*

*An earlier version of this article appeared under the title "Was schon den Alten heilig war" (What Was Already Sacred to the Ancients) in* Esotera *(10/91). This translation is of a subsequent version, "Die heiligen Pflanzen unserer Ahnen," which appeared in the Festschrift collected in honor of Albert Hofmann entitled* Das Tor zu inneren Räumen: Heilige Pflanzen und psychedelische Substanzen als Quelle spiritueller Inspiration *(Gateway to Inner Space: Sacred Plants and Psychedelic Substances as a Source of Spiritual Inspiration), edited by Christian Rätsch (Löhrbach: Edition Rauschkunde, 1996). It appears here by kind permission of the author.*

## Translator's Notes:

1. In his Ring Cycle operas based on the Nibelungen stories, Wagner merged aspects of Freia (Freya) and Idunn, the latter of whom was actually the goddess in the ancient Germanic myths who tended the apples of eternal youth.

2. *Bilsenkraut* is the German common name for henbane.

3. *Hochzeit* = marriage or wedding; literally *hoch* = high, *zeit* = time.

4. *Narrenschwämme*, literally "fool's mushrooms," is one of the many German common names for fly agaric *(Amanita muscaria)*.

## Sources:

Bauer, Wolfgang, et al. *Der Fliegenpilz: Ein kulturhistorisches Museum* (Cologne: Wienand Verlag, 1991).

Bräunlein, Peter. "Vom Zauber der Pflanzen in der mitteralterlichen Heilkunst" in the exhibition catalog *Kreutter-Kunst* (Freiburg: 1986), pp. 55–77.

Delorez, R. L. M. *Götter und Mythen der Germanen* (Einsiedeln, Zurich, Cologne: Benziger, 1963).

Flattery, David S., & Martin Schwartz. *Haoma and Harmaline*

[Near Eastern Studies, vol. 21] (Los Angeles: University of California, 1989).

Gaeßner, Heinz. *Bier und Bierartige Getränke im Germanischem Kulturkreis* (Berlin: Veröffentlichungen der Gesellschaft für die Geschichte und Bibliographie des Brauwesens, 1941).

Graichen, Gisela. *Das Kultplatzbuch* (Hamburg: Hoffmann & Campe, 1988).

Heiser, Charles B. *The Fascinating World of Nightshades* (New York: Dover, 1987).

Hirschberg, Magnus, and Richard Linsert. *Liebesmittel* (Berlin: Man Verlag, 1930).

Höfler, Max. *Volksmedizinische Botanik der Germanen* (Berlin: VWB, 1990 [reprint from 1908]).

Hofmann, Albert, et al. "Présence de la psilocybine dans une espèce européene d'Agaric, le *Psilocybe semilanceata* Fr. Note(*) de MM" in *C. R. Acad. Sc.* (Paris: 1963), pp. 10–12.

Huber, E. *Das Trankopfer im Kulte der Völker* (Hannover-Kirchrode: Opperman, 1929).

Jordan, Michael. *Mushroom Magic* (London: Elm Tree Books, 1989).

Kessler, Thomas. *Cannabis Helvetica* (Zurich: Nachtschatten, 1985).

Lohberg, Rolf. *Das große Lexikon vom Bier*, 3rd. expanded edition (Stuttgart: Scripta, 1984).

Maurizio, A. *Geschichte der gegorene Getränke* (Berlin: Paul Parey, 1933).

McKenna, Terence. *Food of the Gods: The Search for the Original Tree of Knowledge* (New York: Bantam, 1992).

Müller-Ebeling, Claudia. "Wolf und Bilsenkraut, Himmel und Hölle—Ein Beitrag zum Thema Dämonisierung der Nature" in Susanne G. Seiler, ed., *Gaia—Das Erwachen der Göttin* (Braunschweig: Aurum, 1991), pp. 163–182.

Neményi, Géza von. *Heidnische Naturreligion* (Bergen an der Dumme: Johanna Bohmeier Verlag, 1988).

Perger, K. Ritter von. *Deutsche Pflanzensagen* (Stuttgart and Oehringen: August Schaber, 1864).

Pursey, Helen L. *Die Wundersame Welt der Pilze* (Zollikon: Albatross, 1977).

Rätsch, Christian. *Lexikon der Zauberpflanzen aus ethnologischer Sicht* (Graz: Akademische Druck- und Verlagsanstalt, 1988).

Rätsch, Christian. "Bridges to the Gods: Psychedelic Rituals

of Knowledge" in *Annali dei Musei civici* 6 (1990), pp. 127–138.

Renfrew, Jane. *Paleoethnobotany: The Prehistoric Food Plants of the Near East and Europe* (New York: Columbia University Press, 1973).

Rosenbohm, Alexander. *Halluzinogene Drogen im Schamanismus* (Berlin: Dietrich Reimer Verlag, 1991)

Schultes, Richard E., and Albert Hofmann. *Plants of the Gods* (New York: McGraw Hill, 1979). Revised edition, with Christian Rätsch (Rochester, Vermont: Inner Traditions, 2002).

Seefelder, Mattias. *Opium—Eine Kulturgeschichte* (Frankfurt an der Main: Athenäum, 1987)

Siegel, Ronal K. *Intoxication: Life in Pursuit of Artificial Paradise* (New York: Dutton, 1989)

Storl, Wolf-Dieter. *Vom rechten Umgang mit heilenden Pflanzen* (Freiburg: Hyperion, 1986).

Wasson, R. Gordon. *Soma, the Divine Mushroom of Immortality* (New York: Harcourt Brace Jovanovich, 1968).

Wasson et al. *Der Weg nach Eleusis* (Frankfurt on the Main: Insel, 1984).

Weil, Andrew. *The Natural Mind*, revised ed. (Boston: Houghton Mifflin, 1986).

Wohlberg, Joseph. "Hoama-Soma in the World of Ancient Greece" in *Journal of Psychoactive Drugs* 22 (1990), pp. 333-342.

Zinberg, Norman. *Drug, Set, and Setting: The Basis for Controlled Intoxicant Use* (New Haven: Yale University Press, 1984).

## NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
## INFORMAL GRIEVANCE RESOLUTION FORM
### UNIT STAFF

**FROM:** Rüst, Wolfgang/Rust, John E.          30118          NSP/5-A-20

      Last Name,  First,  Middle Initial          Number          Facility/Housing Unit

---

Page 1 of 5                    **PART A: Inmate Request/Concern.**

The construction (which is complete) of the purported additional
rooms for religious worship and/or religious education/study
classes in the NSP Chapel imposes a substantial burden on
"religious exercise" in direct contravention of the "Religious
Land Use and Institutionalized Persons Act of 2000 (RLUIPA)" 42
U.S.C. §2000cc thru §2000cc-5.

During the October 2006 meeting with inmate representatives of
various NSP faith groups the NSP Warden Dennis Bakewell, NSP
Deputy Warden Richard Cruickshank and NSP Religious Coordinator
Steve Marsh apprised us that classrooms would be constructed in
the NSP Chapel for religious worship and/or religious
education/study.

The construction of these additional rooms in the NSP Chapel
consists of:  2 separate solid walls installed on either side of
the Religious Coordinators offices (one wall on the south side &

2/7/07
Date

Signature *Wolfgang. Rust*
*John E. Rust*

---

**PART B: Response and Reason(s) for Decision Reached.**

Mr. Marsh reports that to his knowledge as of 2/8/07 there are no religious activities
that have been moved to the Chapel ( since the walls were built ) which would subject
any inmate to "Religious preaching, singing, and/or witnessing" against their wishes.
The option is open to move the Sabbatharian class if they would prefer to meet
earlier, and are bothered by the sounds of another activity. Further improvements will
be considered as concerns are raised.

2/8/07
Date

Signature

---

**NOTE:** A copy of this completed *Informal Grievance Resolution Form* must accompany any *Step 1 Institutional Grievance Form.*

EXHIBIT
#2

**NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES**
# INFORMAL GRIEVANCE RESOLUTION FORM
## UNIT STAFF

FROM: Rust, Wolfgang/Rust, John E.     30118     NSP/5-A-20

    Last Name,   First,   Middle Initial      Number       Facility/Housing Unit

Page 2 of 5        **PART A: Inmate Request/Concern.**

the other wall on the North side) extending from the floor to the
lower front edge of the balcony with a open floor to ceiling
walkway/doorway for the Chapel's aisles at both ends of each of
these 2 separate walls. Each of these 2 separate walls
constitutes the West wall of both rooms. These purported 2 rooms
are not enclosed with 4 walls like a normal room is since there
is only the West wall on the Chapel's interior.

The NSP Chapel's normal acoustics (without any assistance from
the Chapel's public address system) allows the sound(s) of
religious worship and/or religious education/study classes to
circumvent the 4 open aisle walkways/doorways and/or from the
other purported room. This results in faith groups in the 2
purported rooms and the main portion of the Chapel being coerced
into listening/hearing the sounds of another faith's religious
worship and/or religious education/study class when they have no

Date 2/7/07           Signature *Wolfgang Rust* / *John E. Rust*

---

**PART B: Response and Reason(s) for Decision Reached.**

SEE Pg #1

Date 2/8/07             Signature

NOTE: A copy of this completed *Informal Grievance Resolution Form* must accompany any *Step I Institutional Grievance Form.*

**PART C: Receipt.**

RETURN TO: _____

      Last Name,   First,   Middle Initial      Number       Facility/Housing Unit

*I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject:*

Date                Signature of Unit Staff Receiving Complaint

## NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
## INFORMAL GRIEVANCE RESOLUTION FORM
## UNIT STAFF

**FROM:** Rust, Wolfgang/Rust, John E.                30118                NSP/5-A-20

Last Name,    First,    Middle Initial                Number                Facility/Housing Unit

Page 3 of 5                    **PART A: Inmate Request/Concern.**
inclination/desire to hear or receive another faith's religious
message.

The 2 purported rooms could have been built with 4 walls, a door,
and with appropriate windows for security purposes similar to the
construction of the 2 Religious Coordinators offices in the NSP
Chapel. Furthermore, there is at least 3 more areas within the
NSP Chapel that could be utilized for rooms to hold religious
worship and/or religious education/study classes, to wit:  (1)
the balcony in which 3 rooms could have been constructed; (2) in
the basement, located under the Chapel's stage, are 8 rooms that
could be cleaned up and utilized; and (3) in the basement,
directly below the congregation's pews, is a room that could
converted into additional rooms

The NDCS adopted and adhered the clearly established law set
forth in Campbell v. Cauthron, 623 F.2d 503, 509 (8th Cir, 1980)

2/7/07
Date                                         Signature Wolfgang Rust John E. Rust

---

**PART B: Response and Reason(s) for Decision Reached.**

SEE Pg # 1

2/8/07
Date                                         Signature

NOTE: A copy of this completed *Informal Grievance Resolution Form* must accompany any *Step 1 Institutional Grievance Form.*

**PART C: Receipt.**

**RETURN TO:** _____

Last Name,    First,    Middle Initial                Number                Facility/Housing Unit

*I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject:*

_____

Date                                         Signature of Unit Staff Receiving Complaint

DCS-A-adm-016 (rev. 2-97)                Printed on Recycled Paper with Soy Ink

**NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES**
**INFORMAL GRIEVANCE RESOLUTION FORM**
**UNIT STAFF**

**FROM:** Rüst, Wolfgang/Rust, John E.          30118          NSP/5-A-20

Last Name,   First,   Middle Initial          Number          Facility/Housing Unit

Page 4 of 5                     **PART A: Inmate Request/Concern.**
for over 25 years. The Campbell Court specifically held that
allowing religious preaching, singing and witnessing within
hearing of prisoners who did not wish to hear said message
contravenes those prisoner's Free Exercise of Religion right if
prison officials refuse to ensure that said prisoners will not be
subjected to said coerced inculcation.

The NDCS is now refusing to comply with the clearly established
law Campbell, supra, which is enforceable pursuant to RLUIPA, and
is now imposing a "substantial burden" on ~~a prisoner's~~ "religious
exercise" when NDCS implemented the current policy of coerced
inculcation through the construction of the 2 purported rooms in
the NSP Chapel.

RELIEF: Comply with the clearly established law of Campbell,
supra, via the construction of or conversion of rooms in the NSP
Chapel and/or utilization of space else-where in the NSP (that

2/7/07
Date                                                       Signature

---

**PART B: Response and Reason(s) for Decision Reached.**

SEE Pg #1

2/8/07
Date                                                       Signature

**NOTE:** A copy of this completed *Informal Grievance Resolution Form* must accompany any *Step 1 Institutional Grievance Form.*

**PART C: Receipt.**

**RETURN TO:** _____

Last Name,   First,   Middle Initial          Number          Facility/Housing Unit

*I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject:*

_____

_____

_____

_____          _____
Date                                   Signature of Unit Staff Receiving Complaint

**NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES**
**INFORMAL GRIEVANCE RESOLUTION FORM**
**UNIT STAFF**

**FROM:** Rüst, Wolfgang/Rust, John E.        30118        NSP/5-A-20

Last Name,    First,    Middle Initial        Number        Facility/Housing Unit

---

Page 5 of 5                **PART A: Inmate Request/Concern.**

was the NDCS and/or NSP policy and procedure prior to the
construction of the 2 purported rooms in the NSP Chapel) to
ensure that prisoner's "religious exercise" is not contravened.

2/7/07
Date

Wolfgang Rüst
John E. Rust
Signature

---

**PART B: Response and Reason(s) for Decision Reached.**

SEE Pg #1

2/8/07
Date                                    Signature

**NOTE:** A copy of this completed *Informal Grievance Resolution Form* must accompany any *Step 1 Institutional Grievance Form.*

---

**PART C: Receipt.**

**RETURN TO:** _____

Last Name,    First,    Middle Initial        Number        Facility/Housing Unit

*I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject:*

_____

_____

_____

Date                                    Signature of Unit Staff Receiving Complaint

DCS-A-adm-016 (rev. 2-97)        Printed on Recycled Paper with Soy Ink

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step One
## CHIEF EXECUTIVE OFFICER

INSTRUCTIONS: TYPE OR USE BALL POINT PEN. IF MORE SPACE IS NEEDED, USE ATTACHMENT SHEET IN TRIPLICATE.

From: Rüst, Wolfgang/Rust, John E.          30118          NSP/5-A-20

LAST NAME,       FIRST,      MIDDLE INITIAL              NO.              FACILITY/HOUSING UNIT

Page 1 of 6                **Part A – INMATE REQUEST/CONCERN:**

I am dissatisfied with the 2/8/07 response to my 2/7/07 Informal Grievance #31 and I want to reiterate the issue and facts set forth in the aforesaid Informal Grievance #31 in this Step One Grievance.

Informal Grievance #31 and this Step One Grievance is not about the violation of the Sabatharian (sic) "religious exercise" of RLUIPA and Campbell v. Cauthron, 623 F.2d 503, 509 (8th Cir. 1980) that the 2/8/07 response to my Informal Grievance #31 suggests. The Sabbatarians will need to grieve that violation themselves.

The issue, in my Informal Grievance #31 and this Step One Grievance, is the present newly implemented policy and procedure of noncompliance, after the adoption/adherence for over 25 years, with the Campbell, supra, holding, which is enforceable pursuant

2/11/07
DATE

SIGNATURE OF REQUESTOR

---

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**

I support the response of the informal grievance. Further improvements will be considered as concerns are raised and funds become available.

2-14-07
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step One
### CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.                    30118        NSP/5-A-20
　　　LAST NAME,　　FIRST,　　MIDDLE INITIAL                    NO.            FACILITY/HOUSING UNIT

Page 2 of 6            **Part A – INMATE REQUEST/CONCERN:**
to RLUIPA, when the NDCS/NSP constructed the 2 purported rooms in
the NSP Chapel for religious worship and/or religious
education/study classes.

The NSP religious faith groups and other NSP self-betterment
clubs, e.g., Veterans, et al., who held their respective
activities in the classrooms located in the NSP Turnkey area were
informed that said religious faith groups will be holding their
activities in the NSP Chapel and the other self-betterment clubs
will be holding their activities in the NSP activities Center.

Nebraska Department of Correctional Services Administrative
Regulation Number 208.01, RELIGIOUS SERVICES, (hereinafter "AR
208.01"), Section II.B.2. at page 3 (Revised 3/15/06), states:
"Program proposals requiring change in institutional or
Departmental policy will be reviewed by the Department Religions

2/11/07
DATE

Wolfgang Rust
SIGNATURE OF REQUESTOR
John E. Rust

---

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

See p. 1

2-14-07
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

## Part C – RECEIPT

Return to: _____                    _____        _____
　　　LAST NAME,　　FIRST,　　MIDDLE INITIAL                              NO.                FACILITY/HOUSING UNIT

I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject: _____

_____

DATE                                                    RECIPIENT'S SIGNATURE (STAFF MEMBER)

(SEE REVERSE SIDE FOR INSTRUCTIONS FOR APPEAL TO DIRECTOR OR DIRECT SUBMISSION TO DIRECTOR)

DCS-A-adm-049 (4-97)                    Printed with soy ink on recycled paper

## NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step One
### CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.          30118          NSP/5-A-20
       LAST NAME,    FIRST,    MIDDLE INITIAL        NO.        FACILITY/HOUSING UNIT

Page 3 of 6          **Part A – INMATE REQUEST/CONCERN:**
Study Committee [hereinafter "RSC"] which will forward a
recommendation to the Assistant Director-Institutions and the
Assistant Director-Programs and Community Services."

The construction of the 2 purported rooms in the NSP Chapel for
religious worship and/or religious education/study classes
constitutes a change in the previous NDCS policy of adherence to
the clearly established law of Campbell, supra, for more than 25
years and now subjects inmates to coerced inculcation.  That RSC
Chair Joe Baldassano, RSC Member/Legal Counsel Kathy Blum, each
Member of the Religion Study Committee, Assistant
Director-Institutions Frank Hopkins, Assistant Director Programs
and Community Services Larry Wayne, and NDCS Director Robert P.
Houston reviewed and approved the aforesaid change of
institutional and Departmental policy.

2/11/07
DATE

*Wolfgang Rust*
SIGNATURE OF REQUESTOR

---

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

see p. 1.

2-14-07
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

## Part C – RECEIPT

Return to: _____
           LAST NAME,    FIRST,    MIDDLE INITIAL                NO.            FACILITY/HOUSING UNIT

I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject: _____

_____

DATE                                        RECIPIENT'S SIGNATURE (STAFF MEMBER)

(SEE REVERSE SIDE FOR INSTRUCTIONS FOR APPEAL TO DIRECTOR OR DIRECT SUBMISSION TO DIRECTOR)

Printed with soy in

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step One
### CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rüst, Wolfgang/Rust, John E.          30118          NSP/5-A-20

LAST NAME,      FIRST,      MIDDLE INITIAL          NO.          FACILITY/HOUSING UNIT

Page 4 of 6          **Part A – INMATE REQUEST/CONCERN:**

The 2/8/07 response to my Informal Grievance #31 posits, it is
the religious faith group's volunteer and/or inmates
responsibility to raise concerns about the sounds, etc. of
another religious groups activity that is causing problems.
Campbell, supra, and its progeny held it is the duty of the
prison officials to ensure that prisoners would not be subjected
to the coerced inculcation to another religious faith group's
message/activities.  Prior to the construction of the 2 purported
rooms in the NSP Chapel the NDCS/NSP officials ensured that
prisoners were not subjected to coerced inculcation from another
religious faith group's message/activites by scheduling religious
worship and/or education/study classes in both the NSP Chapel and
Turnkey classrooms.

Furthermore, NDCS/NSP officials *were* well aware of the

2/11/07
DATE

SIGNATURE OF REQUESTOR

---

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**

See p. 1

2-14-07
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

**Part C – RECEIPT**

Return to: _____

LAST NAME,      FIRST,      MIDDLE INITIAL          NO.          FACILITY/HOUSING UNIT

I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject: _____

_____

_____

_____

DATE          RECIPIENT'S SIGNATURE (STAFF MEMBER)

(SEE REVERSE SIDE FOR INSTRUCTIONS FOR APPEAL TO DIRECTOR OR DIRECT SUBMISSION TO OIRECTOR)

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step One
### CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rüst, Wolfgang/Rust, John E.          30118          NSP/5-A-20
          LAST NAME,   FIRST,   MIDDLE INITIAL          NO.          FACILITY/HOUSING UNIT

Page 5 of 6          **Part A – INMATE REQUEST/CONCERN:**

ramifications of coerced inculcation by another religious faith
group's message/activities because NSP officials required the
Åsatrú education/study class to hold their class in the NSP
Chapel while the Prison Congregation of America was holding their
education/study class from 6:00-8:00 p.m. on a Saturday during
the fall of 2006. This coerced inculcation resulted in an
investigation being conducted; the suspension of the Prison
Congregations of America* volunteer during the aforesaid
investigation; the October 2006 meeting between inmate
representatives of various religious faith groups and Warden
Bakewell, Deputy Warden Cruickshank and Religious Coordinator
Marsh.

RELIEF: Comply with the clearly established law of Campbell,
supra, via construction of 4 walls, a door, etc. for the 2
purported rooms in the NSP Chapel; the construction/conversion of

2/11/07
/DATE

SIGNATURE OF REQUESTOR

---

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**

See p. 1

2-14-07
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

**Part C – RECEIPT**

Return to: _____
          LAST NAME,   FIRST,   MIDDLE INITIAL          NO.          FACILITY/HOUSING UNIT

I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject: _____

DATE                                        RECIPIENT'S SIGNATURE (STAFF MEMBER)

(SEE REVERSE SIDE FOR INSTRUCTIONS FOR APPEAL TO DIRECTOR OR DIRECT SUBMISSION TO DIRECTOR)

DCS-A-adm-049 (4-97)                    Printed with soy ink on recycled paper

# NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
## GRIEVANCE FORM
### Step One
### CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rüst, Wolfgang/Rust, John E.        30118        NSP/5-A-20
LAST NAME,    FIRST,    MIDDLE INITIAL        NO.        FACILITY/HOUSING UNIT

Page 6 of 6                **Part A – INMATE REQUEST/CONCERN:**

the balcony or the areas in the basement of the NSP Chapel; or
resumption of using Turnkey classrooms for religious worship
and/or education/study classes. The aforesaid will not subject
prisoners to the coerced inculcation(s) of another religious
faith groups' message/activities.

2/11/07
DATE

SIGNATURE OF REQUESTOR

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

see p.1

2-14-07
DATE                CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

### Part C – RECEIPT

Return to: _____
LAST NAME,   FIRST,   MIDDLE INITIAL              NO.        FACILITY/HOUSING UNIT

I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject: _____

DATE                RECIPIENT'S SIGNATURE (STAFF MEMBER)

(SEE REVERSE SIDE FOR INSTRUCTIONS FOR APPEAL TO DIRECTOR OR DIRECT SUBMISSION TO DIRECTOR)

DCS-A-adm-049 (4-97)                Printed with soy ink on recycled paper

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.          30118          NSP/5-A-20
       LAST NAME,    FIRST,    MIDDLE INITIAL        NO./GROUP            INSTITUTION

Page 1 of 5              *Part A – REASON FOR APPEAL:

I am dissatisfied with the 2/8/07 response to my 2/7/07 Informal
Grievance #31 and the 2/14/07 response to my 2/11/07 Step One
Grievance #19 and I want to reiterate the issue and facts set
forth in the aforesaid 2 Grievance in this Step Two Grievance.

The Step One Grievance response alleges: "[f]urther improvements
will be considered as concerns are raised and funds become
available."  The NDCS/NSP officials, who are named in the 2
Grievances identified in the preceding paragraph, were fully
aware of the concerns and ramifications of coerced inculcation of
the religious message/activity from another religious faith group
prior to the construction of the purported 2 rooms for religious
activity in the NSP Chapel, to wit:  1. As stated on page 1 of my
Informal Grievance #31 and pages 4-5 of my Step One Grievance #19
the NDCS/NSP officials were fully aware of the ramifications from
the coerced inculcation of a religious message/activity from one

2/28/07
DATE

SIGNATURE
a/k/a John E. Rust

*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S
RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

3-30-07    See attached response.          JK Hopkins Jr
DATE                                                    DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.            30118        NSP/5-A-20
LAST NAME,    FIRST,    MIDDLE INITIAL            NO./GROUP            INSTITUTION

Page 2 of 5            *Part A – REASON FOR APPEAL:
religious faith group can have on another religious faith group
when the NSP required the Asatru religious group to hold their
religious class in the NSP Chapel when Prison Congregation of
America was conducting their religious activity in the NSP
Chapel; and 2. that concerns about coerced inculcation were
raised during a October 2006 meeting (the participates of said
meeting were detailed in the annexed Informal and Step One
Grievances) and Warden Bakewell indicated that inmates would not
. be subjected to coerced inculcation from any religious faith
group's religious message/activity. Also, inmates from several
religious groups have filed Grievances on ~~~~~~ being subjected
to coerced inculcation of unwanted religious messages/activities
from other religious faith groups in the NSP Chapel since the
construction of and utilization of the purported 2 rooms in the
NSP Chapel.

2/28/07
DATE

SIGNATURE

*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S
RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

DATE                    DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

## Part C – RECEIPT

Return to: _____    _____    _____
LAST NAME,    FIRST,    MIDDLE INITIAL            NO./GROUP            INSTITUTION

I acknowledge receipt this date of the above inmate's/student's appeal from the response received from the following complaint: _____

DATE                    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

DCS-A-adm-037 (2/97)            Printed with soy ink on recycled paper

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

> INSTRUCTIONS:
> TYPE OR USE BALL POINT
> PEN. IF MORE SPACE IS
> NEEDED, USE ATTACHMENT
> SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.          30118          NSP/5-A-20
       LAST NAME,    FIRST,    MIDDLE INITIAL        NO./GROUP              INSTITUTION

Page 3 of 5                *Part A – REASON FOR APPEAL:*

The NDCS/NSP officials (who are named in my Informal Grievance #31 and Step One Grievance #I9) did not consult with the free-world volunteers and/or leaders of the various inmate religious faith groups within the Department regarding said volunteers and/or leaders concerns about possible coerced inculcation from the religious message/activity of another religious faith group based on the planned construction of the purported 2 rooms for religious activity in the NSP Chapel. Instead, those named NDCS/NSP officials chose to construct the purported 2 rooms for religious activity in the NSP Chapel in total disregard of the violation of both the inmates and free-world volunteers/leaders "religious exercise" pursuant to RLUIPA and Campbell v. Cauthron, 623 F.2d 503, 509 (8th Cir. 1980). The construction cost for these purported 2 rooms could have been better utilized to create 3 enclosed rooms on the NSP Chapel's balcony or to refurbish the 8 rooms located below the

2/28/07
DATE

*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

DATE                                                        DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

## Part C – RECEIPT

Return to: _____
            LAST NAME,    FIRST,    MIDDLE INITIAL              NO./GROUP              INSTITUTION

I acknowledge receipt this date of the above inmate's/student's appeal from the response received from the following complaint: _____

DATE                                                SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.          30118          NSP/5-A-20
          LAST NAME,      FIRST,    MIDDLE INITIAL           NO./GROUP            INSTITUTION

Page 4 of 5                    *Part A – REASON FOR APPEAL:

NSP Chapel's stage.

Now the NDCS/NSP plead "lack of funds" to remedy the coerced
inculcation ~~of~~ of unwanted religious messages/activities they
created via the construction of the purported 2 rooms for
religious activity in the NSP Chapel.  This coerced inculcation
of unwanted religious messages/activites and violation of RLUIPA
and Campbell, supra, can be remedied without a ~~large~~ expenditure
of funds, to wit:  1. allowing inmate religious faith groups to
utilize the NSP Turnkey classrooms which was the situation before
the construction of the purported 2 rooms in the NSP Chapel; and
2. refurbish the 8 rooms below the NSP Chapel's stage for
religious activity by using inmates who are on room restriction.

RELIEF:  Comply with the clearly established law of RLUIPA and
Campbell, supra, to prevent the coerced inculcation of

2/28/07
    DATE

Wolfgang Rust
aka John E. Rust
SIGNATURE

*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S
RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

DATE                                                      DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

## Part C – RECEIPT

Return to: _____
              LAST NAME,      FIRST,    MIDDLE INITIAL           NO./GROUP            INSTITUTION

I acknowledge receipt this date of the above inmate's/student's appeal from the response received from the following complaint: _____

DATE                                    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

> INSTRUCTIONS:
> TYPE OR USE BALL POINT
> PEN. IF MORE SPACE IS
> NEEDED, USE ATTACHMENT
> SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.          30118      NSP/5-A-20

| LAST NAME, FIRST, MIDDLE INITIAL | NO./GROUP | INSTITUTION |

Page 5 of 5                 **\*Part A – REASON FOR APPEAL:**

the unwanted religious messages/activities from other religious
faith group(s) in the NSP Chapel, to wit:  1.  refurbish the 8
rooms located below the NSP Chapel's stage as described in the
previous paragraph; 2. utilize the Turnkey classrooms as
described in the previous paragraph; or 3. construction of 4
walls, a door, etc. for the purported 2 rooms for religious
activity in the NSP Chapel.

2/28/07
DATE

Wolfgang Rust
John E. Rust
SIGNATURE

\*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S
RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

DATE                                          DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

## Part C – RECEIPT

Return to: _____
           LAST NAME,    FIRST,    MIDDLE INITIAL          NO./GROUP          INSTITUTION

I acknowledge receipt this date of the above inmate's/student's appeal from the response received from the following complaint: _____

DATE                              SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

DCS-A-adm-037 (2/97)                  Printed with soy ink on recycled paper

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM

## Step Two
## Central Office Appeal

### RESPONSE AND REASONS FOR DECISION REACHED

Inmate Name:          Rust, John

Inmate Number:        #30118

Date Received:        March 1, 2007

Grievance Number:     #07-0205

Subject:              Chapel

Response:

The space available for holding religious services and study groups is limited. Therefore, the chapel was divided into two spaces so more religious meeting could be scheduled. The groups meeting at the same time need to be respectful and not disturb each other.

_____3-30-07_____
Date

_____
Director

# NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
## INFORMAL GRIEVANCE RESOLUTION FORM
### UNIT STAFF

**FROM:** Rust, Wolfgang/Rust, John E.   |   30118   |   NSP/5-A-20

Last Name,   First,   Middle Initial   |   Number   |   Facility/Housing Unit

Page 1 of 2                    **PART A: Inmate Request/Concern.**
From 7 p.m. thru 8 p.m. on Tuesday, April 1, 2008, the Theodish
Belief religious exercise, i.e., religious education/study class,
was disrupted when we were subjected to religious singing by the
Spanish catechism group because the acoustics of the Religious
Center/Chapel building results in the reverberation of sounds
throughout the entire building.

The overall structure of the Religious Center/Chapel building's
main floor, the construction of 2 open-ended walls to create 3
areas on the main floor, and the acoustics of the main floor
results in the coerced inculcation of unwanted religious exercise
from other religious groups which imposes a substantial burden on
Theodish Belief inmates' religious exercise.

The NDCS refuses to insure that inmates will not be subjected to
coerced inculcation of the unwanted religious exercise of another
religious group by constructing enclosed rooms on the main floor.

April 2, 2008
Date

Signature

---

**PART B: Response and Reason(s) for Decision Reached.**

Your concerns are noted. The Religious Coordinators reports that they will do their best
to only schedule similar type faith groups in the religious center at the same time. Due to
the lack of overall programming space and staffing, they are not in the position to use the
Religious Center for only one activity at a time.

4-16-08
Date

Signature

**NOTE:** A copy of this completed *Informal Grievance Resolution Form* must accompany any *Step 1 Institutional Grievance Form.*

EXHIBIT
#3

## NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
## INFORMAL GRIEVANCE RESOLUTION FORM
## UNIT STAFF

FROM: Rust, Wolfgang/Rust, John E. Rust      30118          NSP/5-A-20

Last Name,    First,    Middle Initial          Number              Facility/Housing Unit

Page 2 of 2                    **PART A: Inmate Request/Concern.**

of the Religious Center/Chapel, refurbishing and utilizing the
existing rooms located in the basement of the Religious
Center/Chapel, or utilizing the rooms in the school which stands
empty during the evening and on weekends.

RELIEF:  Construct enclosed rooms on the main floor of the
Religious Center/Chapel, refurbish and utilize the existing rooms
in the basement of the Religious Center/Chapel, or utilize the
empty rooms in the school during the evenings and weekends.

April 2, 2008

Date                                                Signature

---

**PART B: Response and Reason(s) for Decision Reached.**

See response on page #1

4-16-08

Date                                                Signature

**NOTE:** A copy of this completed *Informal Grievance Resolution Form* must accompany any *Step 1 Institutional Grievance Form.*

**PART C: Receipt.**

RETURN TO: _____

Last Name,    First,    Middle Initial          Number              Facility/Housing Unit

*I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject:*

_____

_____

_____

Date                                    Signature of Unit Staff Receiving Complaint

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step One
### CHIEF EXECUTIVE OFFICER

> INSTRUCTIONS:
> TYPE OR USE BALL POINT
> PEN. IF MORE SPACE IS
> NEEDED, USE ATTACHMENT
> SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.        30118        NSP/5-A-20

LAST NAME,    FIRST,    MIDDLE INITIAL                NO.            FACILITY/HOUSING UNIT

Page 1 of 4        **Part A – INMATE REQUEST/CONCERN:**
I'm dissatisfied with the 4/16/08 response to my 4/2/08 Informal
Grievance #2008-5004 and I want to reiterate/incorporate into
this Step One Grievance the issue and facts with the relief
requested as set forth in my 4/2/08 Informal Grievance.

The aforementioned 4/16/08 response establishes the NDCS adheres
to the policy of total disregard/contempt for the ritual purity
and spiritual purity of inmates' "religious exercise." Instead
of ensuring inmates will not be subjected to coerced inculcation
of unwanted religious exercise by other religious groups, the
NDCS imposes a substantial burden upon the "religious exercise"
of the other religious groups when an inmate or inmate religious
group raises coerced inculcation of unwanted religious exercise
by another religious group.

The aforementioned NDCS policy is demonstrated by:  Assistant

April 20 2008
DATE

SIGNATURE OF REQUESTOR
DHA John E. Rust

---

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

I support the response to the informal grievance. Staffing patterns do not allow for
separate enclosed rooms while maintaining the safety and security of this area. The
Religious Coordinator's office will continue to work on solutions to these problems as
they arise.

4-24-08
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step One
### CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rüst, Wolfgang/Rust, John E.          30118          NSP/5-A-20
LAST NAME,       FIRST,    MIDDLE INITIAL          NO.          FACILITY/HOUSING UNIT

Page 2 of 4          **Part A – INMATE REQUEST/CONCERN:**

Director Frank Hopkins specious 3/30/07 response to my Step Two
Grievance #07-0205, "[t]he groups meeting at the same time need
to be respectful and not disturb each other." The only way this
can occur is for the inmates' to modify and/or stop their
respective religious exercises so they would not subject other
inmates to coerced inculcation of unwanted religious exercise.
Also, during the Wednesday, 4/9/08, 9:00 a.m., Faith Group
Representatives (inmates) Meeting Religious Coordinator Steve
Marsh, while responding to an inmate's concerns of their
religious exercise of singing interfers with the Saturday morning
Muslim religious exercise, indicated the Tuesday Spanish
Catechism group was advised they could not conduct their singing
religious exercise since it interfered with Theodish Belief
inmates' religious exercise.

I want to point out the 2 Religious Coordinators' offices are

April 20 2008
DATE

SIGNATURE OF REQUESTOR

---

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**

see p 1

4-24-08
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

**Part C – RECEIPT**

Return to: _____
LAST NAME,       FIRST,    MIDDLE INITIAL          NO.          FACILITY/HOUSING UNIT

I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject: _____

_____

_____

_____

DATE          RECIPIENT'S SIGNATURE (STAFF MEMBER)

(SEE REVERSE SIDE FOR INSTRUCTIONS FOR APPEAL TO DIRECTOR OR DIRECT SUBMISSION TO DIRECTOR)

DCS-A-adm-049 (4-97)          Printed with soy ink on recycled paper

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step One
### CHIEF EXECUTIVE OFFICER

> INSTRUCTIONS:
> TYPE OR USE BALL POINT
> PEN. IF MORE SPACE IS
> NEEDED, USE ATTACHMENT
> SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.          30118          NSP/5-A-20

LAST NAME,    FIRST,    MIDDLE INITIAL          NO.          FACILITY/HOUSING UNIT

Page 3 of 4          **Part A – INMATE REQUEST/CONCERN:**

fully enclosed rooms which ensures the Religious Coordinators
will not be subjected to coerced inculcation of unwanted
religious exercise from the various religious groups who use the
NSP Religious Center/Chapel.  The NDCS chooses to erect 2
open-ended walls to create 2 additional spaces for inmate
religious exercise but refuses to construct 2 enclosed rooms like
the Religious Coordinators' offices, or to refurbish the (former
music) rooms in the basement of the NSP Religious Center/Chapel,
or to use the empty school during the evening and weekends to
ensure inmates will not be subjected to coerced inculcation of
unwanted religious exercise by other religious groups.

The acoustics of the NSP Religious Center/Chapel results in
ordinary conversations or other activity (religious or
non-religious) is heard in every location in the building.  The
coerced inculcation of religious exercise by another religious

*April 20, 2008*
DATE

*Wolfgang Rust*
*John E. Rust*
SIGNATURE OF REQUESTOR

---

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**

*See p. 1*

*4-24-08*
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

**Part C – RECEIPT**

Return to: _____

LAST NAME,    FIRST,    MIDDLE INITIAL          NO.          FACILITY/HOUSING UNIT

I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject: _____

DATE          RECIPIENT'S SIGNATURE (STAFF MEMBER)

(SEE REVERSE SIDE FOR INSTRUCTIONS FOR APPEAL TO DIRECTOR OR DIRECT SUBMISSION TO DIRECTOR)

DCS-A-adm-049 (4-97)          Printed with soy ink on recycled paper

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step One
### CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.        30118        NSP/5-A-20

LAST NAME,    FIRST,    MIDDLE INITIAL        NO.        FACILITY/HOUSING UNIT

---

Page 4 of 4        **Part A – INMATE REQUEST/CONCERN:**

group on 4/1/08 is not an isolated incident because the acoustics
of the NSP Religious Center/Chapel allow normal conversations to
carry over the entire building on a weekly basis.

RELIEF REQUESTED: Because of the acoustics of the NSP Religious
Center/Chapel, the only viable way to ensure inmates will not be
subjected to coerced inculcation of unwanted religious exercise
from other religious groups, is to complete the construction
began with the 2 open-ended walls by the constructing 2 fully
enclosed rooms on the main floor of the NSP Religious
Center/Chapel, or to refurbish and utilize the existing rooms in
the basement of the NSP Religious Center/Chapel, or to utilize
the classrooms in school building which is no used and stands
empty during the evening hours and on the weekends.

_April 20 2008_
DATE

_Wolfgang Rust_
_John E. Rust_
SIGNATURE OF REQUESTOR

---

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**

See p-1

_4-24-08_
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

**Part C – RECEIPT**

Return to: _____

LAST NAME,    FIRST,    MIDDLE INITIAL        NO.        FACILITY/HOUSING UNIT

I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject: _____

_____

_____

_____

DATE        RECIPIENT'S SIGNATURE (STAFF MEMBER)

(SEE REVERSE SIDE FOR INSTRUCTIONS FOR APPEAL TO DIRECTOR OR DIRECT SUBMISSION TO DIRECTOR)

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.          30118          NSP/5-A-20
      LAST NAME,   FIRST,   MIDDLE INITIAL        NO./GROUP              INSTITUTION

Page 1 of 4                    *Part A – REASON FOR APPEAL:

I'm dissatisfied with the 4/24/08 response to my 4/20/08 Step One
Grievance #2008-3004 and I want to reiterated/incorporate into
this Step Two Grievance the issue and the facts with the relief
requested as set forth in my 4/2/08 Informal Grievance #2008-5004
and my 4/20/08 Step One Grievance #2008-3004.

The 4/24/08 response alleges "[s]taffing patterns do not allow
for separate enclosed rooms while maintaining the safety and
security of this area." Religious activities are held Monday
thru Friday in the morning and afternoon in the NSP Religious
Center/Chapel with only the Religious Coordinators in their
offices which have large glass windows on 3 sides of each office.
The school is staffed with 1 Correctional Officer when inmates
and civilian teachers are holding class which is a similar
situation with 1 Correctional Officer assigned to the NSP
Religious Center/Chapel with inmates and outside religious

May 1, 2008
      DATE                                                    SIGNATURE

*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S
RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

6-5-08       See attached response.                    JX. Hopkins for
DATE                                                    DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

----------------------------------------------------------------

## Part C – RECEIPT

Return to: _____          _____          _____
           LAST NAME,    FIRST,    MIDDLE INITIAL                  NO./GROUP              INSTITUTION

I acknowledge receipt this date of the above inmate's/student's appeal from the response received from the following complaint: _____

2008 - 3004

_____                                    _____
DATE                                            SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rüst, Wolfgang/Rust, John E.          30118          NSP/5-A-20
      LAST NAME,    FIRST,    MIDDLE INITIAL        NO./GROUP          INSTITUTION

Page 2 of 4              **Part A – REASON FOR APPEAL:**
volunteers in the evenings and on weekends (all day & evening) or
when Religious Coordinators with inmates and outside religious
volunteers from Monday thru Friday in the morning and afternoon.
The aforementioned Correctional Officers assigned to the school
or the Religious Center/Chapel and the Religious Coordinators
walk around their respective areas to maintain safety and
security.  The enclosed school classrooms have large windows
which allow the officer to observe activities in the classrooms.
Conversion of the 2 areas with open-ended walls into fully
enclosed rooms with windows like the school classrooms and the
Religious Coordinators offices should affect safety and security
since the enclosed school classrooms does not affect safety and
security.  I've been informed the 8 rooms in the NSP Religious
Center/Chapel basement supposedly have windows in each room.
Based on the 4/24/08 response, why/how is it possible for the
correctional officer assigned to the school is able to walk

May 1, 2008
_____
DATE

Wolfgang Rüst
_____
SIGNATURE

*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S
RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

_____
DATE

_____
DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

## Part C – RECEIPT

Return to: _____          _____          _____
           LAST NAME,    FIRST,    MIDDLE INITIAL               NO./GROUP              INSTITUTION

I acknowledge receipt this date of the above inmate's/student's appeal from the response received from the following complaint: _____

_____

_____

_____

_____
DATE

_____
SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.     30118     NSP/5-A-20
　　　　LAST NAME,　FIRST,　MIDDLE INITIAL　　　NO./GROUP　　　INSTITUTION

Page 3 of 4                    *Part A – REASON FOR APPEAL:
around and maintain safety and security by observing activities
in each enclosed classroom but the assigned correctional officer
or the Religious Coordinators would not be able to do the same
for fully enclosed enclosed rooms with windows in the NSP
Religious Center/Chapel.  This 4/24/08 response certainly
indicates the school is a more secure building and would be
better suited for religious activities, which does not subject
inmates to coerced inculcation of unwanted "religious activity"
from other religious groups,during the evening and on weekends.

This 4/24/08 response further demonstrates the NDCS policy of
total disregard/contempt for Theodish Belief "religious
exercise(s)" of bringing and maintaining ritual purity and
spiritual purity into the holy stead, i.e., the Weohsteall (place
of the altar), Symbel Hall, Blot, Symbel, other Fainings,
religious education/study class, etc., in Theodish Belief
congregational practice.

May 1, 2008
　　　　DATE

Wolfgang Rust
John E. Rust
SIGNATURE

*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S
RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

　　　　DATE　　　　　　　　　　　　　　　　　　　　　　　　DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

------------------------------------------------------------------------

### Part C – RECEIPT

Return to: _____
　　　　LAST NAME,　　FIRST,　　MIDDLE INITIAL　　　　NO./GROUP　　　　INSTITUTION

I acknowledge receipt this date of the above inmate's/student's appeal from the response received from the following complaint: _____

_____

_____

_____

_____
　DATE　　　　　　　　　　　　　　　　SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL.

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.          30118          NSP/5-A-20
      LAST NAME,    FIRST,    MIDDLE INITIAL      NO./GROUP         INSTITUTION

Page 4 of 4                    *Part A – REASON FOR APPEAL:

RELIEF:  Acknowledge and allow Theodish Belief inmates their
"religious exercise" of bringing and maintaining ritual purity
and spiritual purity into the holy stead as outlined in the
preceding paragraph, and provide the relief requested in both my
4/2/08 Informal Grievance #2008-5004 and my 4/20/08 Step One
Grievance #2008-3004.

_May 1, 2008_
      DATE                                          SIGNATURE

*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S
RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

_____                              _____
    DATE                                          DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

------------------------------------------------------------------------

## Part C – RECEIPT

Return to: _____          _____          _____
           LAST NAME,    FIRST,    MIDDLE INITIAL                    NO./GROUP            INSTITUTION

I acknowledge receipt this date of the above inmate's/student's appeal from the response received from the following complaint: _____

_____                              _____
    DATE                                  SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

## GRIEVANCE FORM

### Step Two
### Central Office Appeal
#### RESPONSE AND REASONS FOR DECISION REACHED

Inmate Name:        RUST JOHN E (RUST,WOLFGANG)

Inmate Number:      30118

Date Received:      05/02/08

Grievance Number:   2008-3004

Subject:            Religion

Response:

You ask that the Religious Center be remodeled to provide enclosed areas with doors.
This request is denied because of security concerns and staffing patterns. The
Religious Coordinators will continue to monitor the situation and try to resolve any
conflicts.

6-5-08
Date                Director

**NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES**
**INFORMAL GRIEVANCE RESOLUTION FORM**
**UNIT STAFF**

FROM: Conn    Bobby    J              57625         NSP / 5A-13
    Last Name,    First,  Middle Initial         Number        Facility/Housing Unit

**PART A: Inmate Request/Concern.**

On Tuesday Evening Oct 30th, 2006. I had to miss Theodish Belief class due to circumstances that were out of my control. Count was late and since we eat 3rd in line. We didn't get to eat until approx. 6:50 p.m. Theodish Belief starts at 6:00 p.m. I shouldn't be denied my religious beliefs to go eat chow and I shouldn't be denied food for me to do my religious beliefs. A simple fix for debacles such as this would be to have all Theodish Belief practitioners out on early lines giving us plenty of time to eat and make the doors rush to class.

10/5/06
Date

Bobby J Conn
Signature

**PART B: Response and Reason(s) for Decision Reached.**

The schedule is set trying to be fair to each Housing Unit. Staff cannot control issues that may effect when count clears and inmates are Allowed out to Eat. The Expansion of Early line us. d Not resolve This issue and to allow one group and not others would not be fair. The compensation to Allow all groups out Early would greatly Effect the schedule as cause security issues during The meal Period

10/19/06
Date

Signature

NOTE: A copy of this completed *Informal Grievance Resolution Form* must accompany any *Step 1 Institutional Grievance Form.*

EXHIBIT
#4

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step One
## CHIEF EXECUTIVE OFFICER

INSTRUCTIONS: TYPE OR USE BALL POINT PEN. IF MORE SPACE IS NEEDED, USE ATTACHMENT SHEET IN TRIPLICATE.

From: Conn Bobby J   57625   NSP/SA-13

LAST NAME, FIRST, MIDDLE INITIAL   NO.   FACILITY/HOUSING UNIT

**Part A – INMATE REQUEST/CONCERN:**

I am dissatisfied with the 10/19/06 response to my informal Grievance #154 and I want to reiterate the issue raised therein.
The Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) 42 U.S.C § 2000cc-1 to § 2000 cc-5 mandates the current constitutional standard for inmate religious rights.
Section IV, G. 2. on Page 10 of administrative regulation #208.01 recognizes that religious education/study is an actual tenet requirement of a religious/faith and local community practices, NEB. REV. STAT. §83-182 requires the Director to establish programs, ie, religion, etc. to prepare and assist each person committed to the NDCS to assume his/her responsibilities as a useful citizen.

10/25/06
DATE

Buddy J Conn
SIGNATURE OF REQUESTOR

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**

I support the response to the informal grievance #154.

11-3-06
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step One
## CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Conn Bobby J
LAST NAME, FIRST, MIDDLE INITIAL

NO. 57625

NSP 5A-13
FACILITY/HOUSING UNIT

**Part A – INMATE REQUEST/CONCERN:**

Theodish Belief asungs (ranks) of "Thralldom" in High Theodism and "Learner" or Learning Wight" in Greater Theodism require education/study/discussion of Theodish religious lore is a mandatory tenet of Theodish Belief. See, e.g., German Lord The way of the Heathen; A Handbook of Greater Theodism, pp. 53-59, Grman Lord, Gesida Hand Book: An Introduction to Theedish Belief, pp 5-6 + pp 11-12. Terry A. Coker, "Thralldom: What is all this?" Theod Magazine, Vol. III No. 2, Woethurges 1996 pp 3-7.

The 10/17/06 response to my informal Grievance #154 states: "The Expansion of Early lines would not resolve the issue and to allow one group and not others would not be fair. The Court in Gonzales V. O Centro Espirita Beneficente Uniao Do Vegetal 126 S.Ct 1211, 1223-24 (2006) Rejected the Similar "Classic Rejoinder of Bereaucrats throughout history: If I make an exception for you, I'll have to

10/25/06
DATE

Bobby Conn
SIGNATURE OF REQUESTOR

---

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**

see p. 1

11-3-06
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

**Part C – RECEIPT**

Return to: _____
LAST NAME,   FIRST,   MIDDLE INITIAL          NO.          FACILITY/HOUSING UNIT

I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject: _____

SEE PG II

11/1/06
DATE

RECIPIENT'S SIGNATURE (STAFF MEMBER)

(SEE REVERSE SIDE FOR INSTRUCTIONS FOR APPEAL TO DIRECTOR OR DIRECT SUBMISSION TO DIRECTOR)

DCS-A-adm-049 (4-97)                    Printed with soy ink on recycled paper

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step One
### CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT PEN. IF MORE SPACE IS NEEDED, USE ATTACHMENT SHEET IN TRIPLICATE.

From: _Conn     Bobby     J_     _57625_     _NSP/ 5A-13_

LAST NAME,     FIRST,     MIDDLE INITIAL     NO.     FACILITY/HOUSING UNIT

**Part A – INMATE REQUEST/CONCERN:**

make one for everybody, so no exceptions," when dealing with religious rights. That inmates are routinely placed on Early line rosters) to eat so they can timely attend/participate as part of the team, etc of the daily schedule of recreational activities e.q, Softball, Basketball, Football, Soccer, Volleyball, etc

The NDCS refusal to place Theadish Belief inmates on early line rosters to allow them to eat so they can timely attend/participate in the scheduled weekly Theadish Belief education/study class when education/study/discussion of Theadish Belief lore is a mandatory requirement (tenet) of Theadish-Belief results in the imposition of a substantial burden on the religious burden exercise of Theadish inmates.

The NDCS refusal to place Theadish Belief inmates on early line education/study class roster but routinely place other inmates on a daily recreation activities roster)

_10/25/06_
DATE

_Bobby J Conn_
SIGNATURE OF REQUESTOR

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**

see p1

_11-3-06_
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

**Part C – RECEIPT**

Return to: _____     _____     _____
LAST NAME,     FIRST,     MIDDLE INITIAL     NO.     FACILITY/HOUSING UNIT

I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject: _____

_____
DATE

_____
RECIPIENT'S SIGNATURE (STAFF MEMBER)

(SEE REVERSE SIDE FOR INSTRUCTIONS FOR APPEAL TO DIRECTOR OR DIRECT SUBMISSION TO DIRECTOR)

DCS-A-adm-049 (4-97)     Printed with soy ink on recycled paper

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step One
### CHIEF EXECUTIVE OFFICER

> INSTRUCTIONS.
> TYPE OR USE BALL POINT
> PEN. IF MORE SPACE IS
> NEEDED, USE ATTACHMENT
> SHEET IN TRIPLICATE.

From: Conn  Bobby  J        57625       NSP/ 5A-13
LAST NAME,    FIRST,   MIDDLE INITIAL       NO.        FACILITY/HOUSING UNIT

**Part A – INMATE REQUEST/CONCERN:**

indicates that NDCS does not believe that First Amendment and RLUIPA religious rights merit the same exemptions accorded to inmates who participate in scheduled recreational activities.

RELIEF: Place Theodish Belief inmates on the early line roster to eat so they can timely attend/participate in the scheduled weekly Theodish Belief education/study because education/study/discussion of Theodish Belief Lore is a mandatory tenet of Theodish Belief

10/25/06
DATE

Bobby J Conn
SIGNATURE OF REQUESTOR

---

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**

see p. 1

11-3-06
DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

**Part C – RECEIPT**

Return to: _____          _____          _____
LAST NAME,     FIRST,     MIDDLE INITIAL          NO.          FACILITY/HOUSING UNIT

I acknowledge receipt this date of a complaint from the above inmate in regard to the following subject: _____

_____          _____
DATE          RECIPIENT'S SIGNATURE (STAFF MEMBER)

(SEE REVERSE SIDE FOR INSTRUCTIONS FOR APPEAL TO DIRECTOR OR DIRECT SUBMISSION TO DIRECTOR)

DCS-A-adm-049 (4-97)          Printed with soy ink on recycled paper

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Conn          Bobby          J                    57625 / Theodish          NSP
      LAST NAME,    FIRST,    MIDDLE INITIAL              NO./GROUP                 INSTITUTION

**\*Part A – REASON FOR APPEAL:**
I am dissatisfied with the 10/19/06 response to my informal Grievance #154 and
the 11/3/06 response to my Step One Grievance #I233 and I reiterate the issue
and facts set forth in the aforesaid two(2) grievances
Murphy v. Missouri Dept. of Corrections 372 F.3rd 979, 988 (8th cir. 2004) held under
RLUIPA group religious discussion and study (ie, religious education, study classes)
is a "Religious Exercise" that can be "substantially burdened" by prison staff. Corp.
of the Presiding Bishop of the church of Jesus Christ of the Latter-day Saints v. Amos,
483 U.S. 327, 334 (1987) held the Government may make special accomodations
for religious practices that are not extended to nonreligious practices. RLUIPA
requires prisons to do just that.

11/13/06                                              Bobby J Conn
DATE                                                  SIGNATURE

\*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S
RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

Please see attached - Th Hau.

12-11-06                                              [signature]
DATE                                                  DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Conn Bobby J    57625/Theodish NSP
LAST NAME,  FIRST  MIDDLE INITIAL    NO./GROUP    INSTITUTION

**\*Part A – REASON FOR APPEAL:**

Neb. Rev. Stat. § 83-182 requires the Director to establish programs, i.e. "Religion and recreational activities," to prepare and assist each person committed to the NDCS to assume his/her responsibilities as a useful citizen. Individualized exemptions have been made to routinely place inmates on early line roster(s) to eat so they can timely attend/participate in the daily schedule of recreational activities. However the NDCS refuses to accord Theodish Belief inmates a similar exception, that would allow them to eat so they can timely attend/participate in the scheduled weekly Theodish Belief education/study class. Bowen v. Roy, 476 U.S. 693, 708 (1986) held when individualized exemptions are available (i.e., the above said early line exemption accorded to inmates participating in recreational activities) the government cannot refuse to extend the same exemption and refusal to extend a similar exemption tends to exhibit hostility towards this particular Religious belief.

11/13/06
DATE

Bobby J. Conn
SIGNATURE

\*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

DATE

DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

---

## Part C – RECEIPT

Return to: _____
LAST NAME,    FIRST,    MIDDLE INITIAL    NO./GROUP    INSTITUTION

I acknowledge receipt this date of the above inmate's/student's appeal from the response received from the following complaint: _____

DATE

SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

DCS-A-adm-037 (2/97)    Printed with soy ink on recycled paper

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM
## Step Two
## CENTRAL OFFICE APPEAL

INSTRUCTIONS: TYPE OR USE BALL POINT PEN. IF MORE SPACE IS NEEDED, USE ATTACHMENT SHEET IN TRIPLICATE.

From: _Conn_ _Bobby_ _J_ _57625/Theodish_ _NSP_
LAST NAME,   FIRST,   MIDDLE INITIAL   NO./GROUP   INSTITUTION

**\*Part A – REASON FOR APPEAL:**

The members of the NDCS Religion Study Committee, Kathy Blum, Joe Baldassano, Steve Marsh, Francis Hopkins, Larry Wayne, and Robert Houston refusal to approve placement of Theodish Belief inmates on early line roster(s) to allow them to eat so they can timely attend/participate in the scheduled weekly Theodish Belief Education/Study Class and/or worship imposes a "substantial burden" on Theodish Belief inmates "religious exercise" is in direct violation of RLUIPA and the blatant refusal approve an exemption to place Theodish Belief on early lines roster(s) while routinely placing other inmates on early line rosters for recreational activities and other non-religious activities imposes a "substantial burden" on theodish Belief inmates "religious exercise is in direct violation of RLUIPA (which encompasses/incorporates Bowen v. Roy, Supra)

_11/13/06_
DATE

_Bobby J Conn_
SIGNATURE

\*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

DATE   DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

## Part C – RECEIPT

Return to: _____
LAST NAME,   FIRST,   MIDDLE INITIAL   NO./GROUP   INSTITUTION

I acknowledge receipt this date of the above inmate's/student's appeal from the response received from the following complaint: _____

DATE   SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

DCS-A-adm-037 (2/97)   Printed with soy ir

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step Two
### CENTRAL OFFICE APPEAL

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Conn   Bobby   J          57625/Theodish   NSP
LAST NAME,   FIRST,   MIDDLE INITIAL          NO./GROUP          INSTITUTION

**\*Part A – REASON FOR APPEAL:**

RELIEF: Place Theodish Belief inmates on early line roster(s) to eat so they can timely attend/participate in theodish Belief religious exercise.

11/13/06
DATE

Bobby J Conn
SIGNATURE

\*THE COMPLETED INSTITUTIONAL GRIEVANCE FORM, INCLUDING THE CHIEF EXECUTIVE OFFICER'S/SUPERINTENDENT'S RESPONSE, MUST ACCOMPANY THIS APPEAL.

## Part B – RESPONSE AND REASONS FOR DECISION REACHED

DATE                                                      DIRECTOR

ORIGINAL: TO BE RETURNED TO INMATE/STUDENT AFTER COMPLETION.

---

## Part C – RECEIPT

Return to: _____
LAST NAME,   FIRST,   MIDDLE INITIAL          NO./GROUP          INSTITUTION

I acknowledge receipt this date of the above inmate's/student's appeal from the response received from the following complaint: _____

DATE                                          SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

DCS-A-adm-037 (2/97)                Printed with soy ink on recycled paper

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# GRIEVANCE FORM

## Step Two
## Central Office Appeal

### RESPONSE AND REASONS FOR DECISION REACHED

Inmate Name:            Conn, Bobby

Inmate Number:          #57625

Date Received:          November 15, 2006

Grievance Number:       #06-1152

Subject:                Religion

Response:

You state that on October 3, 2006 count was late and delayed your going to the dining
hall to eat. You contend this interfered with your attending the Theodish class. Count is
an important security measure and there will be times when the clearing of count is
delayed. When this happens, it affects a number of inmate activities including the
religious study groups..

12-11-06
Date

Karen Shortridge
Director

**EXHIBIT #5**

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# INMATE INTERVIEW REQUEST

TO: _Chapel - Steve MARSH_     DATE: _5-4-06_

FROM: _Wolfgang Rust aka John E. Rust 30118_  NAME/NUMBER   _NSP_ FACILITY   _5-A-20_ LOCATION

WORK LOCATION: _Braille 41_   UNIT STAFF: _____

MESSAGE: Pursuant to our 5/3/06 conversation I'm sending you this note. Our Unit eats last this month. When we're not cleared around 5:20pm on 5/8/06 inmates on early line rosters were allowed to go to chow & the Unit began running showers. Modish inmates were not allowed to go to chow or we would attend the scheduled 6pm class but had to go to chow with the other general population inmates after 6:05pr. I asked to be released since the roster states I need to be at the Chapel by 17:45 but I was not released. When I arrived at the Chapel around 6:15 I asked Officer Creed to call Unit 5 about the roster. Someone at Unit 5 indicated they were aware of the situation but due to having to remove an inmate from the Unit before we went even began they we weren't released. The removal of this inmate for psychiatric observation did not preclude the Unit from releasing dog handlers, inmates on sports rosters, & other early lines for chow or to run the remaining inmates for showers before running the general population & for chow after 6:05pm Officer Creed will relate the specifics of the phone conversation. 

*M. Wolfgang Rust*
aka John E. Rust
ORIGINAL – DCS Employee
YELLOW – Inmate
Both copies need to be submitted for response.   Signature

REPLY: _That day an inmate barricaded himself in his room. "Joe Safety, Security & Good Order" over ruled other considerations. Everyone should be treated equally, fairly. But as conditions change, some inmate-movement previously allowed may later not be allowed. Otherwise, you have authorized via the Theorist Class Roster, to be escorted to set up at the Chapel each_

_5-17-06_            _S Marsh_      Tues.
Date                    Signature       at 1745 hours

## NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
## INFORMAL GRIEVANCE RESOLUTION FORM
## UNIT STAFF

**FROM:** Rust, Wolfgang/Rust, John E.        30118        N.S.P.75-A-20

_____      _____      _____
Last Name,  First,  Middle Initial         Number        Facility/Housing Unit

### PART A: Inmate Request/Concern.

On 2/7/06, the NSP Mess Hall did not close until after 6:00 p.m.
(this occurs at a fairly regular basis) resulting in hourly doors
being delayed until after 6:12 p.m. for scheduled religious
activities. Theodish inmates could not timely attend their
scheduled 6:00 p.m. Tuesday religious activity until after 6:12
p.m. That inmates on an approved religious roster need to be
placed on early lines to permit them to eat so they can timely
attend their scheduled religious activity. The NDCS grants early
line exemptions to permit inmates on approved sports rosters to
eat before going to their scheduled sports activity, i.e.,
softball, basketball, volleyball, football, etc. It is
incongruous the NDCS grants the aforesaid early line exemptions
to inmates for sports activities but refuses to grant the same
early line exemtions to inmates for religious activities.

RELIEF: Grant inmates on approved religious rosters early line
exemption to permit them to eat before timely attending any
scheduled religious worship and education/study activities.

2-8-06                              _Wolfgang Rust_
Date                                Signature   John E. Rust

---

### PART B: Response and Reason(s) for Decision Reached.

At times there may be a reason for a delay in the releasing inmates to chow from
count. The occurrence of this delay does not occur on a regular basis and a change to
the operating procedure is not warranted.

2/23/06                              _____
Date                                 Signature

NOTE: A copy of this completed *Informal Grievance Resolution Form* must accompany any *Step 1 Institutional Grievance Form.*

**EXHIBIT**
**#6**

## NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
# GRIEVANCE FORM
## Step One
## CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rust, Wolfgang/Rust, John E.       30118       N.S.P./5-A-20

LAST NAME,    FIRST,    MIDDLE INITIAL.       NO.       FACILITY/HOUSING UNIT

### Part A – INMATE REQUEST/CONCERN:

Page 1 of 2

I'm dissatisfied with the 2/23/06 response to my 2/8/06 Informal
Grievance and I reiterate the issue and facts set forth in the
aforesaid Grievance.

The issue is: the NDCS refuses to place inmates on the early
line roster to allow them to eat so they can timely
attend/participate in scheduled "religious
worship/education/study/discussion classes" while specifically
granting exemptions that place inmates on early line rosters to
eat so they are permitted to timely attend/participate in
scheduled sports activity, Hobby Association, be a volunter dog
handler, self-betterment club board members, etc. In effect, the
NDCS position, as expressed in the response to my Informal
Grievance, is it is more important to permit inmates on early
line rosters to eat so they can timely attend/particpate in the
activities outlined supra allowing inmates on early line rosters

3-8-06
DATE

_Wolfgang Rust_
Also John E. Rust
SIGNATURE OF REQUESTOR

### Part B – RESPONSE AND REASONS FOR DECISION REACHED

I support the response to Informal Grievance #31. If you have a suggestion
that will assist in the smooth running of religious programming you may work
with Religious Coordinator Marsh on these suggestions.

3/15/06
DATE

_fr. Mario Peart_
CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

I 57

# NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
## GRIEVANCE FORM
### Step One
### CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

From: Rüst, Wolfgang/Rust, John E.          30118          N.S.P./5-A-20
      LAST NAME,   FIRST,   MIDDLE INITIAL          NO.          FACILITY/HOUSING UNIT

Page 2 of 2          **Part A – INMATE REQUEST/CONCERN:**

to eat so they can timely attend/participate in the scheduled
"religious worship/education/study/discussion classes." Its
irrelevant that these delays do not occur on a regular basis.
Religious activity is rehabilitative and "Religious Exercise" is
protected by "The Religious Land Use and Institutional Persons
Act" (RLUIPA) 42 U.S.C. §2000cc et seq.

Relief:  Place Theodish Belief inmates on the early line roster
to allow them to timely attend/participate in their scheduled
religious activity.

3-8-06
DATE

Wolfgang Rust
aka John E. Rust
SIGNATURE OF REQUESTER

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**

DATE

CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

31

## NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
## INFORMAL GRIEVANCE RESOLUTION FORM
## UNIT STAFF

**FROM:** Rust, Wolfgang/Rust, John E.          30118          N.S.P.75-A-20

Last Name,   First,   Middle Initial          Number          Facility/Housing Unit

**PART A: Inmate Request/Concern.**

On 2/7/06, the NSP Mess Hall did not close until after 6:00 p.m. (this occurs at a fairly regular basis) resulting in hourly doors being delayed until after 6:12 p.m. for scheduled religious activities. Theodish inmates could not timely attend their scheduled 6:00 p.m. Tuesday religious activity until after 6:12 p.m. That inmates on an approved religious roster need to be placed on early lines to permit them to eat so they can timely attend their scheduled religious activity. The NDCS grants early line exemptions to permit inmates on approved sports rosters to eat before going to their scheduled sports activity, i.e., softball, basketball, volleyball, football, etc. It is incongruous the NDCS grants the aforesaid early line exemptions to inmates for sports activities but refuses to grant the same early line exemptions to inmates for religious activities.

RELIEF: Grant inmates on approved religious rosters early line exemption to permit them to eat before timely attending any scheduled religious worship and education/study activities.

**2-8-06**
Date

Signature    *Wolfgang Rust*
    *John E. Rust*

---

**PART B: Response and Reason(s) for Decision Reached.**

At times there may be a reason for a delay in the releasing inmates to chow from count. The occurrence of this delay does not occur on a regular basis and a change to the operating procedure is not warranted.

**2/23/06**
Date

Signature

**NOTE:** A copy of this completed *Informal Grievance Resolution Form* must accompany any *Step 1 Institutional Grievance Form.*

JS7

# NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
## GRIEVANCE FORM
### Step One
### CHIEF EXECUTIVE OFFICER

INSTRUCTIONS:
TYPE OR USE BALL POINT
PEN. IF MORE SPACE IS
NEEDED, USE ATTACHMENT
SHEET IN TRIPLICATE.

| From: | Rust, Wolfgang/Rust, John E. | 30118 | N.S.P./5-A-20 |
|---|---|---|---|
| | LAST NAME,    FIRST,    MIDDLE INITIAL | NO. | FACILITY/HOUSING UNIT |

Page 1 of 2         **Part A – INMATE REQUEST/CONCERN:**

I'm dissatisfied with the 2/23/06 response to my 2/8/06 Informal
Grievance and I reiterate the issue and facts set forth in the
aforesaid Grievance.

The issue is: the NDCS refuses to place inmates on the early
line roster to allow them to eat so they can timely
attend/participate in scheduled "religious
worship/education/study/discussion classes" while specifically
granting exemptions that place inmates on early line rosters to
eat so they are permitted to timely attend/participate in
scheduled sports activity, Hobby Association, be a volunter dog
handler, self-betterment club board members, etc.  In effect, the
NDCS position, as expressed in the response to my Informal
Grievance, is it is more important to permit inmates on early
line rosters to eat so they can timely attend/particpate in the
activities outlined supra allowing inmates on early line rosters

_3-8-06_
DATE

_Wolfgang Rust_
SIGNATURE OF REQUESTOR
_aka/John E. Rust_

---

### Part B – RESPONSE AND REASONS FOR DECISION REACHED

I support the response to Informal Grievance #31. If you have a suggestion
that will assist in the smooth running of religious programming you may work
with Religious Coordinator Marsh on these suggestions.

_3/15/06_
DATE

_fr. Mario Peart_
CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

## NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
## GRIEVANCE FORM
### Step One
### CHIEF EXECUTIVE OFFICER

$I 57$

> **INSTRUCTIONS:**
> TYPE OR USE BALL POINT
> PEN. IF MORE SPACE IS
> NEEDED, USE ATTACHMENT
> SHEET IN TRIPLICATE.

From: <u>Rüst, Wolfgang/Rust, John E.</u>          <u>30118</u>          <u>N.S.P./5-A-20</u>
　　　　　LAST NAME,　　FIRST,　　MIDDLE INITIAL　　　　　　NO.　　　　　FACILITY/HOUSING UNIT

**Part A – INMATE REQUEST/CONCERN:**

　　　　Page 2 of 2

to eat so they can timely attend/participate in the scheduled
"religious worship/education/study/discussion classes." Its
irrelevant that these delays do not occur on a regular basis.
Religious activity is rehabilitative and "Religious Exercise" is
protected by "The Religious Land Use and Institutional Persons
Act" (RLUIPA) 42 U.S.C. §2000cc et seq.

Relief: Place Theodish Belief inmates on the early line roster
to allow them to timely attend/participate in their scheduled
religious activity.

<u>3-8-06</u>
　　DATE

_Wolfgang Rust_
_aka John E. Rust_
SIGNATURE OF REQUESTER

---

**Part B – RESPONSE AND REASONS FOR DECISION REACHED**




　　　DATE　　　　　　　　　　　　　　　　　　　CHIEF EXECUTIVE OFFICER

ORIGINAL: TO BE RETURNED TO INMATE AFTER COMPLETION.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

WOLFGANG RUST and           )
BOBBY CONN,                 )        4:08CV3185
            Plaintiffs,     )
                            )
vs                          )        AFFIDAVIT OF TYLER CHAMBERLAIN, RODNEY
                            )        LOWE and RONALD W. SHAFFER
NEBRASKA DEPARTMENT OF       )
CORRECTIONAL SERVICES        )
RELIGION STUDY COMMITTEE,    )
            Defendants.      )


STATE OF NEBRASKA      )
                       )  ss.
COUNTY OF LANCASTER    )


        COMES NOW your Affiants, Tyler Chamberlain, Rodney Lowe, and Ronald W.

Shaffer, having been first duly sworn on oath, and depose and state the following:

1.  Tyler Chamberlain is a Nebraska State Prisoner, #65800, P O Box 2500, Lincoln

NE 68542-2500.  He is, and has been, an active member of the Asatru Faith Kindred

at the Nebraska State Penitentiary where he is a Gothi (priest).

2.  Rodney Lowe is a Nebraska State Prisoner, #61915, P O Box 2500, Lincoln NE

68542-2500.  He is, and has been, an active member of the Asatru Faith Kindred

at the Nebraska State Penitentiary where he is a Gothi (priest).

3.  Ronald W. Shaffer is a Nebraska State Prisoner, #66743, P O Box 2500, Lincoln

NE 68542-2500.  He is, and has been, an active member of the Asatru Faith Kindred

at the Nebraska State Penitentiary where he is a Gothi (priest).

4.  Affiants advise the Court that there has been no prison staff posted at the

metal detector shack during Asatru ceremonies on Asatru land (Ve').

5.  Asatru's Ve is under constant observation by prison staff posted in towers

#5 and #6 and central control observes the Kindred members through cameras.

EXHIBIT
# 7

6.  Towers #7 and #10 can view portions of Asatru's Ve'.

7.  The above security observations are noted during our Asatru ceremonies/ rituals called Blots and Sumble. These are ritual cleansing of the Ve' from Gods.

8.  Asatru Blots and Sumbles are based out of the Volspa in the Poetic Edda. In particular, the Creation, Bladers Death, and Ragnarok.  That is the Life and Death of the Gods and Goddessess.

9.  Ritual cleansing of the Ve' by any rival cult would drive out the Wights (Spirits of the Ve') and Gods and Goddessess.  At that point they would not return.

Further, Affiant sayeth naught.


Tracy Chamberlain

Subscribed and Sworn to before me this 7th day of July, 2009.

GENERAL NOTARY - State of Nebraska
SAMUEL S. SHAW
My Comm. Exp. Sept. 27, 2009

Notary Public

Rodney Lowe

Subscribed and Sworn to before me this 7th day of July, 2009.

GENERAL NOTARY - State of Nebraska
SAMUEL S. SHAW
My Comm. Exp. Sept. 27, 2009

Notary Public

Ronald W. Shaffer

Subscribed and Sworn to before me this 7th day of July, 2009.

GENERAL NOTARY - State of Nebraska
CURTIS MOFFAT
My Comm. Exp. Jan. 10, 2010

Notary Public

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

WOLFGANG RÜST and BOBBY CONN,   )     4:08CV3185
                           )
            Plaintiffs,   )
                           )
                           )     AFFIDAVIT
   VS.                  )
                           )
NEBRASKA DEPARTMENT OF       )
CORRECTIONAL SERVICES RELIGION )
STUDY COMMITTEE, et al.,     )
                           )
            Defendants.   )

STATE OF NEBRASKA  )
               )ss.
COUNTY OF LANCASTER)

I, Wolfgang Rüst, Plaintiff in the above captioned matter, after being first duly sworn on oath and/or affirmation, state and depose the following:

1.    This Affidavit is based on my personal knowledge. This Affidavit was prepared to accompany Plaintiffs' Brief in Opposition of Defendants' Motion for Summary Judgment.

2.    Plaintiffs Amended Complaint with ten exhibits annexed and incorporated therein by reference is submitted as an Affidavit in Opposition of the Defendants' Motion for Summary Judgment.  Plaintiffs' Amended Complaint and ten exhibits are equivalent to an Affidavit for purposes of summary judgment. Williams v. Adams, 935 F.2d 960, 961 (8th Cir. 1991); Callum v. Axdahl, 2007 WL 1289949 (D.Neb. 3/12/07) at 1.

1

EXHIBIT
# 8

3.    In early 1999 I submitted a paper titled "Ravens Hearth Religious Beliefs" to former Nebraska State Penitentiary (hereinafter NSP) Chaplain Perreira and Theodish Belief Sacral King Garman Lord.  At the time I was struggling to understand the tribal belief tradition and the paper I submitted was very audimentary.  Since early 1999 I have grown in knowledge and wisdom which is exhibited in the "A Proposal for Recognition of Theodish Belief" (hereinafter "Proposal") and the "Synopsis of the Differences Between Theodish Belief and Asatru" (hereinafter "Synopsis") that were submitted on July 25, 2003 to the Nebraska Department of Correctional Services Religion Study Committee by former NSP Religious Cordinator Randall Donner.

4.    Theodish Belief Sacral King Garman Lord would not endorse the paper titled "Ravens Hearth Religious Beliefs" (Defendants' Ex. #14).

5.    Theodish Belief Sacral King Garman Lord endorsed Plaintiff Rust's Proposal and Synopsis in the January 6, 2004 letter (Defendants' Ex. #17).

6.    Defendants are denying the Plaintiffs our religion premised on the early 1999 paper titled "Ravens Hearth Religious Beliefs" which was drafted when I was struggling to learn and understand the tribal belief tradition.

7.    At approximately 1:30 p.m. on May 28, 2009, the Plaintiffs' expert witness Mr. J.Dirk Reek was deposed at the Nebraska State Penitentiary.

2

8. Assistant Attorney General Ryan C. Gilbride, Plaintiff Bobby Conn, and Plaintiff Rust were present at the deposition of Mr. J.Dirk Reek.

9. Assistant Attorney General has not provided the Plaintiffs with a copy of Mr. J.Dirk Reek's testimony at the May 28, 2009 deposition.

10. During the deposition, Mr. J.Dirk Reek testified that Garman Lords writings demonstrated there was a break in the Theodish Belief relationship with Asatru where the two groups evolved into separate and distinct religious beliefs and practices. Mr. Reek testified that this break was analogous to Martin Luther's schism from the Catholic Church to create the Lutheran Protestant Church.

11. On September 27, 2004, Plaintiff Rust submitted a nine page Interview Request to the Religion Study Committee requesting authorization to purchase (with our personal funds) "organic foodstuffs" and "free range meat products" from Open Harvest Natural Foods Grocery, Lincoln, NE, or from a similar organic natural food grocery, for the Theodish Belief Sacrificial Blot.

12. Plaintiffs will purchase (with our personal funds) or obtain assistance from Theodsmen (in free society) to purchase Theodish Belief faith specific devotional items, etc. We will not accept funds from the Nebraska Department of Correctional Services for any Theodish Belief devotional item.

13. That no Correctional Officer is assigned to be physically

3

present, on or near, the Native American Sweatlodge and the Asatru
Ve (Land) during the assigned worship time periods for the Native
Americans and Asatru.

14.    That the Native American Sweatlodge and the Asatru Ve
is within direct observation of the Correctional Officers assigned
to NSP Security Towers #5 and 6, and the NSP Security cameras.

15.    That each NSP Security Tower has a Correctional Officer
assigned at all times for security purposes.

16.    Defendants refused to consider the Plaintiffs' sincerely
held religious beliefs and practices within the Plaintiffs' own
scheme of things religious.    Instead, Defendants required the
Plaintiffs' beliefs and practices to be "community wide practices"
of Theodish Belief nation wide, "necessary or essential for the
practice of", "Theological tenats of", etc.    The Defendants
mandatory tenet requirement is set forth in Administrative
Regulation 208.01 RELIGIOUS SERVICES; (Defendants' Exhibits #1,
30, 31, 32, 33, 34, 35, and 36); Defendants' "Brief in Support
of Motion for Summary Judgment"; Theodish Religious Property
Sub-Committee Recommendations (Defendants Ex. #11), etc.

17.    Theodish Belief and Asatru cannot worship together in
one comunal worship time or use the same sacred space as set
forth in the Amended Complaint, Proposal, and Synopsis because
Asatru refuses to accept or swear loyalty to the mystic holy
principle of the Theodish institution of Sacral Kingship.    This
refusal to honor the mystic holy principle of the Theodish

4

institution of Sacral Kingship is a blasphemous insult to both the
Sacral King and to what our religion stands for.  The aforesaid
position has been emphasised repeatedly to the NDCS Religion
Department Staff.

Further Affiant saith not.

Dated this _8th_ day of _July_ , 2009.

Wolfgang Rust #30118
Affiant/Plaintiff
Nebraska State Penitentiary
P.O. Box 2500
Lincoln, NE 68542-2500

SUBSCRIBED AND SWORN to before me this _8_ day of _July_ ,
2009.

NOTARY PUBLIC

GENERAL NOTARY - State of Nebraska
JOANN K. KINNEY
My Comm. Exp. Oct. 16, 2009

5

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct

copy of the foregoing Affidavit was sent to the Defendants, by

and through their attorney of record, via U.S. Mail Services,

first class mail, postage pre-paid, on this 8th day of

_____, 2009.

Addressed to:

Mr. Ryan C. Gilbride
Assistant Attorney General
2115 State Capitol
Lincoln, NE 68509

Wolfgang Rust #30118
Affiant/Plaintiff
Nebraska State Penitentiary
P.O. Box 2500
Lincoln, NE 68542-2500



Inmate Name __Walsgoya Rist__
Inmate Number __30188__

46-03-13

Office of the Clerk
United States District Court
Roman L Hruska US Courthouse
111 S. 18th Plaza, Suite 1152
Omaha, NE 68102-1322