## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **WOLFGANG RUST, and** | ) | **CASE NO. 4:08CV3185** |
| **BOBBY CONN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **MEMORANDUM** |
| **v.** | ) | **AND ORDER** |
| | ) | |
| **NEBRASKA DEPARTMENT OF** | ) | |
| **CORRECTIONAL SERVICES** | ) | |
| **RELIGION STUDY COMMITTEE, et** | ) | |
| **al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

This matter is before the court on Defendants' Motion for Summary Judgment. (Filing No. 46.)  Also pending is Plaintiffs' Motion to Compel Discovery (Filing No. 56) and Plaintiffs' Motion to Extend Time to Respond to Defendants' Motion for Summary Judgment (Filing No. 61).  As set forth below, Defendants' Motion for Summary Judgment is granted in part.  Plaintiffs' Motion to Compel is denied and Plaintiffs' Motion to Extend is granted.

### BACKGROUND

Plaintiffs Wolfgang Rust  ("Rust") and Bobby Conn ("Conn") originally filed their Complaint in this matter on August 26, 2008.  (Filing No. 1.)  After conducting an initial review, the court permitted Plaintiffs' claims to proceed to service.   (Filing No. 15.) Thereafter, Plaintiffs filed a Motion for Leave to Amend their Complaint, which the court granted on June 29, 2009.  (Filing Nos. 35 and 58.)

Condensed and summarized, the Amended Complaint alleges that Defendants placed a substantial burden on Plaintiffs' religious exercise in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the First Amendment.  (Filing No. 59.)  Plaintiffs specifically seek an order compelling the Nebraska Department of

Correctional Services ("DCS") to provide them with a separate space and time for worship and permit them to use several religious items.  (*Id.* at CM/ECF pp. 50-54.)  Plaintiffs also seek monetary damages in the amount of $10,000.00 from each Defendant in their official capacities and $10,000.00 from each Defendant in their individual capacities.  (*Id*. at CM/ECF p. 55.)

### PLAINTIFFS' MOTION TO EXTEND

On June 23, 2009, Plaintiffs filed a Motion to Compel Discovery[1] because Defendants' responses to Plaintiffs' prior discovery requests were "incomplete."  (Filing No. 56.)  Defendants subsequently served Plaintiffs with an Amended Response.  (Filing No. 57.)  Plaintiffs then filed a Motion to Extend Time to Respond to Defendants' Motion for Summary Judgment, which is now pending before the court.  (Filing No. 61.)

In their Motion to Extend Time, Plaintiffs argue that they were unable to respond to Defendants' Summary Judgment Motion because Defendants failed to provide them with several discovery documents.  (Filing No. 61 at CM/ECF pp. 1-2.)  However, only three days after filing this Motion, Plaintiffs filed a Brief in Opposition to Defendants' Motion for Summary Judgment.  (Filing No. 63.)  For good cause shown, Plaintiffs' Motion to Extend Time is granted and Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment is deemed timely filed.

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    Background

On June 17, 2009, Defendants filed a Motion for Summary Judgment (Filing No. 46) along with a Brief in Support (Filing No. 47) and an Index of Evidence (Filing Nos. 49, 50,

---

[1]The court will address Plaintiffs' Motion to Compel later in this Memorandum and Order.

51, 52, 53 and 55).  As discussed above, Plaintiffs have responded to this Motion with a timely Brief in Opposition.  (Filing No. 63.)

The party seeking the entry of summary judgment in its favor must set forth "a separate statement of material facts as to which the moving party contends there is no genuine issue to be tried and that entitle the moving party to judgment as a matter of law." NECivR 56.1(a)(1).  If the non-moving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1).  Such response must "address each numbered paragraph in the movant's statement" of facts and must contain pinpoint citations to evidence supporting the opposition.  *Id.*  "Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response." *Id.*; *see also* Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.").

Both Defendants and Plaintiffs have included a statement of facts in their Briefs. (Filing No. 47 at CM/ECF pp. 2-11; Filing No. 63 at CM/ECF pp. 2-5.)  In addition, both Defendants and Plaintiffs have filed properly authenticated affidavits and other evidence. The court has carefully reviewed these documents and adopts the following undisputed facts.

## II.    Relevant Material Facts

1.    Rust and Conn are both DCS inmates incarcerated at the Nebraska State Penitentiary ("NSP") in Lincoln, Nebraska.  (Filing No. 59 at CM/ECF pp. 5, 56; Filing No. 47 at CM/ECF p. 1.)

2.      Rust and Conn are practitioners of Theodish Belief, a "Teutonic" Heathen faith of Northern Europe.  (Filing No. 59 at CM/ECF p. 11.)

3.      Defendant Nebraska Department of Correctional Services Religion Study Committee ("RSC") is a committee that coordinates religious programs within the DCS. (*Id*. at CM/ECF p. 5.)

4.      Defendants Robert P. Houston ("Houston"), Francis X. Hopkins ("Hopkins"), Larry Wayne ("Wayne"), Kathy Blum ("Blum"), Joe Baldassano ("Baldassano"), Steve Marsh ("Marsh") and Tarn E. Davis ("Davis") are all DCS employees.  (*Id*. at CM/ECF pp. 6-9.)

5.      On July 25, 2003, Rust submitted a "Proposal for the Recognition of Theodish Belief" ("Proposal") and a "Synopsis of the Differences between Theodish Belief and Asatru" ("Synopsis") to former NSP Religious Coordinator Randall Donner ("Donner"). (Filing No. 49-2, Attach. 1; Filing No. 1 at CM/ECF p. 11)

6.      Donner immediately submitted Rust's Proposal and Synopsis to the RSC. (Filing No. 49-2, Attach.1, Filing No. 1 at CM/ECF pp. 11, 12.)  Donner also sent a letter to the Theodish Belief Sacral King, Garman Lord, asking him to describe the minimum practice requirements for Theodish Belief in a correctional setting.  (Filing No. 49-3, Attach. 2; Filing No. 55-2, Attach. 1 at CM/ECF p. 1; Filing No. 49-2, Attach. 1.)

7.      According to Theodish Belief, the "King's Word is Law," which means that Garman Lord's statements become part of Theodish Belief theology.  (Filing No. 55-2, Attach. 1 at CM/ECF p. 1.)

8.     Garman Lord responded to Donner's letter on January 6, 2004, and later clarified his position on March 4, 2004.  (Filing No. 49-4, Attach. 3; Filing No. 50-6, Attach. 5.)

9.     On March 17, 2004, the RSC reviewed Rust's Proposal, Synopsis and Garman Lord's response and made the following recommendation:

> (A) Theodishism is a denomination within Asatru.  A new umbrella name will need to be created to accurately describe both Asatru and Theodishism. (B) Committee agreed to the validity of having a Theodish class separate from the Asatru Classes. (C) Further research by members of the [RSC] will need to be done. (D) Randy Donner would write up a statement for the [RSC] on incorporating Theodishism.

 (Filing No. 48-3, Attach. 2 at CM/ECF p. 2.)

10.     That same day, Donner concluded that Theodish Belief and Asatru were different enough to warrant separate worship and class times.  (Filing No. 48-4, Attach. 3.) Donner also noted that because Rust and his "theod" had been practicing their "rites" on land shared with the Asatru, they did not need their own sacred land to validate those "rites."  (*Id*.)

11.     On May 13, 2004, RSC Chair Gary E. Grammar ("Grammar"), sent a letter to DCS Assistant Director Hopkins recommending that the DCS recognize Theodish Belief as a separate faith group, but that further research needed to be conducted before the RSC could recommend approval of Rust's list of religious items necessary for valid Theodish practice.  (Filing No. 48-7, Attach. 6.)  Among other things, this list included requests for the following items: a stanbaed (a purifying steam bath); an Eormensyl (a wood pillar for outdoor worship); a Fire Twirl (a tool used to start fire); organic food; and mead (an alcoholic drink made with honey).  (Filing No. 1-3, Attach. 2 at CM/ECF pp. 1-4;

Filing No. 48-9, Attach. 8 at CM/ECF pp. 1-2.)  Hopkins approved this recommendation on June 4, 2004.  (Filing No. 48-7, Attach. 6 at CM/ECF p. 1.)

12.    On July 13, 2004, Grammar sent Garman Lord a letter asking him to review Rust's list of religious items necessary for valid Theodish practice.  (Filing No. 48-8, Attach. 7.)

13.    Garman Lord responded on August 2, 2004.  He stated that the list identified the items needed for appropriate and valid Theodish Belief practice.  (Filing No. 48-9, Attach. 8 at CM/ECF p. 1; *see also* Filing No. 48-10, Attach. 9 at CM/ECF p. 1.)

14.    On August 11, 2004, the DCS approved Rust's requested individual religious items and some of the communal religious items. (Filing No. 48-10, Attach. 9 at CM/ECF pp. 1-9. )

15.    On August 16, 2004, Grammar sent another letter to Garman Lord asking for additional comments on several of the items that DCS did not approve.  (Filing No. 48-11, Attach. 10.)

16.    Garman Lord responded with additional comments on September 1, 2004. (Filing No. 49-5, Attach. 4.)  He specifically stated that although organic food is preferred, incarcerated Theodish Belief practitioners could choose the food items needed for worship from those regularly available at the NSP canteen.  In addition, he declared that an Eormensyl needs to be "twice the height of a man or better."  (*Id*. at CM/ECF p. 2.)

17.    In his January 6, 2004, letter, Garman Lord also stated that there are a "variety of ways" to cultivate spiritual purification and he knows of no Theodish practitioners who currently use the "stanbaed."  (Filing No. 49-4, Attach. 3 at CM/ECF p. 1.)

6

18.     In other correspondence, Garman Lord acknowledged the need for "lawfully instituted regulations [and] plain common sense [to] prevail over" ideal Theodish Belief worship, which calls for "edged weapons . . . a young maiden decked in flowers . . .[and] cattle pasturage."  (Filing No. 50-6, Attach. 5 at CM/ECF p. 2.)  He clarified that Theodish Belief is "a matter of the heart and soul, not of the hardware."  (*Id*. at CM/ECF pp. 1-2.)  He also declared that Theodish Belief and Asatru could "be practiced together on the same ground" with some "adjustments."  (Filing No. 48-14, Attach. 13 at CM/ECF pp. 1-2.)

19.     On February 18, 2005, the Theodish Religious Property Sub-Committee ("Sub-Committee") recommended to RSC Chair Baldassano, who replaced Grammar, that (1) the use of a "stanbaed" be denied because it is not a common community practice and Theodish Belief provides other means of religious purification; (2) time and space be accorded to the Theodish practice in the Religious Center for indoor rituals, consistent with what is currently being offered to other DCS faith groups; (3) pursuant to DCS policy, use of ritual mead is prohibited, but as with Asatru inmates, Theodish inmates should be permitted to mix unfermented honey and water to simulate mead; (4) the use of an Eormensyl should be denied because of obvious security concerns; (5) the use of a "Fire Twirl" should be denied because  all religious fires in the institution are currently started by a lighter checked out to an inmate from the appropriate security personnel; and (6) the purchase of organic food items be denied because organic food is not essential for Theodish practice.  (Filing No. 48-12, Attach. 11 at CM/ECF pp. 1-6; Filing No. 53-8, Attach. 7 at CM/ECF p. 6; Filing No. 49-5, Attach. 4 at CM/ECF p. 2.)

20.     On April 27, 2005, the RSC concluded that Theodish Belief and Asatru would have the same approved religious property list.[2]  (Filing No. 48-13, Attach. 12; Filing No. 48-3, Attach. 2.)  Asatru and Theodish Belief were also scheduled for a combined worship time.  (Filing No. 53-6, Attach. 5 at CM/ECF p. 6.)  However, each group was provided with a separate weekly study period.  (*Id*.)

21.     On August 4, 2005, Rust filed an Informal Grievance asking for a written explanation detailing why Theodish Belief and Asatru were combined for religious services and property.  (Filing No. 49-6, Attach. 5.)  On August 23, 2005, Unit Staff responded that the Theodish and Asatru groups worship together because there is simply not enough space and time in the facility for every faith denomination to be recognized as a separate faith group.  (*Id*. at CM/ECF p. 1.)

22.   On August 9, 2005, Baldassano informed Rust that although there are some differences between Asatru and Theodish Belief, the DCS is not able to provide separate time and space to all subsets of a faith, and that scheduling one worship time for Asatru and Theodish Belief is consistent with the way the Department has managed time and space for other faiths.  (Filing No. 50-2, Attach. 1.)

23.   On August 29, 2005, Rust filed a Step One Grievance arguing that Theodish Belief was not a subset of a faith and that Asatru and Theodish Belief were fundamentally different.  (Filing No. 49-7, Attach. 6.)  On September 8, 2005, an NSP Official responded,

---

[2]Administrative Regulation 208.01, Attachment E, provides a current list of the approved religious personal and communal property that the Asatru/Theodism Faith Group can use.  (Filing No. 48-2, Attach. 1 at CM/ECF p. 26.)

stating that DCS currently recognizes Theodism and has made provisions to allow Theodish practitioners to worship and study their faith. (*Id*. at CM/ECF p. 1.)

24.     On September 15, 2005, Rust filed a Step Two Grievance reasserting his Step One arguments.  (Filing No. 55-4, Attach. 3.)  Thirteen days later, the Director responded, stating that DCS recognizes the Theodish Belief and has made arrangements for the practitioners to worship and study.  (*Id*. at CM/ECF p. 10.)

25.     In an undated proposal, Plaintiffs requested an exemption from AR 204.01, which restricts the amount of personal property an inmate can keep in his cell to four cubic feet.  (Filing No. 59 at CM/ECF pp. 58-60; Filing No. 50-4, Attach. 3; Filing No. 50-5, Attach. 4 at CM/ECF p. 1.)  On November 17, 2008, Baldassano denied the request and informed Rust that the property limits are in place to assure the safe, secure, and efficient management of the facility.  (Filing No. 50-5, Attach. 4.)

26.     On April 20, 2008, Rust filed a Step One Grievance arguing that Theodish practitioners were being subjected to coerced inculcation because the acoustics in the NSP Religious Center permitted them to hear the religious exercise of other religious groups. (Filing No. 63 at CM/ECF pp. 79-81.)  On April 24, 2008, an NSP Official responded, stating that staffing patterns do not allow for separate enclosed rooms while maintaining the safety and security of this area.  (*Id*.)

27.     On May 1, 2008, Rust filed a Step Two Grievance reasserting his Step One arguments and asking DCS to remodel the Religious Center or use the classrooms in the prison school for religious classes at night.  (*Id*. at CM/ECF pp. 82-85.)  On May 2, 2008, Hopkins responded, stating that Rust's request was denied because of security concerns and staffing problems.  (*Id*. at CM/ECF p. 86.)

28.     Under current DCS policy, faith groups that meet at the same time in the Religious Center are instructed to be respectful and not to disturb each other.  (Filing No. 53-8, Attach. 7 at CM/ECF p. 2.)  In addition, no inmate is permitted to use the loudspeaker when more than one faith group is meeting unless that inmate has the permission of all groups.  (*Id.* at CM/ECF p. 3.)  Faith groups also have the option to reschedule their study group time.  (*Id*. at CM/ECF p. 4.)

29.     The current NSP Religious Activities Schedule indicates that Theodish Belief Class is held in the NSP Religious Center on Tuesdays from 6 p.m. until 8 p.m.  (Filing No. 53-3, Attach. 2 at CM/ECF p. 1.)  The only other faith group scheduled on Tuesdays in the Religious Center is the Jehovah's Witnesses, who study from 6 p.m. until 7 p.m.  (*Id*.)

30.     Rust and Conn were not on Room Restriction when they filed their Complaint. (Filing No. 53-4, Attach. 3 at CM/ECF p. 1; Filing No. 53-5, Attach. 4 at CM/ECF p. 1.) Room Restriction is the status of being restricted from certain privileges normally afforded to members of the general inmate population. (Filing No. 50-3, Attach. 2 at CM/ECF p. 35.) It does not consist of total separation from the general population.  (*Id*.)  Inmates on Room Restriction may attend one worship service per week.  (Filing No. 48-2, Attach. 1 at CM/ECF p. 11.)  Inmates on Room Restriction are not permitted to attend any other religious activity.  (*Id*.)

31.     Rust is on "early line status" for dinner on Tuesday evenings, and is escorted to the Religious Center to set up for class.  (Filing No. 50-8, Attach. 7 at CM/ECF p. 1.) Conn is not on "early line status" and has missed Theodish Belief class once as a result of an issue with "count."  (Filing No. 63 at CM/ECF pp. 96, 111.)

32.     At NSP, inmates are provided access to a religious library and are permitted to purchase a broad range of religious materials.  (Filing No. 50-5, Attach. 4 at CM/ECF p. 1.)  Inmates have access to books, videos, audio recordings, written correspondence courses and other religious publications.  (Filing No. 53-8, Attach. 7 at CM/ECF p. 7.)

III.   **ANALYSIS**

   **A.     Standard of Review**

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  *See also* *Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir. 1994).  It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue.  *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).  In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion.  *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'"  *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)).  "A mere scintilla of evidence is insufficient to avoid summary judgment."  *Id.*  Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.    Sovereign Immunity

Defendants argue that Plaintiffs' claims for monetary relief against them in their official capacities are barred by the doctrine of sovereign immunity.  (Filing No. 47 at CM/ECF pp. 30-32.)  The court agrees with Defendants.

The Eleventh Amendment bars claims for damages by private parties against a state, state instrumentalities and an employee of a state sued in the employee's official capacity.  *See, e.g., Egerdahl v. Hibbing Cmty. Coll.,* 72 F.3d 615, 619 (8th Cir. 1995); *Dover Elevator Co. v. Arkansas State Univ.*, 64 F.3d 442, 446-47 (8th Cir. 1995).  Any award of retroactive monetary relief payable by the state, including for back pay or damages, is proscribed by the Eleventh Amendment absent a waiver of immunity by the state or an override of immunity by Congress.  *See, e.g., Dover Elevator Co.*, 64 F.3d at 444; *Nevels v. Hanlon*, 656 F.2d 372, 377-78 (8th Cir. 1981).  Sovereign immunity does not bar damages claims against state officials acting in their personal capacities, nor does it bar claims brought pursuant to 42 U.S.C. §1983 that seek equitable relief from state employee defendants acting in their official capacity.

In addition, a claim against an individual, in the official capacity, is in reality a claim against the entity that employs the official.  *See Parrish v. Luckie*, 963 F.2d 201, 203 n.1 (8th Cir. 1992) ("Suits against persons in their official capacity are just another method of filing suit against the entity. . . . A plaintiff seeking damages in an official-capacity suit is seeking a judgment against the entity. . . . Therefore, the appellants in this case will

12

collectively be referred to as the City.") (quotations omitted).  *Accord Eagle v. Morgan*, 88 F.3d 620, 629 n.5 (8th Cir. 1996) ("'[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).  As such, damages claims against individual state employees acting in their official capacities are also barred by the Eleventh Amendment.  *Murphy v. State of Ark.*, 127 F.3d 750, 754 (8th Cir. 1997).

Here, Plaintiffs sue seven individual Defendants in both their individual and official capacities for monetary damages.  (Filing No. 59 at CM/ECF pp. 50-54.)  Each of these individual Defendants is a state employee.  (*Id*. at CM/ECF pp. 1-9.) As discussed above, the Eleventh Amendment bars claims for damages against state employees in their official capacities absent a waiver of immunity or an override of immunity by Congress.  No waiver or override applies here.  *See Van Wyhe v. Reisch*, 581 F.3d 638, 652-55 (8th Cir. 2009) (concluding that a state does "not waive its immunity from suit for monetary damages by accepting federal funds on the conditions set forth in the institutionalized persons section of RLUIPA (Section 3).").  Accordingly, Plaintiffs' official capacity claims for monetary damages against Houston, Hopkins, Wayne, Blum, Baldassano, Marsh and Davis are dismissed.

_____**C.**    **Plaintiffs' RLUIPA Claims**

Defendants argue that Plaintiffs have failed to establish a prima facie RLUIPA claim against them.  (Filing No. 47 at CM/ECF pp. 13-21.)  As discussed below, the court agrees with Defendants as to all but one of Plaintiffs' claims.

RLUIPA provides prison inmates the following protection:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a)(1)-(2) ("Section 3").   Section 3 of RLUIPA protects inmate religious exercise "when the substantial burden is imposed in a program or activity that receives Federal financial assistance."[3] *Id.* at § 2000cc-1 (b)(1).  RLUIPA defines the term "religious exercise" as "the exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *Id.* at § 2000cc-5(7)(A).

To establish a prima facie RLUIPA claim, an inmate must show that a government practice substantially burdens his religious exercise.  *Id.* at § 2000cc-2(b). A government practice substantially burdens an inmate's religious exercise when it significantly inhibits or constrains religious conduct or religious expression, meaningfully curtails the inmate's ability to express adherence to his or her faith, or denies the inmate reasonable opportunities to engage in those activities that are fundamental to his or her religion.  *Van Wyhe*, 581 F.3d at 656 (using the Eighth Circuit's established First Amendment definition of substantial burden for an RLUIPA claim, but acknowledging that in the RLUIPA context the court will not inquire into whether a particular belief or practice is central to an inmate's religion). Where a government practice burdens one means of practicing a religion, but leaves open alternative means, an inmate must show that the alternative means are

---

[3]The parties do not dispute that RLUIPA applies to Nebraska prisons.

inadequate to establish that the government practice imposes a substantial burden.  *See Gladson v. Iowa Dep't. of Corr.*, 551 F.3d 825, 834 (8th Cir. 2009) (holding that a prison did not substantially burden Wiccan inmates' religious holiday observance where the inmates failed to offer any evidence that the prison's grant of only three hours for celebration was inadequate); *see also Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 812, 814-15 (8th Cir. 2008) (finding that a prison's limitations in dietary accommodations did not substantially burden a Muslim prisoner's ability to practice his religion where the prisoner had the option of purchasing halal vegetarian entrees on days that allegedly inadequate kosher meat entrees were served).  If an inmate establishes that a government practice substantially burdens his religious exercise, the burden of persuasion shifts to the government on every other element of the RLUIPA claim.  42 U.S.C. § 2000cc-2(b).

Here, Plaintiffs allege that Defendants imposed a substantial burden on Plaintiffs' religious exercise when Defendants failed to: (i) approve organic food, mead and devotional items for Theodish Belief practice[4], (ii) exempt Theodish Belief practitioners from room restriction[5], (iii) prevent Theodish Belief practitioners from hearing the religious messages of other faith groups[6], (iv) grant Theodish Belief practitioners early line status, (v) permit Theodish Belief practitioners to retain personal religious materials beyond the prison's four cubic feet allotment[7], (vi) pursue a grant for an automated computer system

---

[4]Counts 8, 9, 10 and 14 in Plaintiffs' Amended Complaint.  (Filing No. 59 at CM/ECF pp. 43-47.)

[5]Count 12 in Plaintiffs' Amended Complaint.  (*Id*. at CM/ECF p. 46.)

[6]Count 11 in Plaintiffs' Amended Complaint.  (*Id*. at CM/ECF pp. 45-46.)

[7]Count 18 in Plaintiffs' Amended Complaint.  (*Id*. at CM/ECF pp. 49-50.)

designed to assist Theodish Belief practitioners in researching their beliefs, (vii) provide separate worship time and space for Theodish Belief practitioners[8].  (Filing No. 59 at CM/ECF pp. 40-46.)[9]

There is no dispute that DCS recognizes the Theodish Belief and Defendants do not challenge the sincerity of Plaintiffs' beliefs.  (Filing No. 47 at CM/ECF p. 11.)  Therefore, the court need not address whether Plaintiffs' beliefs are sincerely held.  In light of this, the court will address Plaintiffs' claims in two stages.[10]  First, the court will explore whether Plaintiffs have presented sufficient evidence to show that the above listed government practices substantially burdened their religious exercise.  Second, for the claims that survive the first stage, the court will address whether the practice complained of is in furtherance of a compelling governmental interest and whether the practice is the least restrictive means available.  The court will address each claim in turn.

### D.   Substantial Burden

---

[8]Counts 4, 5, 6, 13, 15 and 16 in Plaintiffs' Amended Complaint.  (*Id*. at CM/ECF pp. 41-48.)

[9]Condensed, summarized and liberally construed, Counts 1, 2, 3, 7 and 17 of Plaintiffs' Amended Complaint alleges that Defendants' process for approving Theodish Belief as a recognized faith imposed a substantial burden on Plaintiffs' religious exercise. (*Id*. at CM/ECF pp. 40-49.)  These claims are without merit.  The record indicates that Defendants thoughtfully considered Rust's Proposal.  Further, prison officials should be accorded deference for decisions relating to an institution's process for requesting recognition of a faith.  *See generally Murphy v. Mo. Dep't. of Corr.*, 372 F.3d 979, 987 (8th Cir. 2004) (recognizing that when Congress enacted RLUIPA it did not intend "to overly burden prison operations, but rather intended to provide as much protection as possible to prisoners' religious rights without undermining the security, discipline, and order of those institutions")

[10]There is no dispute that DCS recognizes the Theodish Belief and Defendants do not challenge the sincerity of Plaintiffs' beliefs.  (Filing No. 47 at CM/ECF p. 11.) Therefore, the court will not address whether Plaintiffs' beliefs are sincerely held.

### 1.    Organic Food, Mead and Devotional Items

Plaintiffs allege that Defendants' refusal to grant them access to organic food, mead and certain devotional items imposes a substantial burden on their religious exercise. (Filing No. 47 at CM/ECF pp. 16-17.)   The court disagrees.

According to Theodish Belief, the "King's Word is Law," which means that Garman Lord's statements become part of Theodish Belief theology.  (Filing No. 55-2, Attach. 1 at CM/ECF p. 1.)   In an effort to provide Theodish Belief practitioners with the items necessary for minimum Theodish Belief practice, DCS corresponded with Garman Lord. (*Id.* at CM/ECF p. 1; Filing No. 49-2, Attach. 1; Filing No. 49-3, Attach. 2.)   During this correspondence, Garman Lord described how Theodish Belief practitioners use organic food, mead and devotional items.

With respect to organic food, Garman Lord stated that although it is preferred, incarcerated Theodish Belief practitioners could choose the food items needed for practice from those regularly available at the NSP canteen.  (Filing No. 49-5, Attach. 4 at CM/ECF p. 2.)  Although Plaintiffs may prefer organic food, they have not shown that using the alternative items available at the NSP canteen significantly inhibits or constrains their religious conduct or religious expression, meaningfully curtails their ability to express adherence to their faith, or prevents them from engaging in activities that are fundamental to their religion.  Accordingly, the court concludes that Plaintiffs have not shown that Defendants imposed a substantial burden upon their religious exercise by denying their request to purchase organic food.  *See, e.g., Patel,* 515 F.3d at 812, 814-15 (concluding plaintiff did not offer sufficient evidence to create genuine issue of material fact as to whether his ability to practice his religion through appropriate diet had been substantially

17

burdened by prison meal plan, where he did not show inadequacy of alternative means by which he could practice his faith).

With respect to mead, Garman Lord stated Theodish practitioners use it as a "symbel" drink to inspire the "poetic state of lofty-mindedness." (Filing No. 49-4 Attach. 3 at CM/ECF p. 2.)  After reviewing this statement, the DCS denied Plaintiffs' request for mead because inmates are not permitted to use, possess, manufacture, or sell intoxicants. (Filing No. 53-8, Attach. 7 at CM/ECF p. 6.)  Despite this denial, the DCS permits both Asatru and Theodish Belief practitioners to mix unfermented honey and water to simulate mead.  (Filing No. 48-12, Attach. 11 at CM/ECF p. 2.)  Plaintiffs have not shown that using this simulation is inadequate. Accordingly, Plaintiffs have not shown that Defendants imposed a substantial burden upon their religious exercise by denying them access to mead.[11]

As for the devotional items, Garman Lord stated that *ideal* Theodish practice calls for "edged weapons . . . a young maiden decked in flowers . . .[and] cattle pasturage." (Filing No. 50-6, Attach. 5 at CM/ECF p. 2.)  However, because Plaintiffs are in a correctional setting he acknowledged the need for "lawfully instituted regulations [and] plain common sense [to] prevail over the *ideal*." (*Id*. (emphasis added).)  Overall, Garman Lord indicated that Theodish Belief is  "a matter of the heart and soul, not of the hardware." (*Id*.

---

[11]Even if Plaintiffs could show that Defendants' decision to deny them mead imposed a substantial burden upon their religious exercise, the court recognizes the obvious security concerns related to allowing inmates to consume intoxicants.  Although RLUIPA uses a compelling government interest standard, context matters, and courts give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 722-23 (2005) (citations and internal footnotes omitted).

at CM/ECF pp. 1-2.)  Using Garman Lord's statements, Defendants argue that Plaintiffs' ability to exercise their religious beliefs cannot, as a matter of Theodish Belief theology, be burdened by the denial of a devotional item.  (Filing No. 47 at CM/ECF p. 18.)  Although the court acknowledges that Garman Lord's statements are part of Theodish Belief theology, it will not dismiss Plaintiffs' RLUIPA claims for the denial of devotional items out of hand on this argument alone.  Instead, the court will address the disputed devotional item denials in turn; these include Defendants' denial of a stanbaed, a Fire Twirl and an Eormensyl.

Plaintiffs argue that a stanbaed is an "excellent legal method of seeking and receiving personal spiritual purity."  (Filing No. 59 at CM/ECF p. 26; Filing No. 63 at CM/ECF p. 17.)  However, Garman Lord stated that there are a "variety of ways" to cultivate spiritual purification and he knows of no Theodish practitioners that currently use the "stanbaed."  (Filing No. 49-4, Attach. 3 at CM/ECF p. 1.)  Although a stanbaed might be an "excellent" way to cultivate spiritual purity, Plaintiffs have not demonstrated that the alternative means of cultivating personal spiritual purity are inadequate.  *See, e.g., Patel, 515 F.3d at 812, 814-15*.  Accordingly, Plaintiffs have not demonstrated that Defendants' failure to permit Plaintiffs to purchase a stanbaed imposed a substantial burden on their religious exercise.[12]

Plaintiffs argue that Defendants violated RLUIPA when they refused to permit Plaintiffs to purchase a fire twirl.  (Filing No. 63 at CM/ECF p. 18.)  However, the  record

---

[12]Plaintiffs also requested to purchase herbs to cleanse and purify the stanbaed. (Filing No. 59 at CM/ECF p. 53.)  "Chamollie" and Sage are currently approved for Theodish Belief use.  (Filing No. 48-12, Attach. 11 at CM/ECF p. 4.)  Plaintiffs have not demonstrated that using these approved herbs is inadequate for their religious exercise.

before the court indicates that DCS permits inmates to start religious fires with a lighter checked out from the appropriate security personnel.  (Filing No. 48-12, Attach. 11 at CM/ECF p. 3.)  Again, Plaintiffs have not shown that using this alternative is inadequate.  Consequently, Plaintiffs have failed to show that Defendants' refusal to permit Plaintiffs to purchase a fire twirl imposed a substantial burden on their religious exercise.

        Plaintiffs argue that the Eormensyl is fundamental to Theodish Belief practice because without Eormensyl prayer, "worship is rendered impossible."  (Filing No. 59 at CM/ECF pp. 29-30.)  However, the record before the court contradicts this argument.  Plaintiffs have been worshiping on the Asatru land at NSP since at least March 17, 2004.  (Filing No. 48-3, Attach. 2 at CM/ECF p. 2.)  If Plaintiffs have been worshiping without an Eormensyl for over five years, it is not "impossible" for Theodish Belief practitioners to worship without Eormensyl prayer.   This fact lends further credit to Garman Lord's statement that Theodish Belief is "a matter of the heart and soul, not of the hardware." (Filing No. 50-6, Attach. 5 at CM/ECF pp. 1-2.) Moreover, Plaintiffs have not submitted any evidence other than the allegation in their Amended Complaint to show that worship without an Eormensyl significantly inhibits or constrains their religious conduct or religious expression, meaningfully curtails their ability to express adherence to their faith, or prevents them from engaging in activities that are fundamental to their religion.  In light of these findings, Plaintiffs have not shown that Defendants' failure to permit Plaintiffs to erect an Eormensyl imposed a substantial burden on their religious exercise.[13]

_____

[13]Even if Plaintiffs could show that Defendants' decision not to approve the use of an Eormensyl imposed a substantial burden upon their religious exercise, the court recognizes the obvious security concerns that an Eormensyl poses.  In Rust's Proposal he describes the Eormensyl as a 16 foot high wood post that is 12 inches in diameter.  (Filing

## 2.    Room Restriction

Defendants argue that Plaintiffs do not have standing to challenge the DCS's Room

Restriction regulation.  (Filing No. 47 at CM/ECF p. 19.)  The court agrees with Defendants.

Under Article III of the United States Constitution, federal courts may only adjudicate

actual cases and controversies.  *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)

("The core component of the requirement that a litigant have standing to invoke the

authority of a federal court is an essential and unchanging part of the case-or-controversy

requirement of Article III.").  Without a showing of continuing, present adverse effects, past

exposure to illegal conduct does not in itself show a present case or controversy.  *Los

Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495-96

(1974).

When Plaintiffs filed their Complaint, they were not on Room Restriction. (Filing No.

53-4, Attach. 3 at CM/ECF p. 1; Filing No. 53-5, Attach. 4 at CM/ECF p. 1.)  Although it

appears that Rust has been on Room Restriction in the past, this exposure does not show

a present case or controversy.  Thus, Plaintiffs lack standing to challenge the DCS Room

Restriction policy.

## 3.    Unwanted Religious Messages

Plaintiffs allege that the current Theodish Belief class time subjects them to

"coerced inculcation of unwanted religious messages" and that Defendants have refused

to use "available space" to correct the problem.  (Filing No. 59 at CM/ECF pp. 35-36.)  In

---

No. 1-3, Attach. 2 at CM/ECF p. 3.) Garman Lord also declared that the Eormensyl needs
to be "twice the height of a man or better."  (Filing No. 49-5, Attach. 4 at CM/ECF p. 2)
Given these dimensions, it is easy to see why the RSC denied plaintiffs request, as
submitted, for "obvious security concerns."  (Filing No. 48-12, Attach. 11 at CM/ECF p. 2.)

contrast, Defendants argue that Plaintiffs have presented no evidence to show that Defendants forced Plaintiffs to listen to unwanted religious messages, and therefore, have failed to show that the current Theodish Belief class time imposes a substantial burden upon their religious exercise.  (Filing No. 47 at CM/ECF p. 19.)  The court agrees with Defendants.

The current NSP Religious Activities Schedule indicates that Theodish Belief Class is held in the NSP Religious Center on Tuesdays from 6 p.m. until 8 p.m. (Filing No. 53-3, Attach. 2 at CM/ECF p. 1.)  The only other faith group scheduled on Tuesdays in the Religious Center is the Jehovah's Witnesses, who study from 6 p.m. until 7 p.m.  (*Id.*)  According to DCS policy, faith groups that meet at the same time in the Religious Center are required to be respectful and not to disturb each other, and no inmate is permitted to use the loudspeaker when more than one faith group is meeting unless that inmate has the permission of all groups. (Filing No. 53-8, Attach. 7 at CM/ECF pp. 2-3.)  In addition, faith groups are permitted to reschedule their class time.  (*Id.* at CM/ECF p. 4.)

Plaintiffs argue that they cannot reschedule their class time because they work. (Filing No. 63 at CM/ECF p. 21.)  However, Plaintiffs have not presented any evidence to show that they even explored the option of rescheduling.[14]  In addition, they have not presented any evidence to suggest that the DCS is not enforcing its policies, which require the Jehovah's Witnesses to be respectful and not disturb the Theodish Belief class. (Filing No. 53-8, Attach. 7 at CM/ECF p. 2.)  In short, the mere fact that Plaintiffs can hear the incidental sounds of another faith group does not establish that current Theodish Belief

[14]The current schedule of religious activities shows that DCS schedules religious classes at various times throughout the week. (Filing No. 53-3, Attach. 2 at CM/ECF p. 1.)

22

class time significantly inhibits or constrains Plaintiffs' religious conduct or religious expression, meaningfully curtails their ability to express adherence to their faith, or prevents them from engaging in activities that are fundamental to their religion.

### 4.    Early Line Status

Plaintiffs allege that Defendants' failure to grant them "early line status," a status that permits inmates to eat before the rest of the general population, forces them to choose between religious exercise and eating.  (Filing No. 59 at CM/ECF p. 33.)  This allegation lacks merit.

Contrary to Plaintiffs' allegations, Rust has been granted "early line status" on Tuesday evenings so that he can set up for the Theodish Belief class.  (Filing No. 50-8, Attach. 7 at CM/ECF p. 1.)  In addition, the evidence indicates that Conn has only missed Theodish Belief class once.  (Filing No. 63 at CM/ECF p. 87.)  This absence occurred when an issue with "count" delayed the time that inmates were released to eat.  (*Id*. at CM/ECF p. 111.)  This delay affected a number of inmate activities including religious study groups. (*Id*. at CM/ECF p. 96.)  In light of these facts, the court finds that Plaintiffs have failed to show that Defendants' failure to grant Plaintiff Conn "early line status" imposed a substantial burden upon their religious exercise.

### 5.    Personal Religious Materials Exemption

Defendants argue that Plaintiffs have failed to show that Defendants imposed a substantial burden on their religious exercise by denying their request for a personal religious materials exemption.  (Filing No. 59 at CM/ECF p. 38.)  The court agrees.

In an undated proposal, Plaintiffs requested an exemption from AR 204.01, which restricts the amount of personal property an inmate can keep in their cells to four cubic

feet.  (*Id*. at CM/ECF pp. 58-60; Filing No. 50-4, Attach. 3; Filing No. 50-5, Attach. 4 at CM/ECF p. 1.)  Plaintiffs specifically sought to retain religious materials in their cells beyond the four cubic foot limit.  (Filing No. 59 at CM/ECF pp. 38)  In the alternative, Plaintiffs asked for permission to store personal religious materials in either the "Religious Center or Property Control" and access them daily.  (*Id*.)  Defendants denied Plaintiffs' proposal on November 17, 2008, and informed Rust that the property limits are in place to assure the safe, secure, and efficient management of the facility.  (Filing No. 50-5, Attach. 4.)

Although Plaintiffs would prefer to have unlimited access to personal religious items, they have not shown that the current four cubic foot restriction significantly inhibits or constrains their religious conduct or religious expression, meaningfully curtails their ability to express adherence their faith, or prevents them from engaging in activities that are fundamental to their religion.  In fact, Plaintiffs have not indicated that they need to retain any personal religious items to properly practice their belief.  Even if the court assumes that Plaintiffs do have a need to retain personal religious items in their cells, the current regulation permits Plaintiffs to balance that need with their need for other personal items. If Plaintiffs desire to forego retaining other personal items in favor of religious items, they may do so.  Under these facts, Defendants' failure to grant Plaintiffs a personal religious materials exemption did not impose a substantial burden on Plaintiffs' religious exercise.[15]

---

[15]Moreover, the attachments to Plaintiffs' Complaint indicates that DCS has accommodated Plaintiffs' desire to store property in the Religious Center.  (*See* Filing No. 59 at CM/ECF p. 65 (Unit Staff response, stating that DCS is in the process of making cabinet space available in the Religious Center for Theodish Belief property).)

### 6.   Automated Computer System Grant

Defendants also argue that Plaintiffs have failed to show that Defendants imposed a substantial burden on their religious exercise by refusing to pursue a grant for an automated computer system designed to assist Theodish Belief practitioners with their religious studies.  (Filing No. 59 at CM/ECF pp. 32, 34.)  Again, the court agrees.

Plaintiffs are currently afforded access to the religious library and are permitted to purchase a broad range of Theodish Belief religious materials.  (Filing No. 50-5, Attach. 4 at CM/ECF p. 1.)  Plaintiffs have access to books, videos, audio recordings, written correspondence courses and other religious publications.  (Filing No. 53-8, Attach. 7 at CM/ECF p. 7.)  Plaintiffs have not shown that these available research sources inhibit or constrain their religious conduct or religious expression, meaningfully curtail their ability to express adherence to their faith, or prevent them from engaging in activities that are fundamental to their religion.  Therefore, Plaintiffs have failed to show that Defendants' refusal to pursue a grant for an automated computer system imposed a substantial burden on their religious exercise.

### 7.   Combined Worship Time and Space

Last, Plaintiffs allege that Defendants' decision to schedule a single combined worship time and space for Theodish Belief and Asatru practitioners imposes a substantial burden on Plaintiffs' religious exercise.  (Filing No. 59 at CM/ECF pp. 42-43.)  For the reasons discussed below, the court agrees in part.

 In their Complaint, Plaintiffs detail the fundamental differences between Asatru and Theodish Belief.  These differences include, but are not limited to, the fact that Theodish Belief practitioners worship different gods (Filing No. 59 at CM/ECF p. 17) and follow the

Case: 4:08-cv-03185-LSC-PRSE   Document #: 67   Date Filed: 11/12/09   Page 26 of 32

institution of Sacral Kingship (*id*. at CM/ECF pp. 22-23).  Due to these differences, Plaintiffs argue that the combined worship time and space forces them to "change their sacred worship orthopraxy and violate their beliefs."  (Filing No. 63 at CM/ECF p. 13.)

In contrast, Defendants argue that Theodish and Asatru practitioners can engage in joint worship without violating their religious beliefs.  To support this argument Defendants rely on "The King's Word is Law" tenet of Theodish Belief, which, as discussed above, means that Garman Lord's statements become part of Theodish Belief theology. (Filing No. 47 at CM/ECF p. 16; Filing No. 55-2, Attach. 1 at CM/ECF p. 1.)  Using this tenet, Defendants argue that Plaintiffs can share joint worship time and space with Asatru practitioners because Garman Lord stated that both faiths can "accommodate each other's worship forms."  (Filing No. 47 at CM/ECF pp. 15-16.)  When Garman Lord's statements are read in context, this argument is unpersuasive.  Garman Lord specifically stated that "although it is conceivable that Theodism and Asatru could theoretically find ways to accommodate each other's worship forms . . . there are nonetheless practical obstacles to that reliably happening in the specialized environment of a prison setting . . . ."  (Filing No. 55-2, Attach. 1 at CM/ECF p. 4.)  He also indicates that Asatru and Theodish Belief practitioners cannot "reasonably be expected to get along without strife, because . . . they are two radically different religions."  (Filing No. 49-4, Attach. 3 at CM/ECF p. 5.)

Defendants do not rely only on the "King's Word is Law" tenet; they also point to several cases in an effort to demonstrate that joint worship time and space does not impose a substantial burden on Plaintiffs' religious exercise.  (Filing No. 47 at CM/ECF pp. 14-15.)  However, in each of these cases the court found that the plaintiffs had not pointed to an aspect of the joint service that was inconsistent with their religion.  *See Izquierdo v.*

26

*Crawford*, No. 1:05CV192 CDP, 2007 WL 2873210, at *5 (E.D. Mo. Sept. 26, 2007) (holding that a prison policy that required joint service for all Muslims did not violate RLUIPA where the plaintiff had not presented any evidence to indicate that joint worship contradicted the central tenets of his faith); *Harris v. Moore,* No. 2:04CV00073 ERW, 2007 WL 4380277, at *9-11 (E.D. Mo. Dec. 13, 2007) (holding that a prison policy that restricted weekly religious service attendance did not violate RLUIPA where the plaintiff neither alleged nor demonstrated that the restriction forced him to act in a way that violated his sincerely held religious beliefs).

The Eighth Circuit has held that a substantial burden to religious exercise may exist "when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own." *Weir v. Nix*, 114 F.3d 817, 821 (8th Cir. 1997) (citing *SapaNajin v. Gunter*, 857 F.2d 463, 464 (8th Cir. 1988)).  Here, Plaintiffs have alleged that the combined worship time forces them "to worship under the guidance of Asatru," "change their sacred worship orthopraxy[,] and violate their beliefs." (Filing No. 59 at CM/ECF p. 42; Filing No. 63 at CM/ECF p. 13.)  In addition, the evidence indicates Theodish Belief and Asatru practitioners cannot get along without strife because they are two radically different religions that worship separate gods and have different beliefs about sacral kingship.  Accordingly, Plaintiffs have shown that the combined worship time imposes a substantial burden upon their religious exercise.

Although a combined worship time imposes a substantial burden on Plaintiffs' religious exercise, a combined worship space does not.  Garman Lord has stated that Theodish Belief and Asatru can "be practiced together on the same ground" with some "adjustments."  (Filing No. 48-14, Attach. 13 at CM/ECF pp. 1-2.)  Plaintiffs have not

alleged nor demonstrated that they cannot adjust their practice to worship in the same space as the Asatru.  In fact, the record suggests that Plaintiffs have already adjusted their practice to accommodate worship on shared land.  When Rust originally submitted his Proposal, Donner noted that the Theodish Belief practitioners did not need their own sacred land because Rust and his "theod" had already been practicing their "rites" on land shared with the Asatru.  (Filing No. 48-4, Attach. 3.)  In light of these facts, the court concludes that Plaintiffs have failed to show that a combined worship space imposes a substantial burden on their religious exercise.

In sum, Plaintiffs have not shown that a combined worship *space* for Theodish Belief and Asatru practitioners imposes a substantial burden on their religious exercise.  However, Plaintiffs have shown that a combined worship *time* imposes a substantial burden on Plaintiffs' religious exercise.

### E.    Compelling Government Interest

As discussed above, Plaintiffs have established that Defendants' practice of scheduling a combined worship time for Theodish Belief and Asatru practitioners imposes a substantial burden on their religious exercise.  However, they have failed to meet the substantial burden requirement for their other claims.  Thus, the court will now address whether Defendants' practice of scheduling a combined worship time for Theodish Belief and Asatru practitioners is in furtherance of a compelling governmental interest and whether it is the least restrictive means available.

Defendants argue that scheduling a joint worship time is in furtherance of three compelling government interests: safety and security, budget restrictions, and staffing limitations.  (Filing No. 47 at CM/ECF pp. 23-25.)  However, the record before the court

28

with respect to the compelling interest issue is ambiguous as to these claims.  Therefore,

on its own motion, the court will permit Defendants 30 days to supplement the record with

evidence to clarify the compelling interest issue.  Plaintiffs shall have 30 days to respond.

Any supplemental briefs and evidence shall address the following:

1.     The number of Theodish practitioners at NSP.
2.     The number of Asatru practitioners at NSP.
3.     The number of Native American practitioners at NSP.[16]
4.     The number of Native Americans that the sweat lodge holds.
5.     The costs associated with scheduling a separate worship time for Asatru and Theodish Belief practitioners.
6.     The staff increase associated with scheduling a separate worship time for Asatru and Theodish Belief practitioners.
7.     The safety and security issues associated with scheduling a separate worship time for Asatru and Theodish Belief practitioners.

**F.     Plaintiffs' First Amendment Claims**

Where an inmate has not set forth sufficient evidence to demonstrate a substantial

burden on his religious exercise under RLUIPA, his claim also fails under the Free Exercise

Clause of the First Amendment.  *See Patel*, 515 F.3d at 813. Thus, for the reasons stated

above, Defendants are entitled to summary judgment on Plaintiffs' First Amendment claims

for failure to approve organic food, mead and devotional items for Theodish Belief worship,

exempt Theodish Belief practitioners from room restriction, prevent Theodish Belief

practitioners from hearing the religious messages of other faith groups, grant Theodish

Belief practitioners early line status, permit Theodish Belief practitioners to retain personal

religious materials beyond the prison's four cubic feet allotment, and pursue a grant for an

---

[16]Defendants argue that scheduling a combined worship time for religious land use is consistent with the way DCS manages time and space for other faiths.  (Filing No. 47 at CM/ECF p. 23.)  Native Americans are the only other faith group that uses religious land at NSP.  (Filing No. 53-3, Attach. 2 at CM/ECF p.1.)

automated computer system designed to assist Theodish Belief practitioners in researching their beliefs.

Because the court is permitting the parties an opportunity to supplement the record with evidence to clarify the combined worship time issue, the court will also permit the parties an opportunity to supplement the record regarding Plaintiffs' combined worship time First Amendment claims.

### PLAINTIFFS' MOTION TO COMPEL

Also pending before the court is Plaintiffs' Motion to Compel. (Filing No. 56.) Many of the documents that Plaintiffs request in this Motion have been delivered. (Filing No. 57.) However, in an Affidavit filed on July 6, 2009, Plaintiffs allege that Defendants have still failed respond to "questions #1, #12, and #13 of [their] First Request for the Production of Documents." (Filing No. 62 at CM/ECF p. 3.) These questions relate to Defendants' institutional process for approving Theodish Belief as a recognized faith and Defendants' decision to combine use a combined worship space for both Asatru and Theodish Belief practitioners. Because the only remaining issue before the court is whether Defendants violated RLUIPA and the First Amendment by scheduling a combined worship time for Theodish Belief and Asatru practitioners, Plaintiffs' Motion to Compel is moot. However, the court notes that Plaintiffs also request a copy of Mr. J. Dirk Reeks' deposition transcript. (*Id*. at CM/ECF pp. 3-4.) Although this request was not part of Plaintiffs' Motion to Compel, Defendants shall provide a copy of Mr. Reeks' deposition transcript to Plaintiffs at Plaintiffs' cost.

IT IS THEREFORE ORDERED that:

1.      Plaintiffs' Motion to Extend (Filing No. 61) is granted and Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment is deemed timely filed;

2.      Plaintiffs' official capacity claims for monetary relief against Defendants Houston, Hopkins, Wayne, Blum, Baldassano, Marsh and Davis are dismissed without prejudice;

3.      Plaintiffs' Motion to Compel (Filing No. 56) is denied as moot;

4.      Defendants shall provide Plaintiffs with a copy of Mr. J. Dirk Reeks' deposition transcript at Plaintiffs' cost;

5.      Defendants' Motion for Summary Judgment (Filing No. 46) is granted in part. Plaintiffs' RLUIPA and First Amendment claims for Defendants' failure to approve organic food, mead and devotional items for Theodish Belief worship, prevent Theodish Belief practitioners from hearing the religious messages of other faith groups, grant Theodish Belief practitioners early line status, permit Theodish Belief practitioners to retain personal religious materials beyond the prison's four cubic feet allotment, and pursue a grant for an automated computer system designed to assist Theodish Belief practitioners in researching their beliefs are dismissed with prejudice. Plaintiffs' RLUIPA and First Amendment claims for Defendants' failure to exempt Theodish Belief practitioners from room restriction are dismissed without prejudice;

6.      Defendants shall have until December 15, 2009, to supplement the record in accordance with this Memorandum and Order and the court's local rules with evidence to clarify the record regarding Plaintiffs' RLUIPA and First Amendment claims for Defendants' failure to provide Plaintiffs with a separate worship time.  Plaintiffs may respond no later than January 19, 2010;

7.      If Defendants fail to supplement the record in accordance with this Memorandum and Order and the court's local rules by December 15, 2009, the court will enter a progression order scheduling this case for trial;

8.      The final pretrial conference scheduled for November 19, 2009, is cancelled. The final pretrial conference will be rescheduled after the resolution of the compelling interest issue, if necessary; and

9.      The Clerk of the court is directed to set a pro se case management deadline in this case with the following text: January 19, 2010: check for Plaintiffs' reply brief.

DATED this 12th day of November, 2009.

                              BY THE COURT:


                              s/Laurie Smith Camp
                              United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.